# APPENDIX TO MEMORANDUM OF LAW

## UNPUBLISHED DECISIONS
## OF THE NEW YORK STATE ATTORNEY
## GENERAL REFERENCED IN FOOTNOTE 9

ATTORNEY GENERAL OF THE STATE OF NEW YORK
REAL ESTATE FINANCE BUREAU

------------------------------------------------------------X

In the Matter of

                                                                      No. DIS 09/0275

SAPPHIRE INVESTMENT VENTURES, LLC and
RUBY INVESTMENT VENTURES, INC.
(Purchasers)


        and


MARK HOTEL SPONSOR LLC
(Seller)

------------------------------------------------------------X

## DETERMINATION OF THE
## DISPOSITION OF DOWN PAYMENT

ANDREW M. CUOMO, Attorney General of the State of New York, having reviewed the June 10, 2009 application of SAPPHIRE INVESTMENT VENTURES, LLC and RUBY INVESTMENT VENTURES, INC. (collectively, "Purchasers") (the "Application") for a determination on the disposition of a down payment made pursuant to a separate purchase agreement dated April 4, 2008 (the "Agreement") entered into with MARK HOTEL SPONSOR LLC (the "Seller") for the sale to Purchasers of the shares allocated to Suite 1501 (the "Suite") at The Mark Hotel, 25 East 77th Street, New York, New York (the "Cooperative"), hereby finds in favor of the Seller for the forfeiture of the Purchasers' down payments tendered pursuant to the Agreement.

## STATUTORY AND REGULATORY AUTHORITY

Pursuant to his authority under Article 23-A of the General Business Law ("GBL"), the Attorney General promulgated regulations governing newly constructed and vacant cooperatives. 13 NYCRR Part 21. The specific regulations relating to purchaser's down payments, 13 NYCRR § 21.3(l)(3), requires sponsors to state in all offering plans that funds held pursuant to GBL Section

1

352-e(2-b) and GBL Section 352-h will be held in escrow accounts in conformity with this regulation. In the event of a dispute between a sponsor and a purchaser concerning the purchaser's request for the return of his or her down payment, a sponsor shall apply, and the purchaser or escrow agent may apply, to the Attorney General for a determination regarding this dispute, 13 NYCRR 21.3(l)(3)(vii-viii).

## RELEVANT BACKGROUND

**The Agreement**

1.      On April 4, 2008, Purchasers entered into the Agreement to purchase the Unit in the Cooperative from Seller. Copies of the Agreement can be found at Exhibit A to the Application and Exhibit C to Seller's July 23, 2009 response to the Application (the "Response").

2.      Purchasers made an Initial Deposit of $2,362,500.00 and an Additional Deposit of $1,575,000.00 pursuant to the Agreement (the terms Initial Deposit and Additional Deposit are defined in Agreement at 1 ¶ 3).

3.      Purchasers made both the Initial Deposit and Additional Deposits, which are collectively referenced in this Determination as the "Deposit," which totals $3,957,000.00.

4.      The Deposit is held in the Kramer Levin Naftalis & Frankel, LLP Escrow Account at Citibank, N.A., Account No. 95355153. Application at 2.

**The Closing Notices And Dates**

5.      By letter dated February 26, 2009 (Response Exh. D), Seller wrote to Purchasers, notifying Purchasers that Seller had scheduled the closings of title for the Suites for March 31, 2009.

6.     By letter dated March 24, 2009, Seller rescheduled the closing to April 7, 2009. By subsequent letters dated April 1, 2009, Seller rescheduled the closings to April 14, 2009. Response Exh. E.

7.     By letter dated April 9, 2009, Seller adjourned the closing again until April 17, 2009. Id.

8.     Thereafter, the parties entered into a lengthy back-and-forth about the pre-closing inspection of the Unit. Response Exhs. F-G; Application Exhs. H-L. As explained below, the Attorney General need not make any factual findings concerning the parties' competing claims as to the scheduling of the walk-through to issue this Determination.

9.     By letter dated April 23, 2009, Seller informed Purchasers that they were in default for failing to close on April 16, 2009 (even though the noticed closing date was April 17, 2009). Response Exh. H. Nevertheless, Seller agreed in the same letter to adjourn the closing to April 27, 2009.

10.    Purchasers did not close on April 27, 2009, which is understandable given that they had requested to schedule an inspection date of April 29, 2009 before Seller purported to set April 27, 2009 as the new closing date. In any event, Seller issued a notice to cure on April 28, 2009, giving Purchasers until May 29, 2009 to cure their default by closing. Response Exh. J. Seller further wrote that "TIME IS OF THE ESSENCE with respect to your obligation to cure your default on or before" May 29, 2009.

11.    By email dated April 28, 2009 (the same date as the notice to cure), Seller agreed to allow Purchasers' designated representative to inspect the Suite the following day. Application Exh.

M. The inspection occurred as scheduled, as evidenced by Purchasers' signed punch list. Response Exh. K.

12.      Seller provided Purchasers with an updated closing statement on May 28, 2009. In response, Purchasers' attorney wrote: "Please note that my clients will not be ready to consummate this transaction on 5/29. Jonathan Cantor [attorney for Seller] is aware."

13.      Purchasers did not close on or before May 29, 2009, so by letter dated June 1, 2009, Seller wrote to Purchasers informing them that Seller had elected to terminate the Agreement and retain the Deposit. Response Exh. N.

## DISCUSSION

14.      The Attorney General finds in favor of the Seller for the following reasons:*

### Seller Failed To Disclose Additional Financing

15.      Purchasers contend that Seller's failure to update the Offering Plan to disclose additional mortgage loan(s) it (or a related entity) obtained that encumbers the land on which the Cooperative is situated in April 2009 was a material omission and should have given rise to a right of rescission. In response, Seller asserts, and Purchasers do not dispute, that all loans and mortgages of Seller and its affiliates are "subordinate to the rights of the Cooperative and each and every proprietary lease holder to remain undisturbed at the Property. Response at 7. Consequently, Seller's obtaining of additional financing would not, even if included in an amendment submitted to and accepted for filing by the Attorney General, be "a substantial amendment to the offering plan that adversely affects the purchasers." 13 NYCRR § 18.5(a).

---

* The headings that follow track Purchasers' contentions.

16.      The fact that Seller disclosed construction financing in the Offering Plan does not, contrary to Purchasers' contention, mean that every change to the structure or amount of that financing requires an amendment, let alone that such amendments would have to offer rescission. Nor does Purchasers' speculative claim that the potential for additional liens on the building change this result.

**Small Number Of Sales**

17.      Purchasers seem to claim that they are entitled to rescind because only seven of the 42 suites have been sold. To the extent they claim this, they are wrong: Seller disclosed that it had reserved the right to rent rather than sell suites (Offering Plan, Cover Page) and disclosed as a special risk that issues may arise where less than half the shares are sold. Offering Plan, Special Risk 10, at x-xi.

**Hotel Not Open**

18.      Purchasers suggest that the fact that the hotel has not opened also gives them the right to refuse to close. No provision of the Agreement or Offering Plan supports this contention. Rather, the Offering Plan states that "[d]uring at least the First Year of Operation, construction" by the Sponsor and the "Hotel Owner" may be ongoing.

**Scheduling Of Inspection**

19.      The Attorney General need not wade into the thicket of competing claims concerning the scheduling and number of attendees at the pre-closing inspection because the evidence submitted by both parties makes clear that the inspection did occur on April 29, 2009, Purchaser prepared its punch-list (Response Exh. K) and inspector's report (Application Exh. N), both of which identify what appear to be typical punch-list items to be remedied, and Purchaser had 30 days after the

5

inspection to close. Nor have Purchasers identified any prejudice to them arising from any delay in access to the Units. Absent a showing of significant prejudice, the Attorney General cannot conclude that any putative breach of the Agreement as to the alleged denial of access was material.

## Alleged Expiration Of The Offering Plan

20.     Purchasers allege that the Offering Plan expired on January 11, 2009, because the amendments the Attorney General accepted for filing do not state that they extend the terms of the Offering Plan. However, as Purchasers concede, the Attorney General in fact extended the term of the Offering Plan in its letters accepting the amendments for filing. Purchasers allege that the Attorney General acted "improperly" in granting such extensions. However, the extensions in question were granted on June 6, 2008, October 31, 2008, and April 15, 2009. Purchasers time to challenge the Attorney General's determinations to grant such extensions ran out on (respectively), October 6, 2008, March 3, 2009, and August 15, 2009. CPLR 217, 7803, 7804; see Academy Street Assocs. v. Spitzer, 44 A.D.3d 592, 845 N.Y.S.2d 237 (1st Dep't 2007).

21.     The Attorney General has considered Purchasers' remaining contentions, most of which are relegated to a single footnote (footnote 22) in the Application, and finds them to lack merit.

## DETERMINATION

For the foregoing reasons, the Attorney General finds in favor of the Seller and directs the

escrow agent to release to Seller the $2,593,750 Deposit of Purchasers, plus any accrued interest,

within thirty days of receipt of this determination.

Dated: New York, New York
     January 15, 2010

                                    ANDREW M. CUOMO
                                    Attorney General of the
                                    State of New York
                                    By:

                                    LEWIS A. POLISHOOK
                                    Assistant Attorney General
                                    Real Estate Finance Bureau

TO:    David A. Pellegrino, Esq.
        TANNENBAUM HELPERN SYRACUSE & HIRSCHTRITT LLP
        Attorneys for Purchasers
        900 Third Avenue
        New York, New York 10022
        (212) 508-6700

        Jonathan Canter, Esq.
        KRAMER LEVIN NAFTALIS & FRANKEL LLP
        Attorneys for Seller
        1177 Avenue of the Americas
        New York, New York 10036-2714
        (212) 715-9250

        904 TOWER APARTMENT LLC
        MADISON APARTMENT 905 LLC
        c/o Sol M. Israel, Esq.
        185 Madison Avenue, 8th Floor
        New York, New York 10016
        (212) 481-9777

ATTORNEY GENERAL OF THE STATE OF NEW YORK
REAL ESTATE FINANCE BUREAU

-----------------------------------------------------------------X

In the Matter of

904 TOWER APARTMENT LLC and MADISON
APARTMENT 905 LLC
(Purchasers)

    and

MARK HOTEL SPONSOR LLC
(Seller)

-----------------------------------------------------------------X

No. DIS 09/0259

## DETERMINATION OF THE
## DISPOSITION OF DOWN PAYMENT

ANDREW M. CUOMO, Attorney General of the State of New York, having reviewed the

May 27, 2009 application of 904 TOWER APARTMENT LLC ("904 LLC") and MADISON

APARTMENT 905 LLC ("905 LLC") (collectively, "Purchasers") (the "Application") for a

determination on the disposition of a down payment made pursuant to two separate purchase

agreements dated January 31, 2008 (collectively, the "Agreements") entered into with MARK

HOTEL SPONSOR LLC (the "Seller") for the sale to Purchasers of the shares allocated to Suites 904

and 905 (the "Suites") at The Mark Hotel, 25 East 77th Street, New York, New York (the

"Cooperative"), hereby finds in favor of the Seller for the forfeiture of the Purchasers' down

payments tendered pursuant to the Agreements.

### STATUTORY AND REGULATORY AUTHORITY

Pursuant to his authority under Article 23-A of the General Business Law ("GBL"), the

Attorney General promulgated regulations governing newly constructed and vacant cooperatives. 13

NYCRR Part 21. The specific regulations relating to purchaser's down payments, 13 NYCRR §

1

21.3(l)(3), requires sponsors to state in all offering plans that funds held pursuant to GBL Section 352-e(2-b) and GBL Section 352-h will be held in escrow accounts in conformity with this regulation. In the event of a dispute between a sponsor and a purchaser concerning the purchaser's request for the return of his or her down payment, a sponsor shall apply, and the purchaser or escrow agent may apply, to the Attorney General for a determination regarding this dispute, 13 NYCRR 21.3(l)(3)(vii-viii).

## **RELEVANT BACKGROUND**

### **The Agreements**

1.      On January 31, 2008, 904 LLC entered into an agreement for the purchase of Suite 904 in the Cooperative (the "904 Agreement") and 905 LLC entered into an agreement for the purchase of Suite 905 (the "905 Agreement"). Copies of each of the Agreements can be found at Exhibits A-B to Seller's July 6, 2009 response to the Application (the "Response"); copies are also annexed to the Application.

2.      Sol Israel is the "Authorized Manager" of both LLCs. Response Exhs. A-B at 18. He is or was counsel to the principals of the LLCs, which appear to be entities "controlled by Richard Samuel Elman and/ or his wife, Susan Elman Lim Soon Jong." Response Exhs. A-B, Agreement Rider 1 at 1; Response at 4 ¶ 9.

3.      Each Purchaser made an Initial Deposit and an Additional Deposit pursuant to the Agreements (the terms Initial Deposit and Additional Deposit are defined in the Agreements, Response Exhs. A-B at 1 ¶ 3).

2

4.     Purchasers made the Initial Deposits on February 4, 2008, and made the Additional Deposits on June 3, 2008.  Application at 3.  The Initial Deposits were $1,267,500 (Suite 904) and $288,750 (Suite 905); the Additional Deposits were $845,000 (Suite 904) and $192,500 (Suite 905).

5.     The Initial and Additional Deposits are referenced in this Determination as the "Deposit," and total $2,593,750.  Application at 3.

6.     The Deposit is held in the Kramer Levin Naftalis & Frankel, LLP Escrow Account at Citibank, N.A., Account No. 95355153.  Application at 2.

**The Closing Notices And Dates**

7.     By letters dated February 26, 2009 (Response Exh. D), Seller wrote to Purchasers, notifying Purchasers that Seller had scheduled the closings of title for the Suites for March 31, 2009.

8.     By letters dated March 27, 2009, Seller rescheduled the closings to April 8, 2009.  By subsequent letters dated April 2, 2009, Seller rescheduled the closings to April 16, 2009.  Response Exh. E.

9.     Purchasers performed a pre-closing inspection of the Suites and prepared punch lists on April 15, 2009.  Response Exh. U.

10.    At the request of the Office of the Attorney General (the "OAG"), by letters dated April 15, 2009, Seller adjourned the closings of title for the Suites to April 23, 2009.  Response Exh. G.

11.    By letters dated April 20, 2009, Purchasers purported to exercise their right under Agreement Rider No. 1 to adjourn the closings to May 1, 2009.  Response Exh. K; see id. Exhs. A-B, Rider No. 1.

3

12.     By email dated April 17, 2009, Seller rejected the purported adjournment, and responded that unless Purchasers' withdrew their purported adjournment of the closing Seller would reschedule the closing date for April 20, 2009. Response Exh. J.

13.     In response, on April 20, 2009, Purchasers again purported to adjourn the closing until May 1, 2009. Response Exh. K.

14.     Sponsor again rejected the purported adjournment and again purported to rescind its adjournment of the closing date from April 16, 2009 to April 23, 2009. Response Exh. L.

15.     By letters dated April 23, 2009, Seller put Purchasers on notice that they were in default under the Agreements and gave them until May 27, 2009, to cure the default, further stating that "TIME IS OF THE ESSENCE with respect to your obligation to cure your default." Response Exh. M. In those letters, Seller again reiterates its position that it validly withdrew its adjournment of the closing date to April 23, 2009, but apparently did not hold Purchasers in default until that date arrived. See id. at 2; accord Response at 8.

16.     Purchasers again failed to close, so by letters dated May 28, 2009, Seller wrote to Purchasers informing them that Seller had elected to terminate the Agreements and retain the Deposit. Response Exh. O.

4

## DISCUSSION

17.    The Attorney General finds in favor of the Seller for the following reasons:

**Seller Failed To Disclose Additional Financing\***

18.    Purchasers contend that Seller's failure to update the Offering Plan to disclose additional financing it (or a related entity) took out in April 2009 was a material omission and should have given rise to a right of rescission.  In response, Seller asserts, and Purchasers do not dispute, that these loans are "subordinate to the rights of the Cooperative and each and every proprietary lease holder to remain, undisturbed, at the Property [Co-Tenancy and Reciprocal Operating Agreement] and each and every Proprietary Lease' entered into by the Cooperative.".  Response at 7. Consequently, Seller's obtaining of additional financing would not, even if included in an amendment submitted to and accepted for filing by the Attorney General, be "a substantial amendment to the offering plan that adversely affects the purchasers."  13 NYCRR § 18.5(a). Purchasers' further claim that the subordination of the mortgages is irrelevant because of "the additional liens on the building" does not change this result, and is in any event speculative.

**Seller's Alleged Inability To Close On April 23, 2009**

19.    Purchasers advance various contentions allegedly showing that Seller could not have closed on April 16, 2009, the date noticed.  As noted above, given the back-and-forth between the parties it is unclear whether the closing date was in fact April 16, April 20, April 23, or May 1. Regardless, the Attorney General reviews each of those contentions below:

---

\* The headings that follow track Purchasers' contentions.

**Zoning**

20.     Purchasers allege that Seller did not at the time of closing have the requisite approval
from the New York City Department of Buildings allowing use of the Suites for purposes other than
as a "transient hotel."   Application, Attachment at 7.   Purchasers acknowledge that Seller had
obtained DOB approval for use of 30 percent of the building's units and 33 percent of the building's
square footage as unlimited stay units, but note that the total square footage of the Suites offered for
sale pursuant to the Offering Plan exceeded 33 percent. Thus, riders to the Agreements contained the
following provision:

> At or prior to closing, both Suites shall be included within those
> portions of the building which may, pursuant to the December 19,
> 2007 reconfirmation letter signed by the New York City Department
> of Buildings (the "DOB Letter"), be occupied without limitation as to
> the length of stay, as shall be set forth in a written designation to such
> effect by Sponsor or a further writing from the Department of
> Buildings."

Agreements, Rider 1 at 2.

21.     Purchasers allege that Seller could not have issued its designation in time for closing
because on April 15, 2009 the DOB disapproved Seller's filing "to identify class B units approved
for unlimited stay."   Application Exh. J.

22.     This contention is meritless for two reasons.   First, the Riders to the Agreements
merely require Seller to provide a designation "[a]t or prior to closing" (emphasis added).   Had
Purchasers attended a closing and had Sellers failed to provide the requisite written designation,
Purchasers might well have been within their rights to refuse to close (although Seller may well have
still had an opportunity to cure).   However, Purchasers did not show up for a closing at any of the
possible closing dates or attempt to schedule a closing at a later date.   Consequently, they cannot rely

on speculation as to what documentation might or might not have been provided at a closing that did not occur because they would not attend it.

23.    Second, the Riders do not specify the form of "written designation" that is required. Purchasers implicitly contend that the "written designation" must be provided pursuant to an application approved by the New York City Department of Buildings (the "DOB") but the text of the Riders does not support such a contention. Rather, the Riders contemplate, in the disjunctive, either "a written designation to such effect by Sponsor or a further writing from the Department of Buildings." Agreements, Riders 1 at 2 (emphasis added). Thus, according to the terms of the Riders and the similar language in the First Amendment to the Offering Plan, it seems that Seller could make the requisite "written designation" without DOB approval.

24.    Finally, the Attorney General notes that Seller has submitted documentation from the DOB indicating that the zoning designation was approved on May 6, 2009. Although Seller obtained this approval after it sent its default notice, the approval occurred during the cure period. Thus, had Purchasers actually wished to close with DOB-approved designations in place they could have done so.

### Proprietary Lease

25.    Purchasers also contend that closing could not have occurred on April 16, 2009 because Seller did not complete the cooperative conversion until April 17, 2009. Seller responds that had Purchasers appeared for closing on April 16, 2009, Seller would have arranged to complete the cooperative conversion simultaneously. Purchasers' contention in this regard is utterly lacking in merit because they did not show up for any closing on April 16, 2009, nor did they show up for any

7

closing after the cooperative conversion occurred. Given the foregoing, Purchasers are not entitled

to rescission because paperwork was not completed in time for a closing they did not attend.

### No Heat And Hot Water

26.　Seller apparently concedes that there was no heat and hot water at the time of the pre-

closing inspection. If Seller could not remedy this defect, the absence of heat and hot water would

obviously be material. However, Purchasers' Inspection Statement (Application Exh. Q; Response

Exh. U) does not list the absence of heat or hot water as defects, but, rather, mentions only that

"heating/ AC not tested during inspection."

27.　Additionally, the Offering Plan defines construction defects and purports to give

Seller the unconditional right to cure such defects as Purchasers' remedy, at least in the first instance.

Offering Plan at 92, 118-19. Where this is so, Purchasers cannot rely on any such alleged defects as

a basis for rescission if they have not given Seller notice and an opportunity to cure such defects.

28.　Seller's submission of letter from a licensed mechanical engineer confirming that the

heat and hot water were operational on May 12, 2009 (Response Exh. V), provides some evidence

that Seller could have (and in fact did) correct this alleged defect once it was brought to its attention.

That precludes reliance on such a defect as a basis for rescission.

### Alleged Poor Construction

29.　Purchasers allege that, notwithstanding the issuance of a temporary certificate of

occupancy for the Suites, they "would not be able to move into them for many weeks, if not months."

The sole "evidence" cited for this claim is the Purchasers' extensive punch lists for the Suites

(Application Exh. Q; Response Exh. U). The identified defects in fact appear to be in the nature of

what are typically regarded as punch-list items that a Seller may remedy after closing. Offering Plan

at 94; <u>see</u> Agreements § 16.3. As such, they do not give Purchasers the right to terminate the
Agreements and demand rescission.

### Small Number Of Sales

30.     Purchasers seem to claim that they are entitled to rescind because only seven of the
42 suites have been sold, rendering the Cooperative "empty and hazardous." To the extent they
claim this, they are wrong: Seller disclosed that it had reserved the right to rent rather than sell
Suites (Offering Plan, Cover Page) and disclosed as a special risk that issues may arise in connection
with obtaining financing where less than half the shares are sold. Offering Plan, Special Risk 10, at
x-xi.

31.     Purchasers allege in conclusory fashion that other "hazardous" conditions existed.
However, they have not even attempted to substantiate such allegations. The sole support they have
adduced for such claims is a a letter submitted to the Attorney General by counsel for a purchaser of a
different suite in the Cooperative in connection with an escrow trust fund dispute application that the
Attorney General closed without issuing a determination after the applicant opted to file suit against
Seller in court. The Attorney General will not consider that letter here.

### Alleged Limitations On Access At Walk-Through

32.     Purchasers allege that Seller improperly limited the scope of the pre-closing walk-
through and the number of participants in that walk-through. The right to perform a walk-through is
provided by Agreements § 17, which provides, under the heading "**Inspection of Suite**," that, upon
Purchasers' receipt of notification:

> that the Suite is ready for inspection, . . . Purchaser shall promptly
> arrange an appointment with Sponsor's representative to inspect the
> Suite within the week prior to the Closing Date. Purchaser or his or

her duly authorized agent shall attend such inspection, shall carefully
inspect the suite, and shall complete, date, and sign the Inspection
Statement (in the form set forth as Schedule B to this Agreement) and
deliver same to Sponsor's representative at the conclusion of the
inspection.

33.     This provision can be read, as Seller suggests, to permit only an authorized "agent,"

not multiple representatives, to attend an inspection. It also authorizes an inspection of the Suites,

not the entire building.

34.     However, the Attorney General need not go that far in rejecting Purchasers'

contention. Purchasers have not identified any prejudice to them arising from denial of access to

three unspecified individuals. Moreover, Purchasers have provided information concerning the

"punch-list" defects and other alleged deficiencies in connection with the Application, undercutting

any claim of prejudice resulting from Seller's alleged denial of access. Absent a showing of

significant prejudice, the Attorney General cannot conclude that any putative breach of the

Agreement as to the alleged denial of access was material.

**Elevator Service**

35.     Purchasers contend that elevator service was inadequate because the only elevator

operational was not yet designated exclusively for residential use. As Seller correctly points out, the

Offering Plan promised at least one elevator serving each floor only "after the First Closing, subject

to Hotel occupancy, industry practices and other similar factors." Offering Plan § C.5 at 20.

However, the Offering Plan further discloses that because of ongoing construction "[e]levators . . .

may be taken out of service and diverted to facilitate construction." Id. Moreover, one of the three

elevators had passed inspection as of January 13, 2009. Response Exh. W.

10

36.    Given the foregoing, the Attorney General cannot credit Purchasers' conclusory assertion as to lack of elevator service.

37.    In any event, there is no evidence that Purchasers brought this condition to Seller's attention at the time of the walkthrough and gave Seller an opportunity to cure the alleged defect. It appears that Seller would have been able to effect such cure if a defect existed, as two other elevators passed inspection shortly after the pre-closing inspection, on April 27 and 30, 2009. Response Exh. W.

**Lobby Incomplete**

38.    The Agreements make clear that not all amenities would be ready at the time of closing of title to the Suite. Agreements § 16.3 at 4 (Seller may require to close once it obtains a temporary certificate of occupancy for the Suite notwithstanding "the incomplete construction and/or decoration of any portion of the Building not preventing Purchaser's occupancy of the Suite"). The Offering Plan includes similar disclosures.

a.    "construction in general is a complicated process which requires the coordination of numerous concurrent tasks, contractors and suppliers and the balancing of complex mechanical and architectural systems, all of which is subject to unanticipated delays and difficulties" (Offering Plan at 20);

b.    "for a period of time following the First Closing (through, including and beyond the closing of title to any particular Purchaser's Suite), work should be expected to be undertaken and continue" (id.);

c.    "Sponsor may not fully complete the decoration or finishing of the lobby, fitness center, corridors, elevator finishes and other portions of the Building . . . until that particular floor is

11

fully occupied or, if additional construction within an area within the Building is anticipated, for some period thereafter" (id.);

d. "Certain portions of the common areas may be completed before or after completion of any particular Purchaser's Suite. As a result, certain amenities and benefits anticipated to be available to Suite Owners may not be available until such other portions of the Building are completed and fully operational. Neither Sponsor nor the Hotel Owner (or Hotel Operator) will have any liability whatsoever in the event these services are delayed, not made available, or discontinued or disrupted."

39. Thus, Purchasers cannot rescind the Agreements based on the fact that the lobby was incomplete at the time noticed for closing.

**Alleged Expiration Of The Offering Plan**

40. Purchasers allege that the Offering Plan expired on January 11, 2009, because the amendments the Attorney General accepted for filing do not state that they extend the terms of the Offering Plan. However, as Purchasers concede, the Attorney General in fact extended the term of the Offering Plan in its letters accepting the amendments for filing. Purchasers allege that the Attorney General acted "improperly" in granting such extensions. However, the extensions in question were granted on June 6, 2008, October 31, 2008, and April 15, 2009. Purchasers time to challenge the Attorney General's determinations to grant such extensions ran out on (respectively), October 6, 2008, March 3, 2009, and August 15, 2009. CPLR 217, 7803, 7804; see Academy Street Assocs. v. Spitzer, 44 A.D.3d 592, 845 N.Y.S.2d 237 (1st Dep't 2007).

## Alleged Failure To Provide Reasonable Notice Of Closing Dates

41.    The Attorney General need not wade into the morass of competing claims as to the closing date and its adjournments. The reason is simple: Seller gave Purchasers more than 30 days' notice to cure, making time of the essence, in Seller's April 23. 2009 letters. That gave Purchasers more than adequate time to schedule a closing. Purchasers chose not to do so. For that reason, any contention that any of the April closing notices and Seller's effort to advance the closing date to a date that had passed—an effort that Seller apparently abandoned—are irrelevant.*

## Alleged Failure To Provide "Adequate Assurances"

42.    The Attorney General need not consider whether the doctrine of adequate assurances applies to sales such as this one or whether a purchaser can, by demanding "adequate assurances," effectively require a sponsor to provide disclosures that the Attorney General has not required. In this case, as Seller points out and Purchasers do not dispute, Purchasers made no demand for "adequate assurances" before they failed to close. Having failed to request adequate assurances, Purchasers cannot be heard to seek rescission when such assurances were purportedly not forthcoming.

43.    The Attorney General has considered Purchasers' remaining contentions and finds them to lack merit.

_____

* For the same reason, the Attorney General need not consider the parties' competing claims as to the reasons the Office of the Attorney General asked Seller to adjourn the closing to April 23, 2009.

## DETERMINATION

For the foregoing reasons, the Attorney General finds in favor of the Seller and directs the escrow agent to release to Seller the $3,957,000.00 Deposit of Purchasers, plus any accrued interest, within thirty days of receipt of this determination.

Dated: New York, New York
      January 15, 2010

                              ANDREW M. CUOMO
                              Attorney General of the
                              State of New York
                              By:

                              LEWIS A. POLISHOOK
                              Assistant Attorney General
                              Real Estate Finance Bureau

TO:     David A. Pellegrino, Esq.
         TANNENBAUM HELPERN SYRACUSE & HIRSCHTRITT LLP
         Attorneys for Purchasers
         900 Third Avenue
         New York, New York  10022
         (212) 508-6700

         Jonathan Canter, Esq.
         KRAMER LEVIN NAFTALIS & FRANKEL LLP
         Attorneys for Seller
         1177 Avenue of the Americas
         New York, New York  10036-2714
         (212) 715-9250

         FELIX NIHAMIN & ASSOCIATES, P.C.
         65 West 36th Street, Ninth Floor
         New York, New York  10018
         (212) 502-4868