C6iQcam1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------x

3    ROBERTA CAMPBELL,

4                    Plaintiff,

5              v.                              09 Civ. 9644 (WHP)

6    MARK HOTEL SPONSOR, LLC,

7                    Defendant.

8    -------------------------------x

9                                             June 18, 2012
                                              10:00 a.m.
10

11

12   Before:

13                   HON. WILLIAM H. PAULEY III

14                                            District Judge

15

16                          APPEARANCES

17

     AMOS ALTER,
18        Attorney for plaintiff
          - and -
19   COHEN & COLEMAN, LLP
     BY:  JOHN ALVIN COLEMAN, JR., Esq. - Of Counsel
20        JOSHUA N. COHEN

21

     KRAMER LEVIN NAFTALIS & FRANKEL, LLP
22        Attorneys for defendant
     BY:  JEFFREY LOUIS BRAUN, Esq.
23        NATAN M. HAMERMAN, Esq.

24

25

C6iQcam1

```
1              (In open court)

2              THE DEPUTY CLERK:  The case of Campbell v. Mark Hotel.

3              Appearances for the plaintiff.

4              MR. ALTER:  For the plaintiff, Amos Alter.

5              MR. COLEMAN:  John Coleman, Coleman & Coleman.

6              MR. COHEN:  Josh Cohen, Cohen & Coleman.

7              THE COURT:  Good morning, gentlemen.

8              THE DEPUTY CLERK:  Appearances for the defendant.

9              MR. BRAUN:  Jeffrey Braun of Kramer Levin, your Honor.

10             MR. HAMERMAN:  Natan Hamerman.  Good morning.

11             THE COURT:  Good morning.  This matter is on for

12   trial.  Are the parties ready to proceed.

13             MR. ALTER:  Plaintiff is ready, your Honor.

14             MR. BRAUN:  Defendant is ready, your Honor.

15             THE COURT:  Other than the in limine motions that the

16   parties have submitted, are there any issues that either of you

17   want to raise before we proceed to the hearing?

18             MR. ALTER:  Well, we had some questions which we

19   discussed with the clerk as to how you want certain procedural

20   matters handled.

21             For instance, the question is if we have a joint

22   exhibit, do we have to offer it or is it already deemed offered

23   because it's in the pretrial order?  Similarly, with the facts

24   that are in the pretrial order, do we have to offer them, read

25   them in, say, your Honor, please look at fact X?  How do you
```

C6iQcam1

1    want it done?

2            THE COURT:  Here is how we will do it.  Even if the

3    parties have agreed on an exhibit, simply offer the exhibit.  I

4    will ask your adversary whether he has an objection.  He will

5    state that he has no objection, and the exhibit will be

6    received in evidence.  That way it's in the record; it's in the

7    transcript; it's all in one place.  The same is true with

8    respect to any stipulations of fact.  Let's put them in the

9    record.

10           Now, with respect to the motions in limine.

11           First, the plaintiff seeks to exclude the testimony of

12   Lawrence Frawley as improper expert testimony.  Frawley's

13   testimony, however, is admissible as a lay witness opinion

14   testimony under Rule 701.  First, his testimony is based on his

15   perception; that is, his "firsthand knowledge or observation."

16   Federal Rule 701 Advisory Committee Note.

17           Second, his testimony is arguably helpful in

18   determining a fact in issue.  The speed with which ConEdison

19   could have activated gas service is relevant to the issue of

20   whether there were conditions outside the suite preventing

21   Ms. Campbell's occupancy of the suite.

22           Finally, his testimony is not based on scientific,

23   technical or other specialized knowledge because it rests on

24   reasoning processes familiar to the average person in everyday

25   life.  Citing *United States v. Garcia* 413 F.3d 201, 215 (2d

C6iQcam1

1    Cir. 2005).

2            Accordingly, Campbell's application is denied.

3            Now, the defendant seeks to exclude the proposed

4    expert testimony of Lee Jablin because it's not the "product of

5    reliable principles and methods" employed by architects.

6            While Jablin's opinions in some respects appear

7    speculative, "where a bench trial is, in prospect, resolving

8    Daubert questions at a pretrial stage is generally less

9    efficient than simply hearing the evidence," a very common

10   sense observation by Judge Lynch in *Victoria's Secret Stores*

11   *Brand Management, Inc. v. Sexy Air Concepts,* LLC, 07 Civ. 5804

12   (GEL) 2009, WL 959775 at *6 note 3 (S.D.N.Y. 2009).

13   Accordingly, the defendant Mark Hotel Sponsor LLC's motion is

14   denied.

15           Because it's a bench trial, the Court can take the

16   testimony for whatever it's worth, and it's best evaluated at

17   the end.

18           If the parties wish to make sort opening statement, I

19   will permit it.

20           Are there any other issues that counsel want to raise

21   before we move forward?

22           MR. BRAUN:  I guess we should mention, I think we

23   mentioned it, we discussed with your Honor at the pretrial,

24   there will be some witnesses who will be testifying somewhat

25   out of sequence to accommodate them.

C6iQcam1

1          THE COURT:  It's perfectly fine.

2          So, does the plaintiff, Roberta Campbell, wish to give

3    an opening statement?

4          MR. ALTER:  Her counsel does, yes, your Honor.

5          THE COURT:  All right, Mr. Alter.

6          MR. ALTER:  Before I do that, let me mention two

7    things:  One, is we have placed on the witness stand, I believe

8    on the bench as well, and each counsel has just for the

9    convenience of everyone, calendars for April 2009 and May 2009.

10          Does your Honor have one up there?  If not, may I hand

11    one up?

12          THE COURT:  You may, but I have calendars from the

13    year Gimel, OK, that I keep up at the bench for any trial.

14          MR. ALTER:  Your Honor is far more experienced in this

15    than we.

16          The other is I have a demonstrative which is simply a

17    time line.  I am going to use it for my opening statement.

18    It's not a piece of evidence.  It's not being offered in

19    evidence.  I hope your Honor can see it.

20          THE COURT:  Well, do you have it on an

21    eight-and-a-half-by-eleven?

22          MR. ALTER:  Yes.

23          THE COURT:  My vision is pretty good, but it's not

24    that good.

25          MR. ALTER:  Then let me hand it up to your Honor, and

C6iQcam1

1    I am going to have to stand here to look at this one myself.

2              THE COURT:  That's fine.

3              MR. ALTER:  Your Honor, this case deals with a suit

4    over return of a down payment for an apartment.  The money is

5    right now being held in escrow by the law firm representing

6    defendant, the Kramer Levin law firm.

7              In the fall of 2007, plaintiff begins looking for an

8    apartment in Manhattan.  In January of 2008, she and her then

9    husband sign a contract for unit 1402 at The Mark.  The

10   purchase price is $18,750,000, and the amount paid into escrow

11   pursuant to contract, which is the down payment here in issue,

12   is $4 million plus.

13             According to the offering plan, the anticipated first

14   closing was to be in May 1 of 2008.  That didn't happen.  Your

15   Honor will hear testimony about attempts to find out what's

16   going on, and very little information is heard.

17             Plaintiff eventually learns that the problem was, or

18   at least a problem was, that defendant didn't have the 7 out of

19   42 contracts at 15 percent that was needed to declare the plan

20   effective.  This is through May, through going into the fall of

21   September.

22             In September, Lehman Brothers collapses, the economy

23   nosedives and it becomes even less likely that anything is

24   going to happen.

25             Nonetheless, in February of 2009 the plan is declared

C6iQcam1                         Opening - Mr. Alter

1   effective.  They do have the 7 of the 42 units they need, and a

2   closing is scheduled for March 31.  That's the first scheduled

3   closing date.

4            On March 24, the closing date is adjourned by

5   defendant to April 7.  That was only one week before the

6   previously scheduled date.

7            On April 2, which is only five days before the

8   previously scheduled date, defendant further adjourns the

9   closing to April 16.

10           On April 10, finally the defendant schedules

11   inspection for April 15.

12           On April 13, defendant is finally issued a temporary

13   certificate of occupancy.  That is probably the major, but by

14   no means the only, piece of paper defendant has to produce in

15   order to allow a closing.  You will hear testimony about the

16   others.

17           Ms. Campbell, who lives in California, does come in

18   for the inspection.  I should mention, incidentally, that she

19   and her then husband have been divorced in between, and his

20   interest has been assigned to her, and she is the sole party

21   with interest in this lawsuit.

22           The inspection takes place, and your Honor will hear

23   quite a bit of testimony about the inspection, but the

24   important points, I will note now, is that the inspection

25   revealed no heat, no air conditioning, no hot water, very

C6iQcam1                         Opening - Mr. Alter

1    spotty elevator service, no glass enclosures in the showers and

2    a very long punch list of items that remained to be done.

3         April 16 was that scheduled closing date.  Closing did

4    not happen at that time.  There was a telephone call on that

5    date between the parties, I should say, and you will hear and

6    you will see an email that one of the participants on behalf of

7    defendant to that telephone conversation sent to his boss

8    stating that plaintiff will close if certain stated conditions

9    are fixed.

10        On April 17, that's a Friday, plaintiff indicates to

11   defendants she has concerns about Sponsor's finances and

12   plaintiff returns home to California.

13        On April 20 there are conversations and correspondence

14   between Mr. Cone and Canter.  Mr. Cohen is the plaintiff,

15   Ms. Campbell's attorney.  Mr. Canter is an attorney at Kramer

16   Levin representing the defendant.

17        On April 21 -- let me get back to April 20.  And you

18   will hear that the tone of that conversation correspondence was

19   very negative, and there is what I will call a threat by

20   Mr. Canter to declare Ms. Campbell in default for not having

21   closed on April 16.

22        On April 21 in the morning there is a four-way

23   conversation between Ms. Campbell and her attorney, Mr. Cohen,

24   and an executive representing defendant.  His name is

25   Mr. Marton, and his lawyer, Mr. Canter, and you will hear about

C6iQcam1                          Opening - Mr. Alter

1     that conversation.  Later that day there is correspondence.

2     Mr. Cohen writes to Mr. Canter.  It is that letter by Mr. Cohen

3     to Mr. Canter that defendant will claim constituted a

4     repudiation of the contract on behalf of Ms. Campbell.

5              I think your Honor will see that not only was it not a

6     repudiation but on the letter of April 23, which Mr. Canter

7     response to that letter, Mr. Canter expressly states that he's

8     not treating it as a repudiation; that the contract continues.

9     And, in fact, in that letter, he adjourns the closing to

10    April 27.  That's the fourth possible closing date.

11             On April 24, Mr. Cohen responds asserting his right

12    under the contract for a two-week adjournment, and the closing

13    is there by adjourned from April 27 to May 11.

14             On April 28, Mr. Canter sends a letter to Mr. Cohen,

15    which is not received until the next day, April 29, it's sent

16    by Federal Express, and that letter acknowledges the

17    adjournment of the closing to May 11.  It also states that

18    plaintiff may not return to reinspect the apartment.

19             On April 29, Mr. Cohen receives Mr. Canter's letter

20    from the day before, has a conversation with the plaintiff,

21    Ms. Campbell, and plaintiff decides that she is no longer

22    interested in The Mark.  She directs Mr. Cohen to apply to the

23    Attorney General's office for return of the down payment, and

24    Mr. Cohen's office begins work on the AG application.

25             May 1 was the defendant's deadline for obtaining one

C6iQcam1                        Opening - Mr. Alter

1   closing or the plan was dead.  They did barely under the wire

2   actually obtain two closings, and they have never had any

3   closings since.

4           May 4, there are two emails from Mr. Wefels, who is

5   the paralegal at Kramer Levin, who deals with this building.

6   The first one says:  "When are you coming for an inspection?"

7   The second one four hours later says, "Please disregard the

8   earlier email; you already had your inspection."

9           On May 11 is the last closing date -- I've called it

10  closing date five -- and Mr. Canter sends a notice of default

11  because Ms. Campbell did not close on that date.  In that

12  letter he makes no mention of any possibility of Ms. Campbell

13  coming back to return.

14          On May 15, Ms. Campbell already makes an offer on a

15  different unit at 15 Central Park West and a contract is

16  eventually completed by May 21 of that month.

17          On June 22, Mr. Canter's office responds to

18  plaintiff's application to the Attorney General which had been

19  made on May 8.  In that letter, signed by an attorney other

20  than Mr. Canter, it is stated that Mr. Canter would have been

21  willing to allow Ms. Campbell to come back for a second

22  inspection.  Both Mr. Cohen and Ms. Campbell will tell you that

23  that was the first time that it was suggested to them by anyone

24  that Mr. Canter had reconsidered his position that she was not

25  able to return to inspect, but that offer, as far as plaintiff

C6iQcam1                        Opening - Mr. Alter

1   is concerned, was too little too late.

2           In November this action was commenced, and then in

3   December the Attorney General on his own motion closed the

4   escrow dispute matter because of the pending litigation.

5           The position of plaintiff is very simple.  I don't

6   want to shift from opening statement to a summation, but in two

7   sentences; that she was prepared to close on -- although she

8   wanted to see that the apartment was properly fixed up, but

9   were it fixed up, she was prepared to close until she got the

10  letter of April 29 telling her she could not come back.  She

11  did not hear until June that defendant supposedly had changed

12  its mind, and by then it was too little too late.

13          And that, your Honor, is plaintiff's case.

14          THE COURT:  Thank you, Mr. Alter.

15          Mr. Braun, do you wish to make an opening statement?

16          MR. BRAUN:  Briefly, I would like to.  May I use the

17  lecturn?

18          THE COURT:  You may.

19          MR. BRAUN:  As you know, this is a breach of contract

20  case.  So I want to start with the written contract, which I

21  know your Honor is familiar with on the prior motions in the

22  matter.

23          The key provision is 16.3 which provides unequivocally

24  that the purchaser is obligated to close upon the issuance of a

25  temporary or permanent certificate of occupancy of the suite

C6iQcam1                        Opening - Mr. Braun

1    subject to one possible caveat, which I will discuss in a

2    minute.  But to make that obligation even more clear, 16.3 goes

3    on to set forth two "notwithstanding" clauses.  The first one

4    says that the purchaser must close when there is a TCO,

5    "notwithstanding any construction items noted on purchaser's

6    inspection statement (as hereinafter defined) remaining for

7    Sponsor to complete and/or correct in accordance with its

8    obligations under the plan," and as Mr. Alter indicated, you

9    are going to hear testimony about the condition of the suite on

10   the date of the inspection which was April 15, '09.  Since

11   plaintiff is going to offer, I gather, a significant amount of

12   oral testimony on that point, we are going to be offering

13   testimony as well.

14        But, frankly, our position is that all of the

15   testimony about the condition of the suite on that date is

16   irrelevant because the purchase agreement makes the issuance by

17   the New York City Department of Buildings of the TCO the

18   bright-line determinant of when the suite is in the appropriate

19   condition for a closing to require the purchaser to close.

20        The only purpose of the inspection and the only

21   purpose of the inspection statement that the contract specifies

22   is to come out of the inspection is to create an agreed upon

23   list of those items in the suite that remain incomplete or

24   defective and must be corrected by the Sponsor even after the

25   closing.  It's an obligation that expressly survives the

C6iQcam1                        Opening - Mr. Braun

1    closing.  And in the absence of that type of express

2    obligation, the Sponsor's duty to address issues, conditions,

3    defects, could well expire once the purchaser takes title to

4    the unit, but since the contract makes it clear that the items

5    on the list, on the inspection statement survive the closing,

6    that always remains the Sponsor's obligation, and that is the

7    purpose of the inspection.

8              The idea that I heard at earlier stages of the case

9    that somehow a unit, a suite can fail inspection is a false

10   concept that exists nowhere in the contract.  It's something

11   that plaintiff has erroneously trying to engraft into the

12   contract.

13             Now, the second notwithstanding clause provides that

14   the purchaser must close upon issuance of a TCO for the suite

15   "notwithstanding the incomplete construction and/or decoration

16   of any other portions of the building not preventing

17   purchaser's occupancy of the suite," and the negative

18   implication of that language is that there conceivably could be

19   a condition of "incomplete construction and/or decoration" of

20   something outside the suite but in the building that prevents

21   purchaser's occupancy of the suite and therefore would excuse

22   the purchaser from closing.

23             We believe that the evidence will show that that

24   situation did not exist in this case.  We believe the evidence

25   will show that the fact that ConEdison had not activated gas

C6iQcam1                    Opening - Mr. Braun

1    service to the building was not a matter of incomplete

2    construction and/or decoration of the portion of the building

3    and did not prevent Ms. Campbell's occupancy.  We believe the

4    evidence will show that heat, air conditioning, domestic hot

5    water, could have been made available at the building at any

6    time on or after the date of her inspection, although, of

7    course, she had no intention, the evidence will show, to

8    actually begin living in the unit for months thereafter.  And

9    it's also undisputed, and the stipulation acknowledges, that

10   the -- that's in paragraph 54 of the pretrial order -- that the

11   building systems providing heat, air conditioning, domestic hot

12   water, cooking gas were properly constructed and complete as of

13   the date of Ms. Campbell's inspection.  It's also agreed that

14   the gas service was activated six days after the inspection.

15          Now, I think that certainly the correspondence

16   indicates, and I think the oral testimony will suggest, that

17   plaintiff was unhappy with the absence of a hotel in the

18   building and the absence of some of the related amenities as of

19   the scheduled closing date.

20          The possibility that those amenities and that the

21   hotel was not being in place as of the time that the purchaser

22   was required to close was clearly was clearly disclosed in the

23   offering plan, and essential amenities, such as security, were

24   available at the time that plaintiff was required to close, and

25   she had in our view no legitimate reason for refusing to close

C6iQcam1                      Opening - Mr. Braun

1    her purchase and therefore is forfeiting her down payment.

2              Now, everyone knows that the global economy

3    deteriorated terribly between January of '08, when Ms. Campbell

4    and her then husband signed the agreement with my client, and

5    in the spring of '09 when we called upon her to perform.  We

6    think the evidence is going to show that Ms. Campbell got very

7    worried about the economic downturn and about the fact that

8    there was no hotel in place at the time of her inspection, and

9    she decided not to close, and she decided to take a chance at

10   losing her down payment.

11             In fact, once the Sponsor, my client, issued closing

12   notices, Ms. Campbell's transactional lawyer tried and tried

13   again and again and again to retrade the party's contract and

14   extract major concessions from the Sponsor that were

15   fundamentally inconsistent with the contract.

16             And while the Sponsor was willing to provide some

17   limited accommodations, it was not willing to fundamentally

18   rewrite the contract as sought by the purchaser here.  And we

19   believe the evidence will show that the carping about

20   deficiencies in the unit, alleged deficiencies in the unit, and

21   the situation with heat and hot water, were pretextual and had

22   been blown out of proportion as part of a litigation strategy

23   to justify Ms. Campbell's unwillingness to fulfill contractual

24   obligations.

25             We think the evidence will show that not only is

C6iQcam1                          Opening - Mr. Braun

1   Ms. Campbell's premise about heat, hot water and the facts

2   surrounding that incorrect, but that the claim that the Sponsor

3   wouldn't allow her to come back for another visit is wrong.

4           You will hear testimony about oral invitations to come

5   back and see that the Sponsor was working hard to address the

6   issues on the inspection statement preclosing, although it was

7   not under an obligation to do so until after closing, but it

8   had people working hard preclosing to address the items on that

9   list, and plaintiff and her lawyer were orally advised of that

10  and urged to have her come back.

11          There is also going to be testimony, I'm sure, about

12  the idea that Ms. Campbell had grounds for insecurity and

13  therefore was entitled to assurances about my client's future

14  performance.  I think the evidence is going to demolish that

15  theory too because the circumstances that supposedly gave

16  Ms. Campbell grounds for insecurity are really consistent with

17  the contract and were risks that were expressly disclosed in

18  the offering plan.

19          We believe the evidence will show the plaintiff did

20  not ask for assurances about the Sponsor's future performance

21  of its contractual obligations.  Instead, she asked for

22  assurances that the Sponsor would do things that it had no

23  contractual or other legal obligation to do.

24          Even so, we think the evidence will show that this

25  Sponsor provided Ms. Campbell with assurances that were

C6iQcam1                         Opening - Mr. Braun

```
 1    reasonable and sufficient; and to the extent that she or her
 2    lawyer were seeking anything more, they were trying to
 3    renegotiate the contract.
 4             We think that our client has behaved properly and
 5    fulfilled its obligations, and that the plaintiff has not.
 6             Thank you, your Honor
 7             THE COURT:  Thank you, Mr. Braun.
 8             Let's turn to the evidence.  Mr. Alter, would the
 9    plaintiff call her first witness.
10             MR. ALTER:  Yes.  The plaintiff calls herself Roberta
11    calm as first witnesses.
12     ROBERTA CAMPBELL,
13         called as a witness by the Plaintiff,
14         having been duly sworn, testified as follows:
15    DIRECT EXAMINATION
16    BY MR. ALTER:
17             THE DEPUTY CLERK:  Please state your name spell your
18    last name for the record.
19             THE WITNESS:  Roberta Campbell, C-A-M-P-B-E-L-L.
20             THE COURT:  Ms. Campbell, you may have a seat.  Pull
21    your chair up to the microphone.
22             Mr. Alter, you may inquire.
23             MR. ALTER:  Thank you, your Honor.
24    Q.  Ms. Campbell, are you the plaintiff in this action?
25    A.  I am.
```

C6iQcam1                          Campbell - Direct

1   Q.  Where do you now reside?

2   A.  15 Central Park West in New York.

3   Q.  Where did you reside when this action was commenced in

4   2009?

5   A.  In California.

6   Q.  Do you still own a home in California?

7   A.  I do.

8   Q.  Where were you born and raised?

9   A.  Irvington, New Jersey.

10  Q.  Please give us your education and job experience beginning

11  post high school.

12  A.  I went to the College of New Jersey and then to Columbia

13  University for my master's.  And then I worked in various

14  college administration jobs at Sarah Lawrence and the uptown

15  campus of Colombia, then the main campus of Columbia as a dean.

16  Then my last job there was associate director of the capital

17  campaign at Columbia.

18  Q.  When you were a dean, what was your title there?

19  A.  Dean of residence.

20  Q.  When did you leave Columbia?

21  A.  1981.

22  Q.  What have you been doing since?

23  A.  I was a full-time mother.

24        MR. ALTER:  Your Honor, I would like at this point to

25  read in from page 2 of the joint pretrial order item (iii)

1    Jurisdiction and Venue.

2              "This action is brought under this Court diversity

3    jurisdiction, 28 U.S.C. 1332.  At the commencement of this

4    action, plaintiff Roberta Campbell, was a citizen of

5    California.  Defendant Mark Hotel Sponsor LLC the Sponsor was a

6    limited liability company, whose sole member was Mark Member

7    LLC, a limited liability company, none of whose members was a

8    citizen of California or corporation incorporated or with its

9    principal place of business in California, or a resident alien

10   domiciled in California.  Sponsor's principal place of business

11   was in the Southern District of New York.  The amount in

12   controversy, exclusive of interest and costs, exceeds $75,000.

13   There is no issue as to subject matter or personal jurisdiction

14   or as to venue."

15             So stipulated?

16             MR. BRAUN:  Yes, your Honor.

17   Q.  Did there come a time when you decided to look for an

18   apartment in Manhattan?

19   A.  Yes.

20   Q.  When was that?

21   A.  The fall of 2007.

22   Q.  Why was that?

23   A.  My daughter had applied to college, and we were saying that

24   we'd like to spend more time in New York.  My husband was

25   already spending more time in New York, and we would like to

C6iQcam1                        Campbell - Direct

1   have a place of residence here as well as California.

2   Q.  What kind of apartment were you looking for?

3   A.  Either brand new or brand -- newly renovated.

4   Q.  Any particular location?

5   A.  The Upper East Side.

6   Q.  Were your planning on moving permanently to New York?

7   A.  No.

8   Q.  How did you plan to divide your time?

9   A.  We weren't sure yet, but we were planning to divide it .

10  Q.  How did you go about looking?

11  A.  I found a relator, and she found some apartments.

12  Q.  Who was that realtor?

13  A.  Julia Cahill.

14  Q.  How did you get to Julia Cahill?

15  A.  I have a friend in California, and her -- who is a realtor

16  and her boss called, I believe, someone from Corcoran, and I

17  believe it was Pam Liebman, and Pam Liebman recommended Julia

18  Cahill.

19  Q.  Whom did you understand Ms. Cahill to be?

20  A.  A vice-president at Corcoran.

21  Q.  Just for the record, Corcoran is a real estate broker?

22  A.  Yes.

23  Q.  To your knowledge, what was the relationship between

24  Corcoran and The Mark?

25  A.  Well, Corcoran Sunshine was the listing agent for The Mark

1   and Corcoran was my representative, and I think there is a

2   loose association between the two.

3           MR. ALTER:  Your Honor, I would like to read in a

4   joint fact 14 thaw is on page 8 of the pretrial order.

5           "Corcoran Sunshine Marketing Group was the Sponsor's

6   selling agent under the offering plan."

7           So stipulated?

8           MR. BRAUN:  Yes.

9   Q.  Did Ms. Cahill introduce you to some buildings?

10  A.  Yes.

11  Q.  What buildings did she introduce you to?

12  A.  First 995 Fifth Avenue, the Stanhope, and then The Mark.

13  Q.  Did you look at the Stanhope?

14  A.  Yes.

15  Q.  Please tell us your reaction to the Stanhope.

16  A.  It was lovely, but the apartments were too large for what I

17  was looking for.

18  Q.  She next showed you The Mark, I believe you said?

19  A.  Yes.

20  Q.  That's the building at issue in this case?

21  A.  Yes.

22          MR. ALTER:  Your Honor, I would like to read in at

23  this point from page 7 of the pretrial order fact 9.

24          "The Mark Hotel was closed in January 2007 for a

25  complete gut renovation pursuant to which virtually the entire

C6iQcam1                        Campbell - Direct

1    interior except floor slabs, elevator shafts and fire stairs

2    was demolsihed.  The purpose of this project was to convert the

3    building to a luxury cooperative hotel containing transient

4    hotel units and hotel amenities on the lower floors and

5    cooperatively owned suites on the upper floors.  Under this

6    plan, the leasehold interest for the cooperatively owned suites

7    was to be transferred by Mark Hotel LLC to the Mark Hotel

8    Owners Corporation, which would be organized as a cooperative

9    apartment corporation."

10             So stipulated?

11             MR. BRAUN:  Yes, your Honor.

12   Q.  Did you actually see your unit before signing a contract?

13   A.  No.

14   Q.  What did you see?

15   A.  I saw floor plans on a wall in the sales office of The

16   Mark.

17   Q.  Did you ever see the model unit?

18   A.  I saw a model unit quite awhile after, but it was not the

19   model unit of the apartment that I was buying.

20   Q.  Did you ever go up to the 14th floor where the apartment is

21   prior to signing the contract?

22   A.  No.

23   Q.  Did you eventually enter into a contract to purchase

24   apartment 1402 at The Mark?

25   A.  Yes.

C6iQcam1                         Campbell - Direct

1   Q.  You have the exhibit books next to you.  I call your

2   attention to the larger of the two.  There are three books, but

3   you will be working primarily with two of them.  The larger one

4   is the book of defendant exhibits.  Please look at exhibit 2 in

5   that and tell me when you've found it.

6   A.  I have it.

7   Q.  Please look at the signature.  Is that the contract you are

8   referring to?

9   A.  Yes.

10  Q.  Please look at the signature page.  It's page 18?

11  A.  Yes.

12  Q.  You will see it's signed not only by you but also by

13  William B. Campbell.  Who is or was William B Campbell?

14  A.  He is my former husband.

15  Q.  And he was your husband at that time?

16  A.  Yes.

17  Q.  What happened to his interest in the contract and down

18  payment?

19  A.  He relinquished his interest when we got divorced.

20  Q.  How much was the purchase price under this contract?

21  A.  $18,750,000.

22  Q.  Did you eventually make down payments on the contract?

23  A.  Yes.

24          MR. ALTER:  Your Honor, I would like to read from fact

25  11 which is the bottom of page 7 of the pretrial order.

C6iQcam1                         Campbell - Direct

1              "The purchase agreement provided that the purchase

2    price to be paid for Suite 1402 was $18,750,000.  The first

3    deposit on the purchase price for Suite 1402 in the amount of

4    $2,812,500 was paid to the escrow agent on January 28, 2008 and

5    the additional deposit in the amount of $1,875,000 was paid to

6    the escrow agent on May 19, 2008.  The two deposits

7    (collectively the deposit) totaled $4,687,500, and, with the

8    interest earned thereon, are being held in escrow by Sponsor's

9    attorneys, the law firm of Kramer Levin, Naftalis and Frankel,

10   LLP.:

11             So stipulated?

12             MR. BRAUN:  Yes.

13   Q.  Were you represented by counsel in this transaction --

14   A.  Yes.

15   Q.  Please wait till I finish my question.

16             -- in this transaction of signing the contract?

17   A.  Yes.

18   Q.  Who was that?

19   A.  Richard Cohen.

20   Q.  Did you read the contract before signing it?

21   A.  No, not thoroughly.

22   Q.  Was there eventually a First Amendment to the purchase

23   agreement?

24   A.  Yes.

25   Q.  I call your attention to Defendant's Exhibit 9.

C6iQcam1                            Campbell - Direct

1            MR. ALTER:  Incidentally, I realized I'm supposed to

2      offer the contract.  I offer the document Defendant's Exhibit

3      2?

4            MR. BRAUN:  No objection.

5            THE COURT:  All right.  Look I will receive Exhibit 2,

6      but subject to redaction of the social security numbers that I

7      see are on the signature page.

8            MR. ALTER:  Your Honor, those were redacted on any

9      document that was filed.  I don't believe exhibits here have

10     been filed.  You're right, clearly we should redact it.

11           THE COURT:  It will be redacted.

12           MR. ALTER:  That's fine.

13           THE COURT:  It's received.

14           (Defendant's Exhibit 2 received in evidence)

15     Q.  Is Defendant's Exhibit 9 the first amendment to the

16     purchase agreement about which you just spoke?

17     A.  Yes.

18           MR. ALTER:  I offer that in evidence.

19           MR. BRAUN:  No objection, your Honor.

20           THE COURT:  Defendant's Exhibit 9 is received in

21     evidence.

22           (Defendant's Exhibit 9 received in evidence)

23     Q.  Did you read that before signing it?

24     A.  No.

25     Q.  In connection with defendants offering this and other units

C6iQcam1                        Campbell - Direct

1    for sale, was there an offering plan?

2    A.  Yes.

3    Q.  Did you receive a copy before you and Mr. Campbell signed

4    the purchase agreement?

5    A.  Yes.

6    Q.  That's a separate book in front of you, Defendant's Exhibit

7    3, it's a separate binder.  Is that the document you were

8    referring to?

9    A.  Yes.

10           MR. ALTER:  I offer that in evidence.

11           THE COURT:  Defendant's Exhibit 3 is received in

12   evidence.

13           (Defendant's Exhibit 3 received in evidence)

14   Q.  Were there amendments to the offering plan which were

15   received by you or by Mr. Cohen?

16   A.  Yes.

17           MR. ALTER:  Your Honor, I'd offer at this time the

18   first amendment, which is Defendant's Exhibit 7, the second

19   amendment Defendant's Exhibit 10, and third amendment

20   Plaintiff's Exhibit 18.

21           THE COURT:  Any objection?

22           MR. BRAUN:  I believe you misidentified the last

23   document.  I have no objection to the first two, your Honor.

24           MR. ALTER:  You are right.  I did misidentify

25   Plaintiff's Exhibit 18.  Do you have a number on it?  Give me

C6iQcam1                         Campbell - Direct

1  one second, please.

2           THE COURT:  Take your time.

3           MR. HAMERMAN:  139.

4           MR. ALTER:  I will accept Mr. Hamerman's kind

5  suggestion that it is Defendant's Exhibit 139.

6           MR. BRAUN:  Yes, your Honor, we do not object.

7           THE COURT:  So Defendant's Exhibits 7, 10 and 139 are

8  received in evidence.

9           (Defendant's Exhibits 7, 10 and 139 received in

10  evidence)

11  Q.  In the next year or so, what contacts did you have with the

12  Sponsor?

13  A.  Many.

14  Q.  Who did you contact with the Sponsor?

15  A.  J. P. Forbes.

16  Q.  Who was Mr. Forbes?

17  A.  He was the seller, the sales associate.

18  Q.  Why were you contacting him?

19  A.  Because we wanted to find out any information we could

20  about the project, how it was coming along, whether they were

21  going to offer contracts on May 8 or closings beginning May 8.

22  Q.  Did you inquire when the final would be effective?

23  A.  Yes.

24  Q.  What answer did you receive?

25  A.  Very vague and elusive, they weren't sure.

C6iQcam1                         Campbell - Direct

1   Q.  What about the answer to the previous question I asked

2   about, and your answer.  Let me rephrase that.  You indicated a

3   moment ago that you called to find out how the construction was

4   doing.  Did you get any information on that?

5   A.  No.

6   Q.  Did you ask when you could anticipate closing?

7   A.  Yes.

8   Q.  What answer did you receive?

9   A.  Very vague.

10  Q.  Why did you want to know whether the plan was effective?

11  A.  Because I wanted to know that the project was viable, and

12  it was supposed to be effective May 8.

13  Q.  How many times did you call between signing the contract

14  and finally being notified that the plan was effective?

15  A.  Oh, every couple weeks.

16  Q.  Did others also call Mr. Forbes on your behalf, if you

17  know?

18  A.  Yes.

19  Q.  Who were they?

20  A.  Julia Cahill and Paul Gleicher.

21  Q.  Who was Paul Gleicher?

22  A.  He's the architect.

23  Q.  So far as you are aware, did they do any better in

24  eliciting information?

25  A.  No.

C6iQcam1                          Campbell - Direct

 1              MR. BRAUN:  Hearsay, your Honor.

 2              THE COURT:  Sustained.

 3              MR. ALTER:  Your Honor, this brings up a general

 4      subject.  There will be an issue in this case as what

 5      Ms. Campbell knew and understood because it goes to the

 6      question of reasonableness of her demand for financial

 7      information.

 8              I recognize, as Mr. Braun rightly said, that if I'm

 9      offering it for the truth of the statement, it is hearsay, but

10      with respect to Ms. Campbell on the stand --

11              THE COURT:  You're everything offering it for her

12      state of mind?

13              MR. ALTER:  That is correct.

14              THE COURT:  You may proceed.

15              MR. ALTER:  I will point out that I will call these

16      people to the stand themselves and get it directly.

17              THE COURT:  So the objection is overruled, although I

18      would have sustained it as to form on that question.

19      BY MR. ALTER:

20      Q.  Now, you signed the purchase agreement, that's Exhibit

21      Defendant's 2, in January 2008.  When were you notified that

22      the plan was effective?

23      A.  February 2009.

24      Q.  Please look at Defendant's Exhibit 12.  Do you have it?

25      A.  Yes.

C6iQcam1                          Campbell - Direct

1   Q.  Is that the notification about which you just testified?

2   A.  Yes.

3            MR. ALTER:  I offer Defendant's Exhibit 12 in

4   evidence.

5            MR. BRAUN:  No objection.

6            THE COURT:  Defendant's Exhibit 12 is received in

7   evidence.

8            (Defendant's Exhibit 12 received in evidence )

9   Q.  Please look at Plaintiff's Exhibit 1.  That's the other

10  book, plaintiff's book.  Did you receive this notice at or

11  about the same time?

12  A.  Yes.

13           MR. ALTER:  I offer this in evidence.

14           MR. BRAUN:  No objection.

15           THE COURT:  Plaintiff's Exhibit 1 is received.

16           (Plaintiff's Exhibit 1 received in evidence)

17  Q.  What was your reaction to these notices?

18  A.  I was very pleased that we were finally going to close.

19  Q.  Now, please refer to the plan, the offering plan which is

20  that separate book.  Please look at page 66 of the plan.  Does

21  it state there when it's estimated the first closing will be?

22  A.  Yes.

23  Q.  What does it say?

24  A.  May 2008.

25  Q.  You can put that exhibit aside.  Please go back to Exhibit

1  Defendant's 12 which we just looked at a moment ago.  How many

2  units does it say had been contracted for?

3  A.  Seven.

4  Q.  How does this square with what you were led to believe when

5  you were seeking to purchase?

6  A.  I was being pressured to sign the contract because I was

7  told there were at least two or three letters of intent on

8  every single unit that was being offered.

9  Q.  Had you originally expressed different interest in a

10  different unit?

11  A.  I did.

12  Q.  What happened?

13  A.  I decided that I wanted to have the unit that had outside

14  space, so it was a different unit.

15  Q.  And you asked about that unit?

16  A.  Pardon?

17  Q.  Did you ask Mr. Forbes about that unit?

18  A.  Yes.

19  Q.  What was his response?

20  A.  That I better -- if I want it, I'd better sign quickly

21  because somebody else was very interested in it as well.

22  Q.  What was your impression with respect to the status of

23  sales for the building?

24  A.  That there weren't very many.

25  Q.  At that time?

C6iQcam1                         Campbell - Direct

1   A.  Well, at that time I didn't have any information either

2   way.  I was taking his word for it.

3   Q.  And what did you understand that word to be that he was

4   telling you?

5   A.  That there was much demand on the building.

6   Q.  Did you subsequently learn that the project wasn't nearly

7   sold out?

8   A.  Yes.

9   Q.  How did you discover that fact?

10  A.  Well, that the offering plan wasn't declared effective

11  until February, and that they only had seven units sold.

12  Q.  Did learning about defendant's problem with declaring the

13  plan effective change your intent with regard to closing?

14  A.  No.

15  Q.  Did it change your level of confidence as to defendant's

16  ability to close?

17          MR. BRAUN:  I think it's leading, your Honor.

18          THE COURT:  You are leading.  I will sustain the

19  objection.

20          MR. ALTER:  I will move on.

21  Q.  Now, according to Plaintiff's Exhibit 1, which I ask you to

22  look at again, please, when was the closing -- do you got it,

23  plaintiff's 1?

24  A.  No, I'm sorry.  Yes.

25  Q.  That's the document you just looked at?

C6iQcam1                         Campbell - Direct

1   A.   Mmm-hmm.

2   Q.   When was the closing scheduled for?

3   A.   March 31, 2009.

4   Q.   Did the closing take place on March 31, 2009?

5   A.   No.

6   Q.   Why not?

7   A.   The Sponsor adjourned that date.

8   Q.   Did Mr. Cohen try to speed up the process on your behalf to

9   your knowledge?

10          MR. BRAUN:  Objection.  Hearsay.

11          MR. ALTER:  I am just asking yes or no, and then I

12   will move on.

13          THE COURT:  Overruled.

14   Q.   Did Mr. Cohen try to speed up the process on your behalf to

15   your knowledge?

16   A.   Yes.

17   Q.   I will deal with that when Mr. Cohen is on the stand.

18          Let me ask you though, did there come a time when you

19   did eventually fly in from California to inspect the unit?

20   A.   Yes.

21   Q.   I believe you have in front of you calendars for April and

22   May 2009.  Please feel prefer free to refer to them as you need

23   or as you like.  What was the date of the inspection?

24   A.   April 15, 2009.

25   Q.   As of April 15, when was the closing scheduled for?

C6iQcam1                         Campbell - Direct

1    A.  April 16.

2    Q.  Coming into the inspection on Wednesday, the 15th, could

3    you have closed on Thursday, the 16th?

4    A.  Yes.

5    Q.  What about the $14 million or so you needed to close?

6    A.  I could have had it wired.

7    Q.  Did you have liquid funds available to you at that time so

8    that you could have wired the money?

9    A.  I did.

10   Q.  So you're saying that had the inspection gone well on the

11   15th, you would have closed on the 16th?

12   A.  Yes.

13            MR. BRAUN:  Objection.

14            THE COURT:  Sustained.

15   Q.  What was your intention on the 15th prior to the inspection

16   on the 15th with respect to closing on the 16th?

17   A.  I expected I would close on the 16th.

18   Q.  Had you discussed the timing of the closing with Mr. Cohen?

19   A.  No.

20   Q.  Had you even met Mr. Cohen prior to the inspection?

21   A.  No.

22   Q.  Immediately prior to the inspection, what was your intent

23   with respect to moving in after the closing?

24   A.  We were going to take some time to decorate the apartment

25   and start immediately after the closing.

C6iQcam1                        Campbell - Direct

1    Q.  What was your plan with respect to actually moving in?

2    A.  We were going to use the apartment in the fall of 2009 when

3    my daughter started college.

4    Q.  Now, let's talk about the inspection on the 15th you

5    attended?

6    A.  Yes.

7    Q.  And Mr. Cohen attended, is that correct?

8    A.  Yes.

9    Q.  Who else attended on your behalf?

10   A.  Richard Gray and Larry Ubell and Paul Gleicher.

11   Q.  I may be repeating, could you identify Mr. Gleicher?

12   A.  He's the architect.

13   Q.  Who was Larry Ubell?

14   A.  He is a professional inspector.

15   Q.  Who is Mr. Richard Gray?

16   A.  My significant other.

17   Q.  Who attended on behalf of defendant?

18   A.  Stuart Marton and Ramon Chicon.

19        MR. ALTER:  Your Honor, I would like to read in from

20   pages 11 and 12 of the pretrial order joint fact 40 and 41.

21        "The four representatives who accompanied Ms. Campbell

22   at the inspection were her real estate attorney (Mr. Cohen),

23   her architect (Mr. Gleicher), her home inspector (Lawrence J.

24   Ubell), and a friend (Richard N. Gray) who is a practicing

25   lawyer in New York City, and who expected that he would be

C6iQcam1                    Campbell - Direct

 1   living in Suite 1402 with Ms. Campbell.

 2            "The two Sponsor representatives who attended

 3   Ms. Campbell's inspection were Stuart Marton, a business

 4   executive employed by Alexico  and Richard Chicon."

 5            So stipulated?

 6            MR. BRAUN:  Yes.

 7            MR. ALTER:  Your Honor, while we haven't had testimony

 8   about it, perhaps we can simply stipulate that Alexico is the

 9   company which owns the interest in The Mark?

10            MR. BRAUN:  That's not -- I'm sorry, that is not

11   accurate.  It is not an accurate characterization.

12            MR. ALTER:  I will take your characterization,

13   counsel.

14            MR. BRAUN:  Alexico is a company that really acts

15   essentially as developer for The Mark renovation project.

16            MR. ALTER:  I will stipulate to that.  Thank you,

17   Mr. Braun.

18   Q.  How long did the inspection last on April 15?

19   A.  Several hours.

20   Q.  Where did all seven of you meet up?

21   A.  Some of us met in the sales office.  Some met in the lobby

22   of the hotel.  We all con convened in the lobby of the hotel.

23   Q.  Please describe the lobby for the Court.

24   A.  The lobby was a construction site.  There were construction

25   workers all over the lobby.  It was dirty.  There wasn't a

C6iQcam1                          Campbell - Direct

1   check-in desk.  It was clearly a construction site.

2   Q.  How were the workmen dressed?

3   A.  With hard hats, and there was hammering.

4   Q.  Could you see whether the restaurant was finished?

5   A.  It wasn't.

6   Q.  You could see, and it wasn't?

7   A.  Yes.

8   Q.  How did you get up to the 14th floor?

9   A.  By elevator.

10  Q.  Please tell us about the elevator.

11  A.  Well, it was -- looked like a freight elevator.  It was

12  padded to protect the walls.

13  Q.  And how was it summoned?

14  A.  It was -- there was a construction worker who ran the

15  elevator for us.

16  Q.  How did he know to come?

17  A.  He must have been asked -- I don't know.

18  Q.  Was there a hallway on the 14th floor between the elevator

19  to the entrance of unit 1402?

20  A.  Yes.

21  Q.  Please describe the hallway to us as you remember.

22  A.  It was completely unfinished.  Unfinished walls and

23  unfinished flooring.

24          MR. ALTER:  Your Honor, I would like to read in from

25  page 13 of the stipulation fact 49.

C6iQcam1                          Campbell - Direct

1            "At the outset of the inspection, it was agreed by the

2     participants that Mr. Chicon's list would be limited to items

3     inside Suite 1402, and that building-wide issues, including hot

4     water, would not be included on the list."

5            So stipulated?

6            MR. BRAUN:  Yes.

7     Q.  Please tell us what you saw when you entered the suite.

8     A.  I saw a con -- I saw a construction site; that the suite

9     was clearly not finished, and was very disappointed.

10    Q.  Could you give us a little more detail on that, please.

11    A.  The floors weren't finished.  The walls weren't finished.

12    There weren't any shower stalls.  There were no closets.  It

13    was dirty.  It had been swept but not cleaned.  There weren't

14    any guards on the windows.  Those were the major beginning

15    things.

16    Q.  Well, was -- and then you inspected over a period of hours,

17    I believe you said, is that correct?

18    A.  Yes.

19    Q.  Were all seven of you together during the inspection?

20    A.  No, we entered in and out with different people.

21    Q.  Did those who were looking at other things report to you

22    during the inspection as to what they saw?

23    A.  Yes.

24    Q.  Please look at -- was there a punch list signed at the end

25    of the inspection?

C6iQcam1                        Campbell - Direct

1    A.  Yes.

2    Q.  Who was writing down on the punch list?

3    A.  Pardon?

4    Q.  Who was it who was writing on the punch list as you recall?

5    A.  Ramon Chicon.

6    Q.  Please look at Defendant's Exhibit 24 and tell me if that's

7    what you're talking about.

8    A.  Yes.

9          MR. ALTER:  I offer Defendant's Exhibit 24 in

10   evidence.

11         MR. BRAUN:  No objection.

12         THE COURT:  Defendant's Exhibit 24 is received in

13   evidence.

14         (Defendant's Exhibit 24 received in evidence)

15   Q.  Is the cover sheet numbered 1 of 4, 2 of 4, 3 of 4 and 4 of

16   4.  Do you see what I'm referring to?

17   A.  Yes.

18   Q.  Did you yourself personally notice all the items that were

19   on this punch list?

20   A.  No.

21   Q.  Let me talk about certain items, and you tell me whether

22   you noticed them yourself or whether you were told about them

23   in the inspection or neither.

24         Let's look at page 1, lines 9 and 10.  Floor to be

25   stained and finished as per original specification is this

C6iQcam1                          Campbell - Direct

1    something you had noticed

2    A.   Yes.

3              (Continued on next page)

C6IJCAM2                          Campbell - direct

1   Q.  Let's look at that same page, line 25, install microwave.

2           Did you notice a microwave needed to be installed?

3   A.  Yes.

4   Q.  Let's look at Item 26 -- line 26, I should say -- supply

5   cooktop grills and burner tops.  What is that talking about?

6   A.  The cooktop.

7   Q.  On the stove?

8   A.  Yes.

9   Q.  In the kitchen?

10  A.  Correct.

11  Q.  Did you notice this yourself?

12  A.  Yes.

13  Q.  Let's turn to the next Page 2 of 4, let's look at -- still

14  in the kitchen, I believe, according to this, yes, Line 15 Page

15  1, we are in the kitchen look at Page 2, Line 3, kitchen

16  sliding door and Line 4, are these items you noticed?

17  A.  Not specifically, but I knew it was difficult to get out

18  onto the terrace terrace.

19  Q.  Let's look at line 30, the bottom of Page 2.  General note,

20  repaint all walls in apartment.  Did you notice that?

21  A.  Yes.

22  Q.  How about remove sprinkler head protection, did you notice

23  that?

24  A.  Yes.

25  Q.  Let's turn to Page 3, Line 10, you see we are talking about

C6IJCAM2                     Campbell - direct

1   master bath a number of items under that heading.  Let's talk

2   about 21 and 22, install shower enclosure.  Please tell us

3   about that.

4   A.   There weren't any shower enclosures in the bathrooms.

5   Q.   We are talking about the master bathroom in particular?

6   A.   Yes.

7   Q.   Is this something you noticed yourself?

8   A.   Yes.

9   Q.   Install toilet accessories.  What does that mean?

10  A.   Towel bars and toilet paper holders.

11  Q.   Are these missing?

12  A.   Yes.

13  Q.   Is this something you observed yourself?

14  A.   Yes.

15  Q.   Let's look a little further down the page, talking about

16  Bath No. 4, line 26.  Again it says install shower enclosure.

17  Is this a problem in that bathroom as well?

18  A.   Yes.

19  Q.   Type of new shower fins.  Is that something you noticed?

20  A.   Yes, because they were hanging.

21  Q.   Let's look at line 29, general note, closets to be supplied

22  and installed.  Tell us about that, please.

23  A.   The places for the closets were just empty and this

24  clarifies and there was nothing in the closets, no clothing

25  bars or anything.

1    Q.  Is this something you noticed?

2    A.  Yes.

3    Q.  Couple of lines below that under general note -- we talked

4    about that.

5         Let's turn to Page 4, hallway, patch and paint.  Did

6    you see that?

7    A.  Not specifically, but the apartment had to be repainted in

8    its entirety.

9    Q.  Let's look at Line 4, Bedroom No. 2, bath.  Secure loose

10   shower frames.  Is this something you noticed?

11   A.  Yes.

12   Q.  Bathroom No. 3, line 13, adjust loose shower head.  Is this

13   again something you noticed?

14   A.  Yes.

15   Q.  Line 18, terrace.  It speaks about adjusts spacing between

16   pavers, smaller if possible.  Please tell us about that.

17   A.  In many parts of the terrace, the pavers were spread quite

18   widely apart and there was debris in-between them and any,

19   especially a woman with a wide heel, her heel would go down

20   into that crevice.

21   Q.  Let's talk about the heat and air conditioning system.  Was

22   it working that day?

23   A.  No.

24   Q.  Did you test it yourself?

25   A.  No.

C6IJCAM2                      Campbell - direct

1    Q.  How did you know at this time it wasn't working?

2    A.  Someone told me.

3    Q.  Was there hot water in the suite on that day?

4    A.  No.

5    Q.  How do you know that?

6    A.  Someone told me that.

7              MR. BRAUN:  Now we are asking -- look, we stipulated

8    to some of these facts.  I don't know the purpose of asking the

9    witness about these things that someone told her.

10             MR. ALTER:  Again to show that she knew about it at

11   the time, her state of mind.

12             THE COURT:  All right.  That could just be put in one

13   summary question.

14             MR. ALTER:  I'll move on.

15   BY MR. ALTER:

16   Q.  Did you learn during the inspection of an incident when Mr.

17   Ubell were in the elevator?

18   A.  Yes.

19             MR. BRAUN:  Objection.

20             MR. ALTER:  I won't ask about the incident.  The

21   incident will come in through Mr. Ubell's testimony.  My

22   question to her was did you learn during the inspection of an

23   incident.  May I ask that question?

24             THE COURT:  You may.

25   BY MR. ALTER:

C6IJCAM2                    Campbell - direct

1   Q.  I ask it.  Did you learn?

2   A.  Yes.

3   Q.  We'll get from Mr. Ubell what that incident was.

4           What were you feelings about the unit immediately

5   after the inspection?

6   A.  I felt it still had the potential to be a terrific unit

7   with light and the spacing, but that it was an unfinished

8   apartment.

9   Q.  In your opinion, was it livable at the time?

10  A.  No.

11  Q.  Why, in your view, was it not livable?

12  A.  Because there were no major systems, the apartment was not

13  repainted, there weren't shower stalls, there weren't closets

14  and there were varying other things that were smaller.

15  Q.  You said no major systems.  What are you referring to?

16  A.  Heat, hot water, the elevator wasn't working.

17  Q.  Do you have experience with punch lists for construction?

18  A.  I do.

19  Q.  Please explain how.

20  A.  I've had the privilege to own eight homes in my life and

21  five of them were brand new construction.

22  Q.  Did you deal with punch lists on those homes?

23  A.  I did.

24  Q.  How did the punch lists here compare with those?

25  A.  I wouldn't call this a pinch list.  I would call it a state

C6IJCAM2                    Campbell - direct

```
 1   of a project it is so extensive.  Punch lists are much smaller
 2   and many smaller items than what appears on these lists.
 3   Q.  Place look at Defendant's Exhibit 63, the bigger book.  Is
 4   this an e-mail -- well, I point out the date of this is April
 5   15th.  Is this the same date of the inspection?
 6          Is this an e-mail exchange you had with Mr. Gleicher
 7   after the inspection.  Is that correct?
 8   A.  Yes.
 9          MR. ALTER:  I offer it in evidence.
10          MR. BRAUN:  No objection.
11          THE COURT:  All right.  Defendant's Exhibit 63 is
12   received in evidence.
13          (Defendant's Exhibit 63 received in evidence)
14   BY MR. ALTER:
15   Q.  Now you have both Mr. Gleicher and Mr. Ubell on your team
16   at the inspection.  Is that correct?
17   A.  Yes.
18   Q.  What were their respective roles.
19   A.  Larry Ubell was to go through the apartment with a
20   fine-tooth comb and state every single thing that was not how
21   it should have been.
22   Q.  What was Mr. Gleicher's role?
23   A.  He was more overview, looking at it for design purposes
24   because he was the person that I was going to work with for
25   interior design.
```

C6IJCAM2                         Campbell - direct

1    Q.  Was he looking for defects in the apartment?

2    A.  No.

3    Q.  Now in this e-mail, Exhibit 63, at the bottom Mr. Gleicher

4    says the apartment is absolutely fabulous.

5         Do you see what he says?

6    A.  Yes.

7    Q.  In the top e-mail you say, "I definitely feel the same

8    way"?

9    A.  Yes.

10   Q.  What did you understand him to mean and what did you mean

11   in agreeing with him?

12   A.  We were trying to remain hopeful because it would have been

13   a fantastic apartment if it had been finished.

14   Q.  Were you expecting the Sponsor to finish the construction

15   at this point in time?

16   A.  Yes.

17   Q.  Was anything said to you during the inspection by Mr. Mar

18   tone or Mr. Chicon about the closing schedule for the next day?

19   A.  No.

20   Q.  What was your assumption immediately after the inspection

21   with respect to the closing?

22   A.  That I couldn't see closing on this apartment at this time.

23   Q.  Did you subsequently have discussions with defendant about

24   the closing?

25   A.  Yes.

C6IJCAM2                    Campbell - direct

1    Q.  Was that by telephone?

2    A.  Yes.

3    Q.  Who participated in that?

4    A.  Mr. Cohen, myself, Jonathan Canter and Mr. Marton.

5              MR. ALTER:  Your Honor, I would like to read from

6    Joint Fact 60 and 61 on Page 15.

7              MR. BRAUN:  Your Honor, before we do that, I wonder if

8    we could get some clarification as to the witness's

9    understanding as to when this conversation took place because

10   it hasn't been established when the witness thinks this

11   happened and there may be confusion about multiple

12   conversations.

13             MR. ALTER:  I am willing to do so that.

14   BY MR. ALTER:

15   Q.  This conversation about which I was just asking you, when

16   did this one take place?

17   A.  On the 17th, I believe.

18   Q.  All right.  It was the week of the inspection, correct?

19   A.  Right.

20   Q.  Not the following week?

21   A.  No.

22             MR. ALTER:  Let me read now fact 60 and 61.

23             "On April 16th, 2009, a telephone conference call took

24   place in which at least Messrs. Cohen, Canter and Marton

25   participated.  So stipulated?

| | |
|---|---|
| 1 | MR. BRAUN:  Yes. |
| 2 | BY MR. ALTER: |
| 3 | Q.  Is this phone call -- I know you claim it as the 17th -- is |
| 4 | this phone call we have stipulated to as being the 16th the |
| 5 | telephone conference call you're referring to? |
| 6 | A.  Yes. |
| 7 | MR. BRAUN:  Objection; leading. |
| 8 | A.  Sorry. |
| 9 | MR. ALTER:  I think it is a preliminary question to |
| 10 | identify it. |
| 11 | THE COURT:  Overruled. |
| 12 | BY MR. ALTER: |
| 13 | Q.  And the call says at least these three people participated. |
| 14 | Did anyone else participate that you know? |
| 15 | A.  No. |
| 16 | Q.  Did you? |
| 17 | A.  Yes, obviously. |
| 18 | Q.  Fact 61.  On April 16th, 2009, Mr. Marton sent an e-mail to |
| 19 | Mr. Senbahar, a copy of this e-mail is exhibit Plaintiff's 43. |
| 20 | MR. BRAUN:  I stipulated to that, your Honor. |
| 21 | MR. ALTER:  I offer Exhibit 43 in evidence. |
| 22 | MR. BRAUN:  No objection. |
| 23 | THE COURT:  Exhibit 43 is received in evidence. |
| 24 | (Plaintiff's Exhibit 43 received in evidence) |
| 25 | THE COURT:  That is Plaintiff's Exhibit 43. |

C6IJCAM2                          Campbell - direct

1              MR. ALTER:  Is that Plaintiff's Exhibit 43?  Give me a

2     second, your Honor, please.

3              THE COURT:  Take your time.

4              (Pause)

5              MR. ALTER:  It is Plaintiff's 43.  Yes, it is.

6              I am not going to read it out loud because your Honor

7     obviously can read it, but I would call your Honor's attention

8     to the contents of this e-mail which is fairly brief.

9     BY MR. ALTER:

10    Q.  Now, during that conversation, was a specific new closing

11    date set?

12    A.  No.

13    Q.  During that conversation were you asked to stay in New York

14    to close?

15    A.  No.

16    Q.  Was the tone of the conversation positive or negative, in

17    your view?

18    A.  It was positive.

19    Q.  Did there come a time when you began to have doubts about

20    the Sponsor's ability to close?

21    A.  Yes.

22    Q.  When was that?

23    A.  Right after the inspection.

24    Q.  Why was that?

25    A.  Because I was concerned about the project in general and

C6IJCAM2                          Campbell - direct

1   obviously the condition of the apartment, and whether this

2   project was going to be viable at all.

3   Q.  Did you have doubts as to their ability to -- well, let me

4   withdraw that.

5        What did you know about the Sponsor's obligations at

6   this point?

7   A.  Nothing.

8   Q.  Did you know they had a deadline to close?

9   A.  Yes.

10  Q.  What was that deadline as you understood it?

11  A.  May 1st.

12  Q.  Did you decide then you did not want to close?

13  A.  No.

14  Q.  What did you decide?

15  A.  I wanted them to fix the apartment and then I would like to

16  see it and close.

17  Q.  Let me bring to your attention Defendant's Exhibit 30,

18  which is an e-mail chain.

19           MR. ALTER:  Which I will offer in evidence.

20           MR. BRAUN:  No objection, your Honor.

21           THE COURT:  Defendant's Exhibit 30 is received.  In

22  evidence.

23           (Defendant's Exhibit 30 received in evidence)

24           MR. ALTER:  I would like to bring your attention to

25  the last e-mail in this chain which is the earliest of the

C6IJCAM2                     Campbell - direct

1    e-mail, of course chains going in reverse chronological order.

2    BY MR. ALTER:

3    Q.  Was this an e-mail you sent to Mr. Cohen on the morning of

4    Friday, April 17th?

5    A.  Yes.

6    Q.  What time of day did you send it?

7    A.  7:11 am.

8    Q.  It contains a link to a Washington Post matter?

9    A.  Yes.

10   Q.  Do you see that?

11   A.  Yes.

12   Q.  Is that the article Defendant's Exhibit 29?

13   A.  Yes.

14         MR. ALTER:  I offer Defendant's Exhibit 29 in

15   evidence.

16         MR. BRAUN:  Yes, your Honor, I gather it is being

17   offered simply for the fact there was and article that

18   Ms. Campbell saw it.  Obviously, we don't object to that.  We

19   don't want it admitted necessarily for the matters stated

20   therein.

21         MR. ALTER:  Mr. Braun expresses my sentiments as well.

22         THE COURT:  Defense Exhibit 29 is received.

23         (Defendant's Exhibit 29 received in evidence)

24   BY MR. ALTER:

25   Q.  Did you request Mr. Cohen to send, forward e-mail and the

C6IJCAM2                          Campbell - direct

1    article on to Mr. Marton?

2    A.  Yes.

3    Q.  Did he?  Did he do that through counsel?

4              MR. BRAUN:  Excuse me?

5              MR. ALTER:  Let me withdraw that.

6              Please look at the bottom e-mail on the first page of

7    Exhibit 30.  I think the e-mail speaks for itself.  Let me read

8    two sentences:

9              "Please forward the below message and link to Stuart.

10   This is e-mail from Mr. Cohen to Mr. Canter, Stuart being Mr.

11   Marton.  Ms. Campbell would like to have a conference call with

12   Stuart regarding this.  One more sentence.  She is leaving for

13   the airport 1:30 today and is available until then."

14   BY MR. ALTER:

15   Q.  Now, did you have that conference call that day?

16   A.  No.

17   Q.  Did you eventually have it?

18   A.  Yes.

19   Q.  We'll get to that.

20             Meanwhile, did you leave for California that day, as

21   the e-mail says?

22   A.  Yes.

23   Q.  Was that the time that you had originally planned to

24   return?

25   A.  Yes.

C6IJCAM2                          Campbell - direct

1   Q.  When you returned to California, what did you do with

2   regard to the situation with the Mark?

3   A.  I was very concerned, and so I began to just look to see if

4   there were any other options.  I just felt I had to have some

5   kind of backup plan.

6   Q.  By "other options," you were looking at alternative sites

7   to possibly purchase.  Is that what you mean?

8   A.  Yes.

9   Q.  Between the time you signed the purchase agreement and the

10  time of your inspection of the site, which was later, had you

11  at all considered looking for a different site in New York?

12  A.  No.

13          MR. ALTER:  I would like to read in, your Honor, at

14  this point Fact 56, which is on Page 14 of the order.

15          "Between the execution of the purchase agreement and

16  Ms. Campbell's inspection of Suite 1402 on April 15th, 2009,

17  she had not sought to find any other residence for purchase in

18  New York City."

19          MR. BRAUN:  So stipulated.

20          MR. ALTER:  Thank you.

21  BY MR. ALTER:

22  Q.  What was the relationship between the purchasing the unit

23  at the Mark and your new plan?

24  A.  There wasn't a relationship.  I still was planning to close

25  on the Mark, but I just wanted to see what else was available

1   just as a backup plan.

2   Q.  Did you ever tell defendant you had begun looking for a

3   possible alternative purchase?

4   A.  No.

5   Q.  So far as you're aware, did the defendant ever learn before

6   this lawsuit began you had started looking as early as the

7   weekend after the inspection?

8   A.  No.

9   Q.  That weekend after the inspection when you say you began to

10  search online, did you identify some sites you might be

11  interested in?

12  A.  Yes.

13  Q.  Did you have anyone begin to look at other sites?

14  A.  Yes.

15  Q.  Who looked for you?

16  A.  Richard Gray, Julia Cahill, Richard Cohen and Paul

17  Gleicher.

18  Q.  Did all four of them look at every site?

19  A.  No.

20  Q.  Some of them some, and some the others?

21  A.  Correct.

22  Q.  Roughly how many sites did you have them look at?

23  A.  Four.

24  Q.  Prior to the end of April, did you personally look at any

25  other site?

C6IJCAM2                          Campbell - direct

1    A.  No.

2    Q.  Where were you at the time?

3    A.  California.

4    Q.  Prior to the end of April, did you make an offer on any

5    other site?

6    A.  No.

7    Q.  You mentioned earlier you eventually had that conference

8    call with Mr. Marton.  When was this?

9    A.  The following Tuesday, Tuesday the 21st.

10   Q.  Feel free to refer to the calendar, please.

11        On Monday, the 20th, did you learn of substantive

12   communications between Mr. Cohen and Mr. Canter that day other

13   than being willing to set up the conference?

14   A.  Yes.

15   Q.  You learned that from Mr. Cohen?

16   A.  Yes.

17   Q.  Without going into the details of your conversations with

18   Mr. Cohen, did you understand the tone of those communications

19   between Mr. Cohen and Mr. Canter to positive or negative?

20   A.  Negative.

21        MR. BRAUN:  He is asking for hearsay.  I object.

22        MR. ALTER:  My question was did you understand.

23        THE COURT:  It is a Bench trial.  Overruled.

24        MR. ALTER:  I believe it was answered, so I'll move

25   on.

C6IJCAM2                          Campbell - direct

1    BY MR. ALTER:

2    Q.  Who else was a party to that conference call on Tuesday

3    morning the 21st?

4    A.  Stuart Marton and Jonathan Canter, myself and Richard

5    Cohen.

6    Q.  Now, Stuart Marton we have identified.  We have mentioned

7    Mr. Canter and hopefully identified him.  Who was he?

8    A.  He was the sponsor's representative.

9    Q.  Mr. Canter?

10   A.  Mr. Canter, I am sorry, he was the attorney for the

11   Sponsor.

12   Q.  And he is at the Kramer Levin firm?

13   A.  Yes.

14   Q.  Where were you at the time of this conference call?

15   A.  California.

16   Q.  How long roughly did the conversation last?

17   A.  15 or 20 minutes.

18   Q.  Please tell us about the conversation.

19   A.  It was very frustrating, and they couldn't give me a time

20   when the apartment was going to be finished.  They kept

21   estimating a few weeks, and also at that time I wanted to have

22   some financial assurances for the project.  I asked for

23   financial assurances for the project.

24   Q.  What was the response, if any?

25   A.  That I wasn't entitled to any.

C6IJCAM2                           Campbell - direct

1   Q.  Did you express your views as to the condition of the

2   apartment and of the hotel?

3   A.  Yes.

4   Q.  What response, if any, did you receive from that?

5   A.  That it was still going to be corrected.

6   Q.  Was there any mention made of whether you should have

7   closed on the 16th?

8   A.  Yes.

9   Q.  What was said?

10  A.  They still felt I should have closed on the 16th.

11  Q.  That was stated to you?

12  A.  Yes.

13  Q.  How was that conversation left, by which I mean was there

14  any agreement as to what would happen next?

15  A.  No.

16  Q.  What did happen next?

17  A.  I assumed they were going ahead and preparing the

18  apartment.

19  Q.  Do you know of any exchange between Mr. Canter and Mr.

20  Cohen thereafter?

21  A.  Yes.

22  Q.  Generally what do you know about that?

23  A.  I am not sure I understand.

24  Q.  What happened?

25          What happened, if anything, at the proposal date, do

C6IJCAM2                          Campbell - direct

1    you know?

2    A.  It was adjourned by the Sponsor and then Mr. Cohen

3    adjourned it further for two weeks.

4    Q.  And he had a right to do so under the contract?

5    A.  Yes.

6    Q.  Were there formal notices of these adjournments?

7    A.  Yes.

8    Q.  Please look at Plaintiff's 10 and Plaintiff's 14.  Are

9    these the notices you're referring to?

10   A.  Yes.

11           MR. ALTER:  I offer them in evidence.

12           MR. BRAUN:  No objection, your Honor.

13           THE COURT:  Plaintiff's Exhibit 10 and 14 are received

14   in evidence.

15           (Plaintiff's Exhibits 10 and 14 received in evidence)

16   BY MR. ALTER:

17   Q.  For reasons we'll explore in a moment, did you close on May

18   11th?

19   A.  No.

20   Q.  Did the Sponsor send you a letter as a result?

21   A.  Yes.  .

22   Q.  Let's look at Defendant's Exhibit 46, and tell me if that

23   is what you're talking about?

24   A.  Yes.

25   Q.  Was that it?  You have to answer verbally?

C6IJCAM2                        Campbell - direct

1    A.   Pardon?

2    Q.   You have to answer verbally.

3    A.   I said, "yes."

4    Q.   I am sorry.  I didn't hear you.

5              What is the date of that letter?

6    A.   May 11th, 2009.

7    Q.   In that exhibit, Defendant's 46, it speaks of a new

8    deadline of June 12th.  Did you close on the unit at the Mark

9    on or before that date?

10   A.   No.

11   Q.   Did you get another letter from defendant shortly after

12   that date?

13   A.   Yes.

14             MR. BRAUN:  Excuse me.  You didn't offer --

15             MR. ALTER:  Mr. Braun reminds me -- and I thank him --

16   I did not offer Defendant's 46 in evidence, and I now do so.

17             MR. BRAUN:  No objection.

18             THE COURT:  Defendant's Exhibit 46 is received in

19   evidence.

20             (Defendant's Exhibit 46 received in evidence)

21   BY MR. ALTER:

22   Q.   We are talking about the letter, subsequent letter which is

23   Plaintiff's Exhibit 34.  Is that a letter you received from

24   Mr. Canter on or about the date stated there on?

25   A.   34?

C6IJCAM2                          Campbell - direct

1    Q.   Plaintiff's 34?

2    A.   Yes.

3              MR. ALTER:   I offer Plaintiff's 34 in evidence.

4              MR. BRAUN:   No objection.

5              THE COURT:   Plaintiff's Exhibit 34 is received in

6    evidence.

7              (Plaintiff's Exhibit 34 received in evidence)

8    BY MR. ALTER:

9    Q.   Now we've just looked at some formal notices from defendant

10   to you, all dated after the four-way telephone conversation of

11   April 21st.

12             After that conversation and after commencing of this

13   lawsuit, did you have any other written communications with the

14   Sponsor?

15   A.   No.

16   Q.   During that same time period after the four-way

17   conversation of April 21st and the commencement of this

18   lawsuit, did you have any telephone or in-person communications

19   with any representative of the Sponsor?

20   A.   No.

21   Q.   Putting aside those formal notices that we just looked at,

22   how were communications between the two sides handled after the

23   April 21st tone call?

24   A.   Through the lawyers.

25   Q.   After the phone call of April 21, what was your expectation

C6IJCAM2                    Campbell - direct

1   of what was going to happen at the Mark?

2   A.  I really had my concerns and doubt this was ever going to

3   close.

4   Q.  Were you still willing to close at the Mark after that

5   conversation on the 21st?

6   A.  Yes, yes.

7   Q.  Did there come a time you learned the Sponsor was not going

8   to allow you a second visit?

9   A.  Yes.

10  Q.  When and how did you learn that?

11  A.  It was April 29th and I learned it through my attorney, Mr.

12  Cohen.

13  Q.  How did Mr. Cohen know?

14  A.  From Jonathan Canter.

15  Q.  Was that by letter?

16          MR. BRAUN:  Objection.

17  A.  I believe so.

18          MR. BRAUN:  Hearsay.

19          THE COURT:  Sustained.

20          MR. ALTER:  Let me offer the letter, which may

21  shortcut this.  Please look at Plaintiff's Exhibit 13, and I

22  will offer it in evidence.

23          MR. BRAUN:  I am sorry.  No objection.

24          THE COURT:  Plaintiff's Exhibit 13 is received in

25  evidence.

C6IJCAM2                              Campbell - direct

1              (Plaintiff's Exhibit 13 received in evidence)

2     BY MR. ALTER:

3     Q.  Now this letter is dated April 28th, and I see it is sent

4     by Federal Express.  Did Mr. Cohen call you on April 29th to

5     tell you of this letter?

6              MR. BRAUN:  Objection; leading.

7     A.  Yes.

8              THE COURT:  Overruled.

9              MR. ALTER:  If there is an objection, you have to wait

10    until the Judge rules before you respond.

11             THE WITNESS:  Sorry.

12    BY MR. ALTER:

13    Q.  Just yes or no, did you discuss the matter with Mr. Cohen?

14    A.  Yes.

15             MR. ALTER:  Now I'd like to call your Honor's

16    attention at this point to one sentence in this letter which is

17    the paragraph numbered 3, which states:

18             "Thus, having had an opportunity to inspect the suite

19    prior to the duly scheduled closing date and having executed an

20    inspection statement, purchaser has no further rights to

21    inspect the suite prior to closing."?

22    BY MR. ALTER:

23    Q.  Now, as a result of the conversation you had with Mr. Cohen

24    on his receipt of this April 28th letter, did you make certain

25    decisions?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C6IJCAM2                    Campbell - direct

1    A.  Yes.

2    Q.  What were they?

3    A.  I decided I didn't want to close and I didn't want the

4    apartment.

5    Q.  Did you also make any decision with respect to applying to

6    the Attorney General?

7    A.  Yes.

8    Q.  What was that?

9    A.  I authorized Mr. Cohen to apply to the Attorney General to

10   get my deposit back.

11   Q.  Prior to learning that you would not be allowed back and

12   you made a decision not to go forward with the purchase of the

13   unit at the Mark?

14           MR. BRAUN:  Objection.

15           MR. ALTER:  Shall I repeat that?

16           MR. BRAUN:  I object to it because it is a leading

17   question.  It characterizes a document that is here in front of

18   us.

19           MR. ALTER:  I'll rephrase it.

20   BY MR. ALTER:

21   Q.  Prior to learning of the April 28th letter, had you made a

22   decision not to go forward with your purchase of the unit at

23   the Mark?

24   A.  No.

25   Q.  Why did you decide on April 29th to give up on the Mark?

C6IJCAM2                    Campbell - direct

1   A.   Because they were asking me to buy an apartment that I

2   couldn't inspect, and the condition of the apartment last time

3   I saw it was was uninhabitable.

4   Q.   Now you testified earlier that on April 29th you told Mr.

5   Cohen to proceed with an application to the Attorney General

6   for a refund of your down payment.  Is that correct?

7   A.   Yes.

8   Q.   Prior to that time had you authorized him to proceed on an

9   application to the Attorney General?

10  A.   No.

11  Q.   Did you tell anyone else on the 29th you no longer were

12  interested in the mark?

13  A.   Yes.

14  Q.   Whom did you tell?

15  A.   Julia Cahill, Richard Gray and Richard Cohen.

16  Q.   Did you speak to Mr. Gleicher also?

17  A.   Sorry.  I meant Paul Gleicher yes.

18  Q.   Did you call Paul Gleicher?

19  A.   Yes, I did.

20  Q.   Did you have an e-mail exchange with him on that date on

21  the subject?

22  A.   Yes.

23          MR. ALTER:  I ask you to turn, please, to defense's

24  Exhibit 71.

25  BY MR. ALTER:

C6IJCAM2                              Campbell - direct

1    Q.  I ask you, is that E the e-mail exchange you're referring
2    to?
3    A.  Yes, yes.
4              MR. ALTER:  I offer Exhibit 71 in evidence.
5              MR. BRAUN:  No objection.
6              THE COURT:  Defendant's Exhibit 71 is received in
7    evidence.
8              (Defendant's Exhibit 71 received in evidence)
9              MR. ALTER:  Excuse me one second, please.
10             (Off-the-record discussion)
11   BY MR. ALTER:
12   Q.  Now, you mentioned that one of the people you had told that
13   you were no longer interested in the Mark was Julia Cahill.
14             What exactly did you tell her?
15   A.  I was not interested in the Mark any more, but I was
16   interested in looking at other properties in New York.
17   Q.  Did you tell her why you were no longer interested in the
18   Mark?
19   A.  Yes.
20   Q.  Please tell us what that was.
21   A.  For the same reason --
22             MR. BRAUN:  Excuse me.  I think we have had testimony.
23   I object to the form of the question.
24             MR. ALTER:  My question was what she told Ms Cahill.
25             MR. BRAUN:  I didn't think that was the question.  If

C6IJCAM2                          Campbell - direct

 1   that was the --

 2                 THE COURT:  That was the question.

 3   BY MR. ALTER:

 4   Q.  What did you tell Ms. Cahill?

 5   A.  The apartment, I didn't want it any more.  It was

 6   unfinished and they wouldn't let me reinspect; and, therefore,

 7   I wanted to move on.

 8   Q.  What did you ask her in that regard?

 9   A.  To look for other properties in New York.

10   Q.  Did she do so?

11   A.  Yes.

12   Q.  Eventually did you find you a different apartment?

13   A.  Yes.

14   Q.  Where was that located?

15   A.  15 Central Park West.

16   Q.  Did you make an offer on it?

17   A.  Yes.

18   Q.  Let's look at Defendant's Exhibit 101.

19                 MR. ALTER:  Let me offer it in evidence is the easiest

20   way.

21                 MR. BRAUN:  No objection, your Honor.

22                 THE COURT:  Defendant's Exhibit 101 is received in

23   evidence.

24                 (Defendant's Exhibit 101 received in evidence)

25   BY MR. ALTER:

C6IJCAM2                          Campbell - direct

1    Q.  At the bottom of that e-mail Ms. Cahill made an offer, and

2    the reference is 15 Central Park West, Apartment 11 B.  At the

3    bottom e-mail on Page 1 of that e-mail, she made an offer on

4    your behalf.  Is that correct?

5    A.  Yes.

6    Q.  What was the offer?

7    A.  $16,500,000.

8    Q.  What was the date she made that offer?

9    Q.  The date of this e-mail?

10   A.  May 15th.

11   Q.  Was that offer of 16 accepted?

12   A.  No.

13   Q.  Did you eventually reach a agreement on a different number?

14   A.  Yes.

15   Q.  What was that number?

16   A.  17,500,000.

17   Q.  When was the agreement reached?

18   A.  The middle of May.

19   Q.  More specifically, if this -- do you have a May calendar in

20   front of you?

21   A.  Pardon?

22   Q.  Do you have a May calendar in front of you?

23   A.  Yes.

24   Q.  Ms. Cahill made the offer on Friday, the 15th of May for

25   16,5.  You tell us it was rejected.  Is that correct?

C6IJCAM2                        Campbell - direct

1   A.  I am sorry?

2   Q.  Ms. Cahill made the offer for you of 16.5 million --

3   A.  Right.

4   Q.  -- on May 15th, which you tell us was rejected?

5   A.  Correct.

6   Q.  Have I correctly stating your testimony?

7           When was the agreed on price of 17,5 reached if you

8   recall?

9   A.  I don't recall exactly.

10  Q.  In any event, did you come to sign a contract for the

11  Apartment 11 B at 15 Central Park West?

12  A.  Yes.

13  Q.  Is that Defendant's Exhibit 115?

14  A.  Yes, yes.

15          MR. ALTER:  I offer it in evidence.

16          MR. BRAUN:  No objection.

17          THE COURT:  Defendant's Exhibit 115 is received in

18  evidence.

19          (Defendant's Exhibit 115 received in evidence)

20  BY MR. ALTER:

21  Q.  Now, you signed this contract in many places, these

22  documents in many places.  On only one of them did you actually

23  date it that I can find.  That is on the page at the bottom

24  with the plaintiff's production number 1209.  Do you see where

25  I am referring to, the disclosures of lead-based paint?

C6IJCAM2                        Campbell - direct

 1   A.  Yes.

 2   Q.  What date did you sign this document?

 3   A.  May 20th, '09.

 4   Q.  You would have signed all the documents on the same day, is

 5   that a fair statement?

 6   A.  Yes.

 7   Q.  Go back to Page 1 of the contract.  When is it dated?

 8   A.  May 21st.

 9   Q.  Is that the date you got the contract back from the seller?

10   A.  Yes.

11   Q.  When did you close on this purchase?

12   A.  Sometime in July.

13   Q.  Did you move in immediately?

14   A.  No.

15   Q.  Why not?

16   A.  Because we wanted to do some renovations on the apartment.

17   Q.  You are living there today?

18   A.  Yes.

19   Q.  Have you ever personally had any contact with any of the

20   other people who contracted to buy a unit at the Mark?

21   A.  No.

22   Q.  Or have you ever had contract with any representative of

23   any such person?

24   A.  No.

25   Q.  Prior to signing the contract for 15 Central Park West,

1   prior did you hear any suggestion from any source whatsoever

2   that defendant might have changed its mind and would allow you

3   back?

4   A.  No.

5   Q.  Specifically during that time period did Julia Cahill ever

6   say anything to you to that effect?

7   A.  No.

8   Q.  Did anyone else affiliated with Corcoran say anything to

9   you during that time period to that effect?

10  A.  No.

11  Q.  Did you have any contact at all with anyone from Corcoran

12  other than Julia Cahill between April 29th and signing of the

13  contract for 15 Central Park West?

14  A.  No.

15  Q.  Did you have any contact with anyone from defendant during

16  that time period?

17  A.  No.

18  Q.  After the signing of the contract at 15 Central Park West,

19  did it eventually come to your attention that defendant was

20  claiming it would have allowed you to reinspect after all?

21  A.  Yes.

22  Q.  How did that come about?

23  A.  It was the defendant's response to the petition to the

24  Attorney General.

25  Q.  We'll get to that.  Let's proceed chronologically here.

C6IJCAM2                          Campbell - direct

1              Did Mr. Cohen submit an application to the Attorney

2    General, seeking return of your down payment?

3    A.  Yes.

4              MR. ALTER:  I like to offer at this point Defendant's

5    Exhibit 44, which is that application.

6              MR. BRAUN:  No objection, your Honor.

7              THE COURT:  Defendant's Exhibit 44 is received in

8    evidence.

9              (Defendant's Exhibit 44 received in evidence)

10             MR. ALTER:  I would like to read one sentence to the

11   court.  This is on Page 3, the bottom paragraph.

12             "Unbelievably and outrageously, especially considering

13   the unfinished condition of the unit and the building on April

14   15, in response to our request to be notified when the unit was

15   completed so Ms. Campbell can return from California to see all

16   hazardous conditions had been cured and the work completed, the

17   Sponsor has taken ludicrous and outrageous position purchaser

18   is not entitled to a final inspection of premises."

19   BY MR. ALTER:

20   Q.  Did the Kramer Levin firm ever respond to Mr. Cohen's

21   application?

22   A.  I don't know.

23   Q.  How did you learn that they were going to let you back?

24   A.  Mr. Cohen told me.  Sorry.

25   Q.  How did he learn it, if you know?

C6IJCAM2                    Campbell - direct

1    A.  I don't know.

2           MR. ALTER:  Let me offer exhibit Plaintiff's 36, which

3    I will volunteer is the Kramer Levin's firm response to the

4    application to the Attorney General.

5           MR. BRAUN:  Are you offering it in evidence?

6           MR. ALTER:  Yes.

7           MR. BRAUN:  No objection, your Honor.

8           THE COURT:  Plaintiff's Exhibit 36 is received.

9           (Plaintiff's Exhibit 36 received in evidence)

10          MR. ALTER:  Your Honor, I will just call your

11   attention to one sentence of that on Page 6.  The pages are

12   numbered at the top, Page 6 of 7.

13          Numbered Paragraph 6 followed by a paragraph stating

14   Sponsor's response, just reading the last sentence of that

15   paragraph -- before I do that, though, I would point out this

16   letter is signed by an attorney at Kramer Levin other than

17   Mr. Canter.  Now I am reading.

18          "Furthermore, Jonathan Canter esquire of this office

19   has spoken with Assistant Attorney General Kenneth DeMario and

20   advised him that Sponsor is willing to permit purchasers to

21   reinspect the suite even though the Sponsor bears no

22   contractual obligation to do so."

23   BY MR. ALTER:

24   Q.  Is this what you were referring to before when you

25   testified about the Sponsor's response to the application to

C6IJCAM2                         Campbell - direct

1    the Attorney General?

2              MR. BRAUN:  Leading.

3              THE COURT:  Sustained.

4    BY MR. ALTER:

5    Q.  Prior to your learning about this comment which I have just

6    read in Plaintiff's Exhibit 36, was it ever suggested to you by

7    anyone that Sponsor might have changed its mind about allowing

8    you to view the apartment?

9    A.  No.

10             MR. BRAUN:  Objection; leading.

11             THE COURT:  I didn't hear any objection.

12             MR. BRAUN:  Sorry, your Honor, I did say "leading."  I

13   guess I mumbled.

14             THE COURT:  Overruled.

15   BY MR. ALTER:

16   Q.  Let me repeat the question.

17             Prior to your learning about this comment in exhibit

18   Plaintiff's 36 which I have just read, was it ever suggested to

19   you by anyone that Sponsor might have changed its mind about

20   allowing you to view the apartment again?

21             MR. BRAUN:  Your Honor, sorry.  Where is the

22   foundation?  He hasn't established she learned of the comment.

23             THE COURT:  I think he did.  I will overrule the

24   objection.

25   BY MR. ALTER:

C6IJCAM2                      Campbell - direct

1    Q.  May I have an answer please?

2    A.  Would you repeat.

3    Q.  I'll repeat it once more.

4           Prior to your learning about this comment in exhibit

5    Plaintiff's 36 which I have just read, was it suggested to you

6    by anyone Sponsor might have changed its mind about allowing

7    you to view the apartment again?

8    A.  No.

9    Q.  Specifically did Julia Cahill ever say anything to you

10   about it?

11   A.  No.

12   Q.  Did anyone else affiliated with Corcoran ever say anything

13   to you about it?

14   A.  No.

15   Q.  Did anyone ever say anything to you about it?

16   A.  No.

17   Q.  Prior to commencement of this lawsuit, was it ever

18   suggested to you by anybody that the Sponsor supposedly was

19   willing to pay for your plane fare from California to come and

20   inspect the unit again?

21   A.  No.

22   Q.  Incidentally, how much was round trip plane fare from

23   California?

24   A.  About $2,000.

25   Q.  First class?

C6IJCAM2                          Campbell - direct

1    A.  Yes.

2    Q.  How much was the sale price of 1402?

3    A.  17 million 500.

4    Q.  No.  That is --

5    A.  18 million 750,000.

6    Q.  At my request, did you compute what percentage of the

7    purchase price a round trip plane fare represented?

8    A.  Yes.

9    Q.  What was that?

10   A.  100dreth of 1 percent.

11   Q.  Have you gotten your down payment back from the Sponsor?

12   A.  No.

13   Q.  That is what this lawsuit is all about?

14   A.  Yes.

15            MR. ALTER:  No further questions.

16            THE COURT:  All right.  Why don't we take a

17   five-minute recess and then we'll proceed with

18   cross-examination.  Ms. Campbell, you may step down.  You are

19   excused for a few minutes  Be careful of any wires.  We'll

20   reconvene in a little less than 10 minutes.

21            (Recess)

22            THE COURT:  Please be seated.  Cross-examination.

23   CROSS EXAMINATION

24   BY MR. BRAUN:

25   Q.  Good morning.

C6IJCAM2                        Campbell - cross

1    A.  Good morning.

2    Q.  Can I ask you to take a look again at the document that is

3    in the bigger notebook and is marked as Defendant's 2, that is

4    the purchase agreement.

5            I believe you testified on direct that you did not

6    read that document before you signed it.  Is that correct?

7    A.  Correct.

8    Q.  Did you read any part of it before you signed it?

9    A.  I verified the price and then it was the right apartment

10   but not details.

11   Q.  But not what?  I am sorry?

12   A.  Not the details.

13   Q.  Those are the only two parts of the agreement you read

14   yourself before you signed it?

15   A.  Yes.

16   Q.  Well, take a look at Article V which says closing date and

17   place.  Did you read that before you signed the agreement?

18   A.  No.

19   Q.  What about Article X, the plan, did you read that before

20   you signed the agreement?

21   A.  No.

22   Q.  And Article 16 entitled "Construction," did you read that

23   before you signed the agreement?

24   A.  No.

25   Q.  What about Article 17 entitled, "Inspection of suite," did

C6IJCAM2                         Campbell - cross

1    you read that before you signed the agreement?

2    A.   No.

3    Q.   And Article XIX entitled, "No representations," did you

4    read that before you signed the agreement?

5    A.   No.

6    Q.   Did you discuss any of these articles with Mr. Cohen before

7    you signed the agreement?

8    A.   Yes.

9    Q.   Do you recall just -- I am not going to ask you to tell me

10   what he said, but I want to ask you if you recall which

11   provisions of the agreement you discussed with him before you

12   signed it?

13   A.   No, I don't recall.

14   Q.   There is also, I would like you to take a look at Schedule

15   D of the purchase agreement which has a Bates stamp number

16   POOO38.  If you'll notice there is a signature on that page

17   specifically.  Is your signature there?  I am sorry.

18         I think I may have -- yes, on that page is your

19   signature there on that page?

20   A.   Yes.

21   Q.   Would you read Item 4 of that schedule out loud, please.

22   A.   "Sponsor has made no representations or warranty that the

23   hotel will be or will continue to be owned and operated as a

24   hotel and as described in the plan or as the Mark Hotel or any

25   other hotel brand or that the current hotel operator will

C6IJCAM2                    Campbell - cross

1    continue to be the operator of any such hotel."

2    Q.  Did you read that page before you signed it?

3    A.  No.

4    Q.  Did you discuss that page or anything on that page with Mr.

5    Cohen before you signed it?

6    A.  I don't remember.

7    Q.  Now I'd like you to look at the document that has been

8    admitted into evidence as Defense's 3.  It is the one that is

9    in the notebook by itself.  It is the offering plan --

10   A.  Ah-huh.

11   Q.  -- prior to amendments.  You received that prior to signing

12   the purchase agreement, correct?

13   A.  Yes.

14   Q.  Did you read the offering plan prior to signing the

15   purchase agreement?

16   A.  No.

17   Q.  The purchase agreement?

18   A.  No.

19   Q.  Did you read any portion of it?

20   A.  Not that I recall.

21   Q.  Did you discuss any portion of it with Mr. Cohen before you

22   signed the agreement?

23   A.  I don't remember.

24   Q.  Between the time that you signed the agreement and the time

25   that you had your inspection of Suite 1402, did you read the

C6IJCAM2                        Campbell - cross

1   purchase agreement?

2   A.  No.

3   Q.  What about did you read the offering plan during that time?

4   A.  No.

5   Q.  Between the time that you had the inspection and the time

6   that you instructed Mr. Cohen to file an application with the

7   Attorney General, did you read any portion of the purchase

8   agreement?

9   A.  No.

10  Q.  Did you read it during that same period of time, did you

11  read any portion of the offering plan?

12  A.  No.

13  Q.  By the way, you were referred to Mr. Cohen by Ms. Cahill,

14  the real estate agent.  Is that correct?

15  A.  Yes.

16  Q.  And Mr. Cohen's law firm continues to represent you in this

17  lawsuit.  Is that correct?

18  A.  Yes.

19  Q.  What is the financial arrangement or financial

20  understanding that you have with Mr. Cohen's law firm regarding

21  their compensation for their work on this matter, on this

22  lawsuit?

23  A.  That they're paid hourly as a billing.

24  Q.  Is Mr. Cohen's law firm's compensation in any way

25  contingent on the outcome of this lawsuit?

C6IJCAM2                          Campbell - cross

1    A.  No.

2    Q.  Do you have any compensation arrangement with Mr. Cohen for

3    his work on this lawsuit that is separate from your arrangement

4    with his law firm?

5    A.  No.

6    Q.  You also discussed the purchase agreement prior to signing

7    it with Mr. Gray.  Is that correct?

8    A.  Yes.

9    Q.  Did you discuss the offering plan with Mr. Gray prior to

10   signing the purchase agreement?

11   A.  I don't recall.

12   Q.  Mr. Gray is an attorney.  Is that correct?

13   A.  Yes.

14   Q.  He practices law in New York City?

15   A.  Yes.

16   Q.  By the way, did you read the purchase agreement for the

17   apartment at 15 Central Park West before you signed it?

18   A.  No.

19   Q.  I'd like you to look at a document in the defendant's

20   notebook, the big notebook that is Defendant's 6 for

21   identification.

22   A.  6?

23   Q.  Yes.

24   A.  (Pause)

25   Q.  The bottom half of the first page is an e-mail from Mr.

C6IJCAM2                    Campbell - cross

1    Cohen.  I ask you whether you received that on or about January
2    18th, 2008?
3    A.  (Pause)
4    Q.  I have asked you whether you received that in January 18,
5    2008?
6    A.  Yes.
7    Q.  I am talking about the e-mail that is on the bottom half of
8    the first page.
9    A.  Yes.  I am sorry, yes.
10   Q.  Now, the top half of the first page is what appears to be
11   an e-mail from you to Mr. Cohen, with a copy to Ms. Cahill also
12   on January 18th, 2008.  I want to ask you whether you sent that
13   e-mail on that particular day?
14   A.  Yes.
15   Q.  So in that e-mail you wrote, among other things, "I don't
16   see the hotel part of this project will not be finished."
17            That was your view as of January 18, 2008?
18   A.  Yes.
19   Q.  Was it also your view as of that date that you were "not in
20   a rush to move in, et cetera, so if it is delayed, I don't have
21   a problem"?
22   A.  Yes.
23   Q.  Did you also write, was it also your view as of January
24   18th, 2008 that, "Succinctly, I think there is minimal
25   probability that the project will not be completed and I am

C6IJCAM2                        Campbell - cross

1    willing to take that chance".

2              Was that your view on January 18th, 2008?

3    A.  Yes.

4              MR. BRAUN:  I ask Defendant's 6 be received in

5    evidence.

6              MR. ALTER:  No objection.

7              THE COURT:  Defendant's Exhibit 6 is received in

8    evidence.

9              (Defendant's Exhibit 6 received in evidence)

10   BY MR. BRAUN:

11   Q.  January 18th, 2008 is the same day you signed the purchase

12   agreement.  Is that not correct?

13   A.  Yes.

14   Q.  It is correct, isn't it?

15   A.  Yes.

16   Q.  So when you signed that agreement, you knew that you were

17   taking on a risk regarding completion of the project, correct?

18   A.  Yes.

19   Q.  Now, the period that elapsed between when you signed the

20   purchase agreement in January of '08 and when you arrived in

21   New York for the inspection is about 14 or 15 months, correct?

22   A.  Yes.

23   Q.  A lot happened in that time, correct?

24   A.  Yes.

25   Q.  Well, you and your husband divorced, correct?

C6IJCAM2                    Campbell - cross

1    A.   Correct.

2    Q.   And global economic conditions changed dramatically for the

3    worst.  Is that correct?

4    A.   Yes.

5    Q.   Real estate values generally declined as well, correct?

6    A.   Yes.

7    Q.   In the early part of 2009 after the Sponsor sent notice of

8    a closing date, Mr. Cohen tried to renegotiate the purchase

9    price in your favor, correct?

10   A.   Yes.

11   Q.   He did that with your knowledge?

12   A.   I don't remember.

13   Q.   You don't remember whether he did it with your knowledge?

14   A.   I can't imagine he didn't.

15   Q.   He did it with your approval, the same answer?

16   A.   Yes.

17   Q.   Are you aware of the fact that when Mr. Cohen was

18   negotiating the purchase agreement on your behalf in 2008, he

19   successfully negotiated for the inclusion in the purchase

20   agreement of a right by you to adjourn the closing date for up

21   to two weeks?

22   A.   Yes.

23   Q.   Are you aware that he justified that request to the

24   Sponsor's attorney on the ground it was needed to allow you to

25   travel conveniently to New York from California or wherever

C6IJCAM2                         Campbell - cross

1   else you might be at the time?

2   A.  Yes.

3   Q.  Now, you're aware of the fact, aren't you, that up until

4   April 24, 2009 Mr. Cohen did not exercise that right, correct?

5   A.  I don't recall.

6   Q.  You talked about this four-way conversation that took place

7   on Tuesday, April 21, 2009.  You remember that, correct?

8   A.  Yes.

9   Q.  As of that time Mr. Cohen had never exercised your right to

10  have a two-week adjournment of the closing.  Is that correct?

11  A.  I am not positive.  No, he never asked for an adjournment.

12  Q.  Now, you indicated on direct examination that as of the

13  Spring of '09, you were aware that the Sponsor had a deadline

14  requiring that it close at least one sale by a certain date.

15         Is that correct?

16  A.  Yes.

17  Q.  What was your understanding of the date or the deadline?

18  A.  May 1st.

19  Q.  So isn't one of the reasons that Mr. Cohen did not invoke

20  your right to a two-week adjournment until after that April 21

21  phone call, that he wanted to delay it, delay the closing, I

22  should say, until after May 1?

23         MR. ALTER:  Objection.

24         THE COURT:  If she knows, she can answer, but it is

25  overruled.

C6IJCAM2                        Campbell - cross

1   A.  No.

2   BY MR. BRAUN:

3   Q.  That was not a reason?

4   A.  No.

5   Q.  Any reason?

6   A.  No.

7   Q.  You weren't hoping to use the possibility of a post-May 1

8   closing date to get leverage over the Sponsor in some fashion?

9   A.  Absolutely not.

10  Q.  If Mr. Cohen was trying to do that, you don't know that was

11  his thinking.  Is that what you're saying?

12  A.  He wasn't trying to do that.

13  Q.  Well, did he tell you he wasn't trying to do that?

14  A.  No.

15  Q.  As of the Spring of '09 did you have an understanding as to

16  whether there was a relationship between the issuance of the

17  certificate of occupancy for the suite and the Sponsor's right

18  to schedule a closing?

19  A.  Yes.

20  Q.  What was that understanding?

21  A.  That if you have a certificate of occupancy, you have the

22  right to close or ask the person to close.

23  Q.  Ask or require?

24  A.  Require.

25  Q.  And when you say "you," you meant the Sponsor, correct?

C6IJCAM2                         Campbell - cross

1   A.  Yes.

2   Q.  You said you have --

3   A.  One has, or the Sponsor has.

4   Q.  The Sponsor you're referring to, correct?

5   A.  Yes.

6   Q.  As of the Spring of '09, did you have an understanding as

7   to whether it was common in the New York City real estate

8   development area to finish floors of a multistory building on a

9   rolling basis, get certificates of occupancy for those floors

10  on a rolling basis and cause those buildings to be occupied on

11  a rolling basis?

12          MR. ALTER:  I don't understand the question, but I

13  have no problem with the witness answering it if she

14  understands.

15          THE WITNESS:  No, I had no knowledge of that.

16  BY MR. BRAUN:

17  Q.  Did you have an understanding as of the Spring of '09 as to

18  whether the Sponsor could be entitled to require some unit

19  owners to close their purchases before the entire project was

20  completed or substantially complete?

21  A.  Yes.

22  Q.  What was your understanding?

23  A.  That given within reason, the Sponsor could require you to

24  close if the apartment wasn't completely finished.

25  Q.  You said the apartment wasn't completely finished.

C6IJCAM2                         Campbell - cross

1             Are you talking about your apartment or somebody

2   else's apartment?

3   A.   My apartment.

4   Q.   Did you have an understanding that as to whether the

5   Sponsor could require you to close your purchase before other

6   apartments in the building were complete and ready for

7   occupancy?

8   A.   Yes, I was aware of that.

9   Q.   The Sponsor could do that?

10  A.   Correct.

11  Q.   Did you have an understanding at that time whether the

12  Sponsor had the right to start to require unit purchasers to

13  close their purchases before the hotel was opened?

14  A.   Yes.

15  Q.   What was your understanding?

16  A.   That parts of the hotel or some parts of services could be

17  not finished and you would be required to close.

18  Q.   Now, eventually a closing was scheduled for April 16, '09,

19  with the inspection scheduled for the day before.  Is that

20  correct?

21  A.   Yes.

22  Q.   Do you have any awareness that even before the April 15

23  inspection Mr. Cohen had advised Sponsor's counsel that you

24  would not be closing on the day after the inspection?

25  A.   I don't recall.

C6IJCAM2                    Campbell - cross

1    Q.  You don't recall whether he did that or not?

2    A.  No.

3    Q.  Let me ask you to take a look at the document in the

4    smaller notebook, plaintiff's notebook, as Plaintiff's 18.

5           That document contains a number of e-mails, and I

6    would like you to look at the one that is on the page POO607.

7           MR. BRAUN:  By the way, your Honor, I would say that

8    over the course of discovery, plaintiff's counsel and we have

9    had conversations to try to figure out why the sequencing of

10   the Bates numbers is not consecutive.  It is fair to say we

11   just don't know.  Is that correct?

12          MR. ALTER:  I'll stipulate to that.

13          MR. BRAUN:  We believe we have reconstructed it

14   reasonably.

15   BY MR. BRAUN:

16   Q.  I want to direct your attention, Ms. Campbell, to an e-mail

17   that occupies, or I should say begins at the bottom half of the

18   page marked POO607, and you'll see it is an e-mail from Richard

19   Cohen to our paralegal, Michael Wefels.

20   A.  Ah-huh.

21   Q.  Did you see that e-mail on or about April 14th?

22   A.  I don't recall.

23   Q.  In Paragraph No. 2, the e-mail says:

24          "I have previously told you on numerous occasions that

25   we have not agreed to close on April 16th, so I don't know why

C6IJCAM2                        Campbell - cross

```
 1   you are putting that date on your closing checklist.  We are
 2   entitled to 10 days' adjournment, and additionally the proof as
 3   required above in Paragraph 1 as a closing condition, that must
 4   be satisfied prior to closing pursuant to the First Amendment
 5   of the contract."
 6             Does this in any way refresh your recollection Mr.
 7   Cohen had advised Sponsor's counsel prior to the closing --
 8   sorry -- prior to the inspection that there would not be a
 9   closing on the day after the inspection?
10   A.  I am sorry.  I don't recall.
11             MR. BRAUN:  Since the parties have stipulated to this
12   e-mail chain, I do ask that it be received in evidence, your
13   Honor, Plaintiff's 18.
14             MR. ALTER:  No objection.
15             THE COURT:  Plaintiff's Exhibit 18 is received in
16   evidence.
17             (Plaintiff's Exhibit 18 received in evidence)
18   BY MR. BRAUN:
19   Q.  Turning to the other notebook, would you please look at
20   Defendant's 62.  Now I want you to please take a look at the
21   e-mail that is on the top of the first page.  It appears to be
22   from you to Mr. Cohen, with a copy of to Mr. Gleicher.  Did you
23   send an e-mail to Mr. Cohen on or about April 10, 2009?
24   A.  It seems so, yes.
25   Q.  Do you remember the e-mail?
```

C6IJCAM2                         Campbell - cross

1    A.  No.

2    Q.  Does this e-mail in any way refresh your recollection that,

3    in fact, prior to the inspection you were planning to not close

4    but to handle the closing on some subsequent trip to New York?

5    A.  My recollection was I was planning to close as close to the

6    inspection as possible.

7    Q.  But were you planning to go back to California before you

8    actually closed?

9    A.  No.

10   Q.  Do you have any recollection of why in your e-mail here you

11   would tell Mr. Cohen -- sorry -- talk to Mr. Cohen about

12   arranging to make an additional trip?

13   A.  No.

14              MR. BRAUN:  I ask Exhibit 62 be received in evidence.

15              MR. ALTER:  No objection.

16              THE COURT:  Exhibit 62 is received in evidence.

17              (Defendant's Exhibit 62 received in evidence)

18              MR. ALTER:  That is Defense's 62, I believe, your

19   Honor.

20              THE COURT:  Yes, Defendant's Exhibit 62.

21   BY MR. BRAUN:

22   Q.  In any event, when you came to New York for the inspection,

23   you knew that you were not going to be moving into the

24   apartment for some period of time, a period of months.  Is that

25   correct?

C6IJCAM2                    Campbell - cross

1    A.  Right.

2    Q.  It was tied to your daughter's starting college in New York

3    in the fall of '09?

4    A.  Well, it was tied also to also having the interior design

5    completed.

6    Q.  In other words, between the time that you closed the

7    purchase and the time you moved in, there would be work that

8    you would have done in the apartment, correct?

9    A.  No.  There would be interior design items bought.  We

10   weren't planning to do any subsequent work in the apartment.

11   It was supposed to have been done at the closing.

12   Q.  Well, you say you weren't planning to do any substantive

13   work in the apartment?

14          In fact, the Sponsor had agreed to reconfigure the

15   apartment to fit your wishes, correct?

16          (Pause)

17          MR. BRAUN:  There is a question pending.  I wonder if

18   I can have an answer to it.  Do you need the question reread?

19          THE COURT:  Why don't you put the question to the

20   witness again.

21   BY MR. BRAUN:

22   Q.  You said you were not planning to do substantive work in

23   the apartment.  Isn't it a fact that the Sponsor had agreed to

24   reconfigure the apartment to fit your specifications to some

25   degree.  Isn't that correct?

C6IJCAM2                    Campbell - cross

1    A.   Yes, before the closing.

2    Q.   Before the closing the Sponsor had agreed to break up

3    certain rooms to create one large great room.  Is that correct?

4    A.   Yes.

5    Q.   In fact, when you arrived for the inspection, the Sponsor

6    had done that, correct?

7    A.   Yes.

8    Q.   As of the time that you appeared for your inspection, had

9    you decided on the furniture you were going to have in that

10   apartment?

11   A.   Well, we had a furniture plan and we were going to look at

12   actual items.

13   Q.   You were still in the stage of shopping for furniture?

14   A.   Definitely.

15   Q.   Had you selected carpeting at all?

16   A.   No.

17   Q.   As part of your work on the apartment after you took

18   ownership of the apartment, you were going to install

19   electrical floor outlets, weren't you?

20   A.   Yes.

21   Q.   That required surgery on the floors, didn't it?

22   A.   Yes.

23   Q.   Do you have a recollection that you also planned to replace

24   the gas cooktop with an electric induction cooker?

25   A.   Yes.

1  Q.  That is not something that the Sponsor agreed to do for

2  you.  Is that correct?

3  A.  I don't recall.

4  Q.  Well, do you recall that someone on your behalf asked the

5  Sponsor to replace the electric -- sorry -- the gas cooktop

6  with an electric cooktop?

7  A.  I don't recall exactly, but I know I wanted to replace it,

8  yes.

9  Q.  Do you recall that the Sponsor would not agree to replace

10  it?

11  A.  I don't recall.

12  Q.  Prior to your inspection of the suite at the Mark Hotel,

13  had you thought about whether you were going to paint or

14  wallpaper any of the walls in the suite?

15  A.  No, we hadn't made any final decision.

16  Q.  Do you have any recollection of trying to negotiate or

17  someone on your behalf, I should say, trying to negotiate with

18  the Sponsor, for the Sponsor to customize the paint

19  applications in the suite?

20  A.  I don't recall.

21  Q.  You don't recall whether Sponsor refused to agree to that

22  request?

23  A.  No.

24  Q.  Correct?

25  A.  Uh-huh.

C6IJCAM2                    Campbell - cross

1   Q.  Were you planning to have basic, flat white paint on every

2   wall in this apartment?

3   A.  I don't recall exactly.  I wanted the apartment paint-ready

4   and however that is done.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C6iQcam3                        Campbell - Cross

1   Q.   Paint-ready meaning ready for you to come in and apply

2   whatever paint colors you selected, is that correct?

3   A.   Yes, but I wanted a complete apartment and paint --

4   Q.   I understand that.  I'm entitled to a yes or no answer.

5   A.   OK.

6   Q.   Is your current apartment painted all one color?

7   A.   No.

8   Q.   Different rooms are different colors?

9   A.   Yes.

10  Q.   Do you have wallpaper on any of the rooms in your current

11  apartment?

12  A.   Yes.

13  Q.   Were you going to put wallpaper on any of the rooms in The

14  Mark Hotel apartment?

15  A.   Probably.

16  Q.   As of the time of the inspection, had you engaged any

17  contractors to do the electrical or other work on the floors

18  that you had planned?

19  A.   I wouldn't have, but my architect might.

20  Q.   So you don't know whether your architect had engaged any

21  contractors on your behalf, is that what you're saying?

22  A.   As of that time, no.

23  Q.   Do you know whether your architect had solicited any bids

24  from contractors?

25  A.   I don't know.

C6iQcam3                          Campbell - Cross

1   Q.  Do you know whether your architect had spoken to or

2   interviewed any contractors?

3   A.  I don't know.

4   Q.  But in no way had you closed on April 16, 2009 were you

5   going to move in on that day, correct?

6   A.  Correct.

7   Q.  I wonder if I could ask you in this smaller notebook to

8   take a look at plaintiff's 141.

9           MR. BRAUN:  Your Honor, I am reminded by counsel that

10  I may not have offered Defendant's 62 in evidence.  I would

11  like to do that.

12          THE COURT:  Any objection?

13          MR. ALTER:  None, your Honor.

14          THE COURT:  All right.  Defendant's Exhibit 62 is

15  received in evidence.

16          (Defendant's Exhibit 62 received in evidence)

17  Q.  I'm sorry, let me proceed then with 141.  You see that on

18  the bottom of the first page, there is an email from Mr. Cohen

19  to Ms. Campbell with copies.  It continues on to the next page.

20  On the beginning of the second page, the email as printed out

21  here says, "Then I will send to my client, and she will look

22  into flight arrangements to get here for an inspection and

23  close perhaps a few days later depending on how the inspection

24  goes (that is, if it is just punch list items or anything major

25  that was not completed)."

C6iQcam3                         Campbell - Cross

1         Do you remember seeing that email that you were copied

2    on?

3    A.  No.

4    Q.  You don't dispute that you received the email, correct?

5    A.  No.

6         MR. BRAUN:  I would like to ask that Plaintiff's 141

7    be received in evidence?

8         MR. ALTER:  No objection.

9         THE COURT:  Plaintiff's Exhibit 141 is received.

10        (Plaintiff's Exhibit 141 received in evidence)

11   Q.  Now, I want to talk to you about the inspection itself.

12   Did you have an understanding as to whether anyone was living

13   in the building on the day of the inspection?

14   A.  Not for sure.

15   Q.  You didn't know one way or the other whether anyone was

16   living in the building?

17   A.  No.

18   Q.  During the course of the inspection, did anyone say -- I'm

19   sorry -- did any representative of Sponsor say that no one was

20   living in the building?

21   A.  No.

22   Q.  Did any of the people who were there on your behalf mention

23   in your presence that no one was living in the building?

24   A.  No.

25   Q.  You said there were workmen in the lobby when you were

C6iQcam3                          Campbell - Cross

1     there?

2     A.   Yes.

3     Q.   They were wearing hard hats?

4     A.   Yes.

5     Q.   Where exactly -- were they actually working or passing

6     through?

7     A.   No, they were working because it was completely unfinished.

8     Q.   Well, did you notice the condition of the floors?  Was

9     there flooring installed in the lobby?

10    A.   I don't know because it was covered by a protective

11    covering.

12    Q.   In terms of the walls, were they -- did you notice if they

13    were Sheetrocked?

14    A.   Yes, they were Sheetrocked.

15    Q.   They were closed, correct?  I mean, they had been installed

16    and were closed off, correct?  They had been Sheetrocked?

17    A.   I'm not positive.

18    Q.   Do you remember whether there were wall sconces in the

19    lobby?

20    A.   No.

21    Q.   You don't --

22    A.   I don't recall.

23    Q.   You don't remember whether there was light in the lobby?

24    A.   There was light in the lobby, but I don't know that it was

25    from the sconces.

C6iQcam3                          Campbell - Cross

1    Q.  Do you remember whether the ceiling had been finished?

2    A.  No.

3    Q.  Do you remember one way or the other?

4    A.  No.

5    Q.  I think you testified on direct about the restaurant.  Is

6    the restaurant part of the lobby?

7    A.  No.

8    Q.  It's closed off, isn't it?

9    A.  Mmm-hmm.

10   Q.  You have to say yes or no.

11   A.  I'm sorry, yes.

12   Q.  And there's a door that separates the lobby from the

13   restaurant, correct?

14   A.  Yes.

15   Q.  What about the bar area, is that closed off from the lobby?

16   A.  Yes.

17   Q.  Then you went into the elevators -- I'm sorry -- into an

18   elevator?

19   A.  Yes.

20   Q.  Did the elevator function all right?

21   A.  Yes, but it wasn't an automatic elevator.  It functioned --

22   Q.  In other words, you can't push a button and summon the

23   elevator to you, is that what you're saying?

24   A.  Correct.

25   Q.  Someone was operating the elevator, is that correct?

C6iQcam3                         Campbell - Cross

1    A.   Correct.

2    Q.   Do you know whether -- do you know what's entailed in

3    changing an elevator or that elevator from an operation where

4    it has to be -- requires a person to operate it to a situation

5    where it can be summoned by push button?

6    A.   No.

7    Q.   That particular elevator, the doors opened smoothly when

8    the elevator was there?

9    A.   Yes.

10   Q.   They closed properly?

11   A.   Yes.

12   Q.   The elevator went up to the 14th floor without any kind of

13   jerky or other strange movement?

14   A.   Yes.

15   Q.   And at the end of the inspection, it went back down

16   smoothly?

17   A.   Yes.

18   Q.   Can you take a look again at Defendant's 3, which is the

19   offering plan.  Would you take a look at the page that has the

20   stamp number in the lower right-hand corner of Sponsor 00037?

21   In the middle of the first full paragraph, there's a sentence

22   there reads, "However, it is anticipated that at all times

23   after the first closing, subject to hotel occupancy, industry

24   practice and other similar factors, the lobby will be attended

25   24 hours per day, seven days per week, and there will be at

C6iQcam3                    Campbell - Cross

1    least one elevator servicing every floor on which there are

2    occupied suites."

3          Were you aware of that language in the offering plan

4    at the time of the inspection?

5    A.  No, not specifically, but there couldn't have been --

6    Q.  Mr. Alter will ask you on redirect.  Staying with the same

7    page, looking at the next paragraph, there is language that

8    begins -- and I want to direct your attention to it -- "During

9    at least the first year of operation, construction workers and

10   related personnel of Sponsor and hotel owner and others will be

11   at the property from time to time performing construction work,

12   making adjustments and performing various other tasks relating

13   to the completion of construction, fitting out of and moving

14   into the suites and other portions of the building."

15         Were you aware of that language at the time of your

16   inspection?

17   A.  No.

18   Q.  It goes on to say, "Elevators and personnel may be taken

19   out of service in order to facilitate construction, and

20   exterior hoists may be in place during at least the first year

21   following the first closing and from time to time thereafter as

22   needed in connection with construction being performed in

23   suites."

24         Were you aware of that language?

25   A.  No.

1    Q.  Then the next sentence of this document and this paragraph

2    states, "Sponsor may not fully complete the decoration or

3    finishing of the corridors and other portions of the coop

4    property and the hotel owner may not fully complete the

5    decoration or finishing of the lobby, fitness center,

6    corridors, elevator finishes and other portions of the

7    building, including, but not limited to, including light

8    fixtures, painting, hanging wall coverings or laying carpeting

9    until that particular floor is fully occupied or if additional

10   construction within an area within the building is anticipated

11   for some period thereafter."

12          Were you aware of that language at the time of the

13   inspection?

14   A.  No.

15   Q.  I believe you said on your direct that when you got into

16   the suite itself, the great room was a construction site.  Were

17   there any construction workers there?

18   A.  No.

19   Q.  Were was there any construction equipment there?

20   A.  No.

21   Q.  Construction materials?

22   A.  I don't recall.

23   Q.  Debris?

24   A.  Yes.

25   Q.  What type of debris?

C6iQcam3                        Campbell - Cross

1    A.  Maybe not in the great room, no.

2    Q.  Not in the great room?

3    A.  Not in the great room, but there was --

4    Q.  Were the walls painted in the great room?

5    A.  Very roughly, certainly not finished.

6    Q.  And were the ceilings painted?

7    A.  I don't recall.

8    Q.  Can you take a look at Defendant's 24, which is the

9    inspection statement.  Can you identify any item in there that

10   in your view made the great room a construction site?

11   A.  Well, the kitchen is considered --

12   Q.  I didn't ask you about the kitchen.  I asked you about the

13   great room.

14   A.  I was going to say it's considered part of the great room.

15   Q.  Well, it is by you.

16   A.  OK.

17   Q.  So you would point to things in the kitchen, but is there

18   anything -- is there anything in the great room other than the

19   kitchen that you view as making the great room a construction

20   site?

21   A.  No, other than it was unfinished.

22   Q.  Let me ask you to look in the same notebook at Defendant's

23   74 for identification, and I will represent to you that these

24   are -- the parties have stipulated that these are photographs

25   that were taken by Mr. Gleicher, your architect/designer,

C6iQcam3                    Campbell - Cross

1   during the inspection on April 15, 2009, and in fact I ask that

2   they be received in evidence.

3            MR. ALTER:  No objection to them being received in

4   evidence.

5            THE COURT:  Defendant's Exhibit 74 is received in

6   evidence.

7            (Defendant's Exhibit 74 received in evidence)

8   Q.  If you would look at the first photograph there,

9   Ms. Campbell, can you identify what that is?

10  A.  It's part of the great room.

11  Q.  Is there anything there that in your view makes it a

12  construction site?

13  A.  None in this picture.

14  Q.  I understand.  In this picture.  Nothing in this picture.

15           Can you identify the next photograph which has two

16  windows toward the right and a window toward the left.  Can you

17  identify what that is a picture of?

18  A.  Part of the great room.

19  Q.  Is there anything in that photograph that indicates that

20  it's a construction site?

21  A.  No.

22  Q.  Now, the next photograph is of a doorway leading out on to

23  the terrace, correct?

24  A.  Yes.

25  Q.  Do you recall where that doorway is?

C6iQcam3                         Campbell - Cross

1    A.  No.

2    Q.  Now, the picture after that is also from the great room

3    looking into the kitchen, is that correct?

4    A.  Yes.

5    Q.  Is there anything in that photograph that shows that the

6    great room was a construction site?

7    A.  No.

8    Q.  Please turn to the next picture.  That is also the great

9    room, isn't it?

10   A.  Yes.

11   Q.  Looking up to the entrance into the apartment?

12   A.  Mmm-hmm.

13   Q.  In other words, there's a dark doorway.  That's the door

14   from the hall into the unit, is that correct?

15   A.  Yes.

16   Q.  Is there anything in that photograph that indicates that

17   the great room was a construction site?

18   A.  No.

19   Q.  Please turn to the next picture.  And can you tell us what

20   that is a photograph of?

21   A.  The great room.

22   Q.  Is there anything in that photograph that shows the great

23   room -- why the great room is a construction site or was one, I

24   should say, on that day?

25   A.  No.

1    Q.  Please turn to the next one, which is photograph

2    essentially of two windows.  Can you identify where they are?

3    A.  No.

4    Q.  Is there anything in that photograph that shows this

5    particular portion of the apartment to be a construction site?

6    A.  No.

7    Q.  Turn to the following photograph.  Can you tell us what

8    that's a picture of?

9    A.  It looks like part of the great room.

10   Q.  Is there anything in that photograph that shows the room to

11   be a construction site?

12   A.  No.

13   Q.  Please turn to the picture after that and tell us, if you

14   can, what it's a picture of?  What part of the apartment, I

15   should say.

16   A.  I don't know.

17   Q.  I'm sorry, I didn't hear you.

18   A.  I don't know.

19   Q.  Is there anything in this photograph that shows the

20   apartment to be a construction site?

21   A.  No.

22   Q.  Now, if you look at the same photograph, the very lower

23   left-hand corner of the photograph, it looks like there might

24   be a little piece of molding missing.  Did you see that?

25   A.  Yes.

C6iQcam3                        Campbell - Cross

1    Q.   Do you remember that being a piece of molding missing

2    there?

3    A.   No.

4    Q.   Then turn to the next photograph.  This again is a couple

5    of windows.  Can you tell us what part of the apartment is

6    depicted in this or captured in this photograph?

7    A.   No.

8    Q.   Do you see anything there that indicates that that

9    particular part of the apartment is a construction site?

10   A.   No.

11   Q.   The next, I guess, three photographs are dark, darker and

12   darkest photographs of the bathrooms, then there is one final

13   photograph, and I ask you if you can identify what that one is,

14   the last one?

15   A.   I'm not sure.

16   Q.   You don't know which part of the apartment it is?

17   A.   No.

18   Q.   Is there anything in that photograph that indicates that

19   this portion of the apartment is a construction site?

20   A.   No.

21   Q.   You testified about the floors.  Do you recall whether

22   there was any discussion about the floors during the course of

23   the inspection?

24   A.   Not specifically, just that they were unfinished.

25   Q.   So you don't recall whether there was any conversation at

C6iQcam3                        Campbell - Cross

1    all during the course of the inspection about the floors being

2    unfinished?

3    A.  No.

4    Q.  Do you recall any discussion of why the floors were

5    unfinished?

6    A.  No.

7    Q.  Do you recall any discussion in which Sponsor's

8    representatives indicated it was unfinished because they

9    thought that's what you and your designer had requested?

10   A.  I remember hearing that, but I'm not sure it was at the

11   inspection.

12   Q.  So you don't know whether you heard it at the inspection --

13   if you didn't hear it at the inspection, when would you have

14   heard it?

15   A.  I don't know.

16   Q.  By the way, in the photographs that we just looked at that

17   were taken by Mr. Gleicher, did you see anything that indicated

18   any problems with the floors other than the fact that they

19   weren't stained the way you were expecting them to be?

20   A.  No.

21   Q.  In the course of the inspection, Sponsor representatives

22   agreed to stain the floors, isn't that correct?

23   A.  Yes.

24   Q.  And you don't have any knowledge as to whether

25   Mr. Gleicher, your architect, and someone on behalf of the

C6iQcam3                          Campbell - Cross

1   Sponsor had had discussion about staining the floors or not

2   staining the floors sometime prior to the inspection?

3   A.   No.   I knew we wanted to install.

4   Q.   You knew you wanted to install?

5   A.   Into the floor.

6   Q.   Outlets in the floor?

7   A.   Yeah.

8   Q.   And you knew that was going to be done by your contract,

9   not by the Sponsor, is that correct?

10  A.   I don't know.

11  Q.   I see.   Do you know what would be entailed in installing

12  outlets in the floor?

13  A.   No.

14  Q.   You don't know whether it would be necessary to remove and

15  take up portions of the finished floor?

16  A.   I assume so.

17  Q.   Because you would have to lay wiring underneath the floor?

18  A.   Mmm-hmm.   Yes.

19  Q.   Excuse me?

20  A.   Yes.

21  Q.   You thought that --

22  A.   Well, because we did that in our current apartment.  We did

23  that in our current apartment.

24  Q.   You took up the floor, put wiring underneath it, and then

25  created -- either replaced that or created or repaired it, is

1    that what you're saying?

2    A.  Yes.

3    Q.  So you're assuming that that was the same thing that was

4    intended in this apartment, the one at The Mark?

5    A.  I'm not sure.

6    Q.  You talked about the kitchen and your dissatisfaction with

7    the kitchen on direct examination.  One of the items you

8    mentioned was a microwave.  There was no microwave there,

9    correct?

10   A.  Correct.

11   Q.  Was there any conversation about where the microwave was?

12   A.  Not that I recall.

13   Q.  Do you recall any conversation where you were told or your

14   representatives were told the microwave was in storage in the

15   building and would be installed upon move-in?

16   A.  No.

17   Q.  You also, I believe, testified in connection with the

18   kitchen, that the burners and grates and burners on the cooktop

19   were not there, is that correct?

20   A.  Yes.

21   Q.  You noticed that yourself?

22   A.  Yes.

23   Q.  Do you recall any conversation about where those pieces

24   were?

25   A.  No.

C6iQcam3                        Campbell - Cross

1    Q.  Now, you said something about a sliding door.  You noticed

2    something that you didn't like about the sliding door, is that

3    what you said?

4    A.  Yeah.  I was in error.  I thought the question was about

5    the door that goes to the terrace, and that was -- that

6    particular item was the door from the kitchen that led from the

7    kitchen into the back hallway.

8    Q.  There was something wrong with that door in your view?

9    A.  Yes.

10   Q.  Which was what, it didn't open cleanly?

11   A.  It didn't open cleanly.  I think it was cracked.  I don't

12   recall exactly.

13   Q.  Was there a problem with the sliding doors or pocket doors

14   in the kitchen?

15   A.  That's what that door was.

16   Q.  You're saying that the door from the terrace was a sliding

17   door or pocket door?

18   A.  No.  No.  But it was difficult to get out on to the terrace

19   with the door.

20   Q.  So that was the problem with the kitchen doors?

21   A.  No, there were two separate issues.

22   Q.  And what was --

23              MR. ALTER:  You are cutting her off.

24   A.  There were two separate issues.  One --

25   Q.  One was the door to the terrace --

C6iQcam3                       Campbell - Cross

1   A.   Correct.

2   Q.   -- didn't open easily?

3   A.   Right.

4   Q.   What about the sliding door issue, what was that about?

5   A.   I don't remember exactly, but it was cracked, and you

6   couldn't slide it to get out of the kitchen easily.

7   Q.   And didn't Sponsor agree to replace that door?

8   A.   Not specifically at that time.

9   Q.   Well, they put it on the punch list, didn't they?

10   A.   Correct.

11   Q.   That means it was an item that was going to have to be

12   corrected?

13   A.   Correct.

14   Q.   Isn't that what it means?

15   A.   Yes.

16   Q.   And that means the Sponsor was going to be obligated to

17   correct it?

18   A.   Yes.

19   Q.   By putting it on the punch list, the Sponsor was indicating

20   that it would take responsibility to correct it, isn't that

21   right?

22   A.   Yes.

23   Q.   You talked about no shower enclosures; they were missing in

24   the master bathroom, correct?

25   A.   Yes.

C6iQcam3                        Campbell - Cross

1    Q.  They were also not in one of the other bathrooms, correct?

2    A.  I think more than one.

3    Q.  Do you know whether if the contract and plans for your

4    suite required the Sponsor to install enclosures in all of the

5    bathrooms?

6    A.  No.

7    Q.  Do you know how many bathrooms the Sponsor had agreed to

8    install shower enclosures in?

9    A.  No.  I assume every one.

10   Q.  You assumed every one, but you're not certain at this time,

11   is that what you're saying?

12   A.  Yes.

13   Q.  Do you recall any discussion during the course of the

14   inspection about shower enclosures?

15   A.  Only that they were missing.

16   Q.  Do you recall any -- by the way, do you recall who pointed

17   out that they were missing?

18   A.  No, I don't.

19   Q.  Do you recall whether the Sponsor or whether the Sponsor's

20   representative said anything about what would happen with

21   respect to the shower doors?

22   A.  No.

23   Q.  Do you recall whether they said anything in terms of an

24   explanation of why the shower doors were not there?

25   A.  No.

C6iQcam3                          Campbell - Cross

1     Q.  But the Sponsor's representatives acknowledged that the

2     shower doors would be installed, correct?

3     A.  Yes.

4     Q.  In whatever bathrooms they were supposed to be installed,

5     correct?

6     A.  Yes.

7     Q.  You mentioned toilet accessories.  Do you recall a

8     discussion of toilet accessories?

9     A.  Yes.

10    Q.  During the inspection?

11    A.  Yes.

12    Q.  What do you recall about that?

13    A.  That they were absent.

14    Q.  Did the Sponsor's representative say anything about toilet

15    accessories?

16    A.  I don't recall exactly, but I assume they were going to

17    install them.

18    Q.  Did they indicate during the course of the inspection where

19    the toilet accessories were at that time?

20    A.  I don't recall.

21    Q.  You talked about closets and the fact that the closets

22    essentially were just sort of Sheetrock enclosures, is that

23    correct?

24    A.  Yes.

25    Q.  In other words, the closet doors were in place, correct?

1    A.  Yes -- not all of them.

2    Q.  You mean there were some closet doors that had not -- some

3    doors between a closet in the other part of the apartment were

4    missing?

5    A.  In the hallway.

6    Q.  Is that one or two or three or how many?

7    A.  I don't recall exactly.

8    Q.  Was there discussion of closet doors that you recall?

9    A.  I don't recall.

10   Q.  Was there a dis -- now, inside the closet was what, just a

11   blank Sheetrock wall?

12   A.  Yes.

13   Q.  Do you have an understanding as to what the Sponsor's

14   obligations were with respect to the installation of closet

15   interiors?

16   A.  No.

17   Q.  Do you recall any discussion of the closets during the

18   course of the inspection?

19   A.  Yes.

20   Q.  What do you recall about that discussion?

21   A.  That they weren't finished.

22   Q.  Did anyone say anything about what would happen?

23   A.  No, but I'm sure the Sponsor --

24   Q.  Well, you don't know, right?

25   A.  Right.

C6iQcam3                    Campbell - Cross

1   Q.  Now, the terrace, you said that some of the spaces between

2   the pavers were wider than you thought proper?

3   A.  Yes.

4   Q.  And you expressed -- did you or anyone else express a

5   concern that someone's heel might get caught in some of those

6   spaces?

7   A.  Yes.

8   Q.  Was there any other safety issues regarding -- did you view

9   that as a safety issue?

10  A.  A safety issue and an aesthetic one.

11  Q.  It was an aesthetic issue; you didn't like the way the

12  pavers were laid in the terrace, correct?

13  A.  No, because it was unsafe also.

14  Q.  You said aesthetic and you said safety.  I want to ask you

15  what is the aesthetic problem that you perceived with respect

16  to the pavers?

17  A.  That they weren't designed -- that way there was debris

18  between the pavers.

19  Q.  What kind of debris was between the pavers?

20  A.  Paper, some leaves, cigarette butts.

21  Q.  So you didn't just want the Sponsor to remove the debris,

22  you wanted the Sponsor to move the pavers closer together, is

23  that correct?

24  A.  Yes.

25  Q.  And one of your concerns was aesthetic --

1   A.  Yes.

2   Q.  -- you said.  So you didn't think it looked good, is that

3   what you mean?

4   A.  Yes.

5   Q.  Did you have a concern about someone's heel getting caught,

6   is that your other concern?

7   A.  Yes, it was a very uneven surface.

8   Q.  I'm sorry, I didn't hear you?

9   A.  It was an uneven surface.

10  Q.  When you say uneven surface, you mean the top of the paver

11  or which surface was it that was uneven?

12  A.  The top of the pavers.  It was difficult to walk either

13  from the spaces between the pavers and some were a little

14  lower.  Nothing had been done to the terrace at all.

15  Q.  You mean the terrace was the way it had been prior to the

16  renovation of the building is your recollection?

17  A.  I never saw it exactly, but it didn't look like anybody had

18  done anything to it.

19  Q.  You thought the pavers that were there had not been

20  installed by the Sponsor, is that what you're saying?

21  A.  I didn't know for sure.

22  Q.  And they had some kind of a rough surface which you didn't

23  like, is that what you're saying?

24  A.  That it was difficult to walk on.

25  Q.  But because of the rough surface on the pavers, is that

1    what you're saying?

2    A.   Yes, and because they were far apart.

3    Q.   You mean they were like crumbling?

4    A.   No.

5    Q.   I'm sorry, you said far apart?

6    A.   Far apart.

7    Q.   I'm sorry, I misheard you.  Was there anything else

8    discussed about the terrace during the course of the

9    inspection?

10    A.   Not that I recall.

11    Q.   Was there anything else at all about the apartment that was

12    discussed during the inspection?

13    A.   There was much discussed.

14    Q.   What else do you remember the heat?

15    A.   Hot water, the system's elevators.

16    Q.   Was that discussed during the inspection with the Sponsor?

17    A.   Yes, after an incident.

18    Q.   Just I'm not asking you about the incident, but I'm going

19    to ask you what was discussed with the Sponsor after whatever

20    incident you're referring to?

21    A.   I don't know --

22    Q.   What did your people say?  What did the Sponsor say?

23    A.   I don't know.

24    Q.   Was there a discussion with the Sponsor's representatives

25    at the inspection about the heat?

C6iQcam3                          Campbell - Cross

1   A.  Yes.

2   Q.  What did the sponsor's representative say to you?

3   A.  I don't know.  It was told to me, I didn't --

4   Q.  It was outside your presence?

5   A.  Correct.

6   Q.  What did the Sponsor's representative say about air

7   conditioning, if you know?

8   A.  Same.

9   Q.  It was outside your presence, is that what you're saying?

10  A.  Yes.

11  Q.  In whose presence was it, if you know?

12  A.  I don't know.

13  Q.  Hot water, was that discussed with the Sponsor in your

14  presence?

15  A.  Yes.

16  Q.  What did the response --

17  A.  Not in my presence -- I'm sorry, no.

18  Q.  So you all went back down to the lobby of the building

19  after the inspection, correct?

20  A.  Yes.

21  Q.  Did you and your group have a conversation in the lobby of

22  the building before you left the building?

23  A.  Yes.

24  Q.  So whatever the condition of the lobby was, it was not such

25  that you couldn't stand around and have a conversation with

C6iQcam3                         Campbell - Cross

1    your representatives, is that right?

2    A.  Correct.

3    Q.  Is there anything in the lobby that interfered with

4    anyone's ability to walk from the front door of the building to

5    the elevators?

6    A.  No, but we had to be careful not to trip on the covering on

7    the floor.

8    Q.  What kind of covering?  Paper?

9    A.  I'm not sure.

10   Q.  Was there anything in the lobby that interfered with the

11   ability of a person to pass from the elevator to the front door

12   of the building?

13   A.  No.

14   Q.  I would ask you to take a look at Defendant's 72.  That's

15   in the bigger notebook.  That's an email addressed from

16   Mr. Gleicher to you on January 12, 2009.  Do you have a

17   recollection of receiving it?

18   A.  No.

19   Q.  It refers in the second paragraph to J.P..  This is the

20   gentleman you identified on your direct as a sales agent for

21   the Sponsor?

22   A.  Yes.

23   Q.  Can you read the second sentence in that paragraph read it

24   out loud, please?

25   A.  In the second paragraph?

C6iQcam3                        Campbell - Cross

1    Q.  Yes, please.

2    A.  "There are no floor outlets called for, so we will need to

3    do some surgery to get it in at the living room area."

4    Q.  Do you recall receiving that information from Mr. Gleicher

5    in substance or in those words?

6    A.  Yeah, I knew we had to do it.

7    Q.  You knew you had to do surgery to install floor outlets in

8    the great room?

9    A.  Yes.

10   Q.  When he says there are no floor outlets called for, did you

11   understand that to mean that there are no floor outlets that

12   the contract or that the offering plan requires the Sponsor to

13   install?

14   A.  I understand.

15   Q.  So you were going to have to do that with your contractor,

16   is that your understanding?

17   A.  I wasn't sure whether we were -- I know we were going to

18   pay for it.  I wasn't sure whether -- who was going to actually

19   do the work.

20   Q.  So, you knew it was your responsibility; not the Sponsor's

21   responsibility?

22   A.  Financially, yes.

23            MR. BRAUN:  I'd ask that defendant's 72 be received in

24   evidence.

25            MR. ALTER:  No objection.

1          THE COURT:  Defendant's 72 is received in evidence.

2          (Defendant's Exhibit 72 received in evidence)

3    Q.  I want to talk about the pavers for a second.  You

4    expressed a concern that a woman's high heel can be caught

5    between them?

6    A.  Yes.

7    Q.  Did you express a concern that a not high heel, a heel

8    other than a woman's high heel, would get caught?

9    A.  No, but a small child, it was -- they were wide apart.

10   Q.  What would happen with respect to a small child?

11   A.  A little -- if you had a small child with a small foot, you

12   know, he could turn his foot in it.  They were that wide.

13   Q.  Would you take a look at 74 again, which are Mr. Gleicher's

14   photographs.  If you would go through them, you will see that

15   the third photograph is a doorway out to the terrace?

16   A.  Yes.

17   Q.  Those are the pavers we were talking about -- that floor

18   covering that you see through this glass door, those are the

19   pavers you're talking about, correct?

20   A.  Just one second.

21   Q.  Of course.

22   A.  Where is the picture?

23   Q.  It's Exhibit 74 in the big notebook.  And it's the third

24   photograph.

25   A.  Yes.

C6iQcam3                        Campbell - Cross

1    Q.  My question is, are those the pavers that you've been

2    talking about?

3    A.  Those are some of the pavers, but towards the front of the

4    terrace they widened considerably.

5    Q.  Can you from memory tell us how wide they were?  What's

6    your best recollection of how wide the spaces were?

7    A.  I would say up to three-quarters of an inch, at least.

8    Q.  So close to the wall of the building, they were whatever is

9    shown on this photograph, correct?  That's your testimony?

10   A.  Yes.

11   Q.  But to the right, toward the parapet, they were further

12   apart, the pavers?

13   A.  Yes.

14   Q.  Up to maybe three-quarters of an inch?  Hard to say at this

15   time, but what's your best recollection?

16   A.  They were much wider.  At least three-quarters of an inch.

17   Enough for debris to be in between them too.

18   Q.  I would like you to look at Defendant's 28, please, also in

19   the big notebook.  Do you recall receiving this email from

20   Mr. Gleicher on the morning of April 16, 2009?

21   A.  No.

22   Q.  Do you recall receiving an email from Mr. Gleicher that

23   listed items that he felt needed to be addressed in the

24   apartment?

25   A.  No.

C6iQcam3                         Campbell - Cross

1    Q.  Do you have any recollection of Mr. Gleicher being asked to

2    prepare a list of items that needed to be addressed in the

3    apartment?

4    A.  He wasn't asked --

5    Q.  I'm sorry?

6    A.  No.

7    Q.  Do you dispute that you received this email; that you were

8    copied on this email from Mr. Gleicher on the morning of

9    April 16, 2009?

10   A.  No.

11            MR. BRAUN:  May it be received in evidence, your

12   Honor?

13            MR. ALTER:  No objection here, your Honor.

14            THE COURT:  Defendant's Exhibit 28 is received in

15   evidence.

16

17            (Defendant's Exhibit 28 received in evidence)

18   Q.  If you look at the third paragraph of Mr. Gleicher's email,

19   he says in part, "The only items that I can see preventing

20   Roberta from occupying the apartment are the unfinished floors,

21   the lack of hobs (grates) on the cooktop, and the lack of

22   heat."

23            Do you have a recollection of Mr. Gleicher expressing

24   the view that these items prevented you from taking occupancy?

25   A.  No.

C6iQcam3                        Campbell - Cross

1   Q.   Or prevented you from occupying the apartment, I should

2   say?

3   A.   No.

4   Q.   Then he goes on to say the other items on the list are

5   cosmetic in nature.  Do you have any recollection of

6   Mr. Gleicher expressing the view that everything else was

7   cosmetic in nature?

8   A.   No.

9   Q.   You have no recollection?

10  A.   No.

11  Q.   Are you disagreeing with Mr. Gleicher's characterization of

12  the other items as being cosmetic in nature?

13  A.   Of the ones he listed here, no, I don't disagree.

14  Q.   Did you respond to this email?  I guess you don't remember,

15  right?

16  A.   I don't remember.

17  Q.   I'm sorry --

18  A.   I don't remember.

19  Q.   By the way, on Defendant's 24, which is the inspection

20  statement, you signed that document, correct?

21  A.   Yes.

22  Q.   And you initialed all of the pages after the cover page, is

23  that correct?

24  A.   Yes.

25  Q.   Did you discuss the document with anyone prior to signing

1    it?

2    A.  No.

3    Q.  But you had two attorneys with you at the time you signed

4    it correct?  Mr. Gray and Mr. Cohen, correct?

5    A.  Mr. Gray wasn't representing me.

6    Q.  I understand, but he is an attorney who was with you,

7    correct?

8    A.  Yes.

9    Q.  By the way, did Mr. Gray express any thoughts during the

10   course of the inspection as to things he thought were defective

11   or wrong in the apartment?

12   A.  We were all discussing them, yes.

13   Q.  So is the answer to my question yes?

14   A.  Yes.

15   Q.  Do you know if Mr. Gray expressed views as to defects in

16   the apartment to representatives or the Sponsor?

17   A.  I don't know.

18   Q.  Did you discuss the inspection -- before signing the

19   inspection statement, did you discuss it with Mr. Gleicher?

20   A.  No.

21   Q.  Mr. Ubell?

22   A.  No.

23   Q.  Now, turning to Exhibit 63 that's in the large notebook,

24   and that's already been received in evidence, again, this is

25   the email exchange starting on 4:38 p.m. on the afternoon of

C6iQcam3                          Campbell - Cross

1    the inspection where, among other things, Mr. Gleicher writes

2    to you: "I just wanted to tell you that I think the apartment

3    is absolutely fabulous.  The light, openness, view, ceilings,

4    finishes, etc., etc., etc., I hope you feel the same way."

5            And you responded:  "I definitely feel the same way,"

6    and you went on to say some other things.

7            Did you have an understanding of what Mr. Gleicher

8    meant by finishes?

9    A.  No, not specifically.

10   Q.  So you don't know whether he was referring to painting, for

11   example, molding?

12   A.  No.

13   Q.  He also uses the words etc., etc., etc., so that means he

14   was talking about more than the enumerated items in this email,

15   correct?

16   A.  I assume so.

17   Q.  And you assumed so at the time, correct?

18   A.  Yes.

19   Q.  And you responded that you definitely felt the same way,

20   correct?

21   A.  Yes.

22   Q.  So you understood at the time that when he said -- when he

23   was talking about the apartment being fabulous, he was

24   referring to more than light, openness, views, ceilings and

25   finishes, correct?

C6iQcam3                          Campbell – Cross

1    A.  Yes.

2              THE COURT:  Is this an appropriate place to take our

3    recess.  How much more do you have of Ms. Campbell?

4              MR. BRAUN:  I have a fair amount more, your Honor, but

5    it is certainly a good spot to take a recess.

6              THE COURT:  We will take our luncheon recess now until

7    2:00 p.m.

8              Ms. Campbell, you may step down.  You're excused once

9    again.  Be careful of the wires.

10             We will reconvene at 2:00.  Have a good lunch.

11             (Witness recessed)

12             MR. BRAUN:  Your Honor, will the courtroom be open to

13   us if we want to come back into the courtroom?

14             THE COURT:  Yes, I will make arrangements for it to be

15   opened at 1:45.

16             MR. BRAUN:  Thank you.

17             (Luncheon recess)

18          (Continued on next page)

19

20

21

22

23

24

25

C6iQcam3                          Campbell - Cross

1                AFTERNOON SESSION

2                2:00 pm

3                (Trial resumes)

4                (In open court)

5                THE COURT:  Please be seated.  Are the parties ready?

6                MR. BRAUN:  Yes.

7                MR. ALTER:  We are.

8                THE COURT:  You may continue your inquiry, Mr. Braun.

9                MR. BRAUN:  Thank you, sir.

10   CROSS-EXAMINATION continued

11   BY MR. BRAUN:

12   Q.  I want to go back and ask you a few more questions about

13   the inspection.  I want to ask you, therefore, to look at

14   Defendant's 24.  It is in the big notebook and it is the

15   inspection statement.  Tell me when you are ready.

16                Do you have it?

17   A.  Yes.

18   Q.  If we start with Page 1 of 4, which is the second page of

19   the document, there is nothing on that page about the

20   bathrooms, correct?

21   A.  Correct.

22   Q.  And on Page 2 of 4, also there is nothing there about the

23   bathrooms, correct?

24   A.  Correct.

25   Q.  Now, if we turn to 3 of 4, there are a number of entries by

1   master bath, correct?

2   A.  Yes.

3   Q.  One of them is the third from the bottom, install shower

4   enclosure.  That indicates that there was a shower enclosure of

5   some sort that was missing from that particular bath, correct?

6   A.  Yes.

7   Q.  We agree on that?

8   A.  Yes.

9   Q.  Now then the next room on the list, on the same page is

10  Bathroom No. 4, and again the third item is install shower

11  enclosure.  So the shower enclosure, everybody agreed, was

12  missing from Bathroom No. 4, correct?

13  A.  Yes.

14  Q.  Now if we go onto Page 4 of 4, which is the last page, then

15  there are some entries -- actually, bear with me.  Sorry for

16  the delay. (Pause)

17          Do you see anything on 4 of 4 about the other

18  bathrooms in the unit?

19  A.  Bathroom 3 and 2.

20  Q.  That's Bedroom No. 2 and 3?

21  A.  Oh, I am sorry.

22  Q.  There is nothing in there about other bathrooms, correct?

23  A.  Correct.

24  Q.  There is no indication on this inspection statement that

25  there were shower enclosures or any other items missing from

1   the other bathrooms in the unit, correct?

2   A.   Correct.

3   Q.   And do you recall how many bathrooms there were in the

4   unit?

5   A.   I believe four and a half.

6   Q.   Thank you.

7            Now I want to ask you to look at 74, which are the

8   photographs Mr. Gleicher took.  I want to direct your attention

9   to one in particular which is the very last one before you get

10  to the pictures of bathrooms.  Please tell me when you've found

11  it.

12  A.   The two windows?

13  Q.   Yes, a photograph of two windows.

14           Now, if you look at the window on the left and you

15  look specifically on the right door frame of the upper window,

16  there is something there, isn't there, that appears to be

17  affixed to the window frame?  It is a small item, do you see

18  it?

19  A.   On the right-hand window?

20  Q.   It is on the right-hand window.  Also if you see it on the

21  right-hand window?

22  A.   Yes.

23  Q.   Do you know what that is?

24  A.   It looks like tape.

25  Q.   It is an L-shaped -- sorry -- not on the window pane, but

C6iQcam3                              Campbell - Cross

1   on the frame of the window on the right there is some kind of

2   a -- I don't want to characterize it.  There is a thing there.

3   Do you see it, a little L-shaped thing?

4   A.  Yes.

5   Q.  Do you know what that is?

6   A.  I think it is a temporary window guard.  I don't know.

7   Q.  You think it is a temporary window guard?

8   A.  I am not sure.

9   Q.  Did you ever hear the expression a window stop?

10  A.  Yes.

11  Q.  Do you know what the function of that window stop is?

12  A.  Yes.

13  Q.  What is it?

14  A.  To keep the window from opening I believe more than four

15  inches.

16          (Off-the-record discussion).

17  Q.  Actually, Ms. Campbell, if I could direct you back to 24,

18  which is the inspection statement, and again to the last page.

19  I may have misspoke and misled you.  I would like to go over

20  with you something again.

21  A.  I have it.

22  Q.  Now again if you look at Page 4 of 4, next to Bedroom No.

23  2, there are some entries labeled, "Bath."  Do you see them?

24  A.  Yes.

25  Q.  Is there any item there indicating missing shower

C6iQcam3                            Campbell - Cross

1    enclosures?

2    A.   No.

3    Q.   And then below the entry for Bedroom No. 2 there is entries

4    for bedroom No. 3, correct?

5    A.   Yes.

6    Q.   Sort of as a subheading, it says "Bath," underlined.  Do

7    you see that?

8    A.   Yes.

9    Q.   And there are four items listed there for that bath.  Do

10   you see them?

11   A.   Yes.

12   Q.   Are any of those items about a missing shower enclosure?

13   A.   No.

14   Q.   Thank you.

15            Also I believe you testified on direct that when you

16   came to New York for the inspection, you were prepared and

17   willing to close the purchase after, immediately after the

18   inspection had you been satisfied with what you saw.  Is that

19   correct?

20   A.   Yes.

21   Q.   You said that you could have wired funds had there been a

22   closing.  Is that correct?

23   A.   Yes.

24   Q.   But you didn't have checks for the purchase price balance,

25   did you?

C6iQcam3                         Campbell - Cross

1   A.  No.

2   Q.  Do you know whether the contract allowed you to pay by

3   wire?

4   A.  No.

5   Q.  You don't know, correct?

6   A.  No.

7   Q.  Can you take a look at Defendant's 2 in the big notebook,

8   please.  Would you specifically take a look at Section 3.2.

9           Do you see in the middle of that paragraph it says the

10  check or checks for the balance and all other sums due sponsor

11  pursuant to this agreement shall be a good certified check of

12  purchaser or official bank or cashier's check, and then it says

13  made payable, et cetera.

14          Were you aware of that requirement in the contract at

15  the time that you came to New York for the inspection?

16  A.  No.

17  Q.  I want to direct your attention again to Defendant's 28 in

18  the same notebook, which is an e-mail that Mr. Gleicher sent to

19  Mr. Cohen and you on the morning of April 16th.  Do you have

20  that?

21  A.  Yes.

22  Q.  Now, his second paragraph begins, "I have another thought

23  on the potential means to delay the closing."

24          Do you have any recollection of Mr. Gleicher being

25  asked to come up with means to delay the closing?

C6iQcam3                         Campbell - Cross

1    A.  No.

2    Q.  Do you have any recollection of Mr. Gleicher volunteering

3    to look for means to delay the closing?

4    A.  No.

5    Q.  So if Mr. Gleicher was instructed or asked to look for

6    means to delay the closing, that instruction did not come from

7    you, is that what you're saying?

8    A.  Yes.

9    Q.  It was not made in your presence, is that also what you're

10   saying?

11   A.  Correct.

12   Q.  Because you don't know anything about that kind of

13   instruction, correct?

14   A.  Pardon?

15   Q.  You don't know anything about that kind of instruction?

16   A.  No, I don't.

17   Q.  Do you have any recollection on the night of April 15th of

18   any discussions or communications about hey, we have to figure

19   out a way to delay the closing?

20   A.  Well, we certainly weren't going to close on the 16th with

21   an apartment in the condition that it was, and I was being

22   pressured to close on the 16th.

23   Q.  You said you were being pressured to close.  What do you

24   base that on?

25   A.  Mr. Marton.

C6iQcam3                         Campbell - Cross

1    Q.  This is something Mr. Marton said to you at the inspection?

2    A.  I don't remember when it was.  It could have been the next

3    day.

4    Q.  It could have been on the conversation, the telephone

5    conversation that took place on the next day?

6    A.  Yes.

7    Q.  Do you remember what time of the day that conversation took

8    place?

9    A.  No.

10   Q.  But if it took place in the afternoon of the next day, then

11   it was after this e-mail from Mr. Gleicher, correct?

12   A.  Yes.

13             (Off-the-record discussion)

14   Q.  Would you take in the other notebook, please take a look at

15   43, Plaintiff's 43.

16             Now, do you see that e-mail then, it says it was sent

17   by Mr. Marton to Mr. Senbahar at 3:31 pm on the afternoon of

18   April 16th, 2009.  Does that in any way refresh your

19   recollection -- withdrawn.

20             Mr. Marton begins his e-mail saying just finished

21   conference call with purchaser and lawyer and Canter.  Does

22   that in any way refresh your recollection that the conversation

23   with Mr. Marton that you referred to took place in the

24   afternoon of the 16th?

25   A.  No.

1  Q.  Turning again to the bigger notebook, would you please take

2  a look at 75, the exhibit marked 75 for identification.

3          Did you receive these e-mails?

4  A.  No.  Not that -- I don't remember.

5  Q.  Well, the first e-mail on the first page which is actually

6  I guess chronologically the latest is Monday, April 20, 3:50 pm

7  from Mr. Gleicher to Bailey, presumably Mr. Vitacco.  Do you

8  know who Mr. Vitacco was at the time?

9  A.  No.

10  Q.  Were you ever advised Mr. Gleicher had retained an

11  expediter or code consultant?

12  A.  No.

13  Q.  Do you know what an expediter or code consultant is?

14  A.  No.

15  Q.  In the e-mail to Mr. Gleicher -- sorry -- from

16  Mr. Gleicher, he tells Mr. Vitacco (tack) that the client is

17  becoming increasingly concerned --

18          THE COURT:  We have a great sound system.  You just

19  have to use the microphone.

20  Q.  -- the e-mail to Mr. Vitacco from Mr. Gleicher says in part

21  the client is becoming increasingly concerned that the Mark is

22  going to go bust and she does not want to be forced into a

23  closing only to have the project blown up.  Can you provide any

24  ammunition for her?

25          Do you have any recollection of anyone being asked to

C6iQcam3                      Campbell - Cross

1    provide ammunition for any purpose relating to this

2    transaction?

3    A.  No.

4    Q.  Do you have any recollection of Mr. Gleicher being asked to

5    look for technical reasons or problems that would support

6    delaying the closing?

7    A.  Technical?

8    Q.  Any kind of technical or legal objection that would support

9    delaying the closing?

10   A.  No.

11            MR. BRAUN:  Your Honor, we have stipulated -- well,

12   this witness doesn't recall these e-mails and may never have

13   seen them.  We have stipulated that they were sent and I would

14   ask they be received in evidence.

15            MR. ALTER:  No objection.

16            THE COURT:  Defendant's Exhibit 75 and Plaintiff's

17   Exhibit 43 are received.

18            (Defendant's Exhibit 75 received in evidence)

19            (Plaintiff's Exhibit 43 received in evidence)

20   BY MR. BRAUN:

21   Q.  I ask you to take a look at the next exhibit in the

22   notebook which is 76.  Did you see any of these e-mails prior

23   to today?

24   A.  No.

25   Q.  Do you recall being advised that someone on your behalf was

C6iQcam3                         Campbell - Cross

1   looking into whether the elevators were appropriately permitted

2   and licensed?

3   A.  No.

4   Q.  Do you recall being advised back in around April of '09

5   that someone on your behalf was looking into the records behind

6   the TCO to see if it was properly supported?

7   A.  Yes.

8   Q.  What do you recall about that?

9   A.  I just know that we were looking, someone was looking into

10  that condition of the apartment.

11  Q.  Do you know who?

12  A.  No.

13          MR. BRAUN:  Again we have stipulated about this

14  document, your Honor and I would, therefore, ask that

15  Defendant's 76 be received in evidence.

16          MR. ALTER:  No objection.

17          THE COURT:  Defendant's exhibit 76 is received.

18              (Defendant's Exhibit 76 received in evidence)

19  BY MR. BRAUN:

20  Q.  Now I would like you to look at Exhibit 22 in this

21  notebook, please.

22  A.  Is there a 22?

23  Q.  I have misidentified the document.  Please give me a

24  minute.  (Pause)

25          Ms. Campbell, would you please take a look at Exhibit

C6iQcam3                          Campbell - Cross

1   27 in the big notebook.  It is Defendant's 27.

2   A.  Yes.

3   Q.  Did you receive that document on or about April 20, 2009?

4   A.  I don't recall.

5   Q.  So you don't recall?  Is it true you don't recall whether

6   you read it?

7   A.  No.

8   Q.  I am sorry.

9   A.  I don't recall receiving it.

10  Q.  You don't recall receiving it?

11  A.  No.

12  Q.  Do you know whether you ever read it?

13  A.  No.

14          MR. BRAUN:  Your Honor, this is the inspection report

15  of plaintiff's inspector, and I ask that pursuant to

16  stipulation, it be received in evidence.  It is Defendant's

17  22 --

18          MR. ALTER:  27.

19          MR. BRAUN:  27?  I apologize.

20          MR. ALTER:  No objection to 27 coming in.

21          THE COURT:  Defendant's Exhibit 27 is received.

22          (Defendant's Exhibit 27 received in evidence)

23  BY MR. BRAUN:

24  Q.  Ms. Campbell, you testified on direct that the work

25  remained to be performed in this unit was not, in your view,

C6iQcam3                        Campbell - Cross

1     punch list work.  Is that correct?

2     A.   Because of the volume.

3     Q.   It was not the individual items; it was the volume?

4     A.   Well, it was in terms of the major systems.

5     Q.   By the "major systems," you mean heat, hot water, et

6     cetera?

7     A.   Yes.

8     Q.   And elevators, right?

9     A.   Yes.

10    Q.   They're not even on the inspection statement, correct?

11    They're treated differently?

12    A.   On the Sponsor's.

13    Q.   I am sorry?

14    A.   On the Sponsor's inspection list, yes.

15    Q.   The contract provides for inspection statement, and we have

16    already identified Exhibit 24 as the inspection statement.  Are

17    you talking about something else?

18    A.   No.

19    Q.   Now, you testified that you had other experience with punch

20    lists, correct?

21    A.   Yes.

22    Q.   In connection with various homes that you and your then

23    husband built?

24    A.   Built, yes.

25    Q.   You built without your husband?

C6iQcam3                            Campbell - Cross

1   A.  No.  We didn't build it together.  We bought it as -- built

2   by someone, certified spec houses.

3   Q.  That was your home in California, it was a certified spec

4   house, is that what you're saying?

5   A.  Yes.  Not his and my house, but my house I bought

6   subsequent to the divorce.

7   Q.  Was that one of the houses you referred to on your direct

8   testimony when you mentioned a number of residences in

9   California?

10  A.  Yes, that is one of them.

11  Q.  What were the others?

12  A.  There were two in Montana, one in Mexico, one in Rochester,

13  New York.

14  Q.  And then there was the one house in California?

15  A.  Correct.

16  Q.  You view your experience with those projects as comparable

17  to what this project should have worked like in terms of punch

18  lists?

19  A.  Yes.

20  Q.  And you view those projects as valid comparisons to the

21  Mark Hotel project?

22  A.  Yes.

23  Q.  At the time of the construction on those projects, those

24  other projects, did you or you and your husband own the

25  property?

C6iQcam3                           Campbell - Cross

1    A.  No.  No.  They were like golf -- I am not sure how they

2    configured it.  They were planned communities that we bought

3    new housing that was being built.

4    Q.  Did you buy them, those properties before the construction

5    was done?

6    A.  Yes.

7    Q.  You paid for the properties before the construction was

8    done?

9    A.  Yes.

10   Q.  Did you pay --

11   A.  We didn't close.

12   Q.  You contracted to buy the properties?

13   A.  Right.

14   Q.  Before the construction was done?

15   A.  Right.

16   Q.  You closed at the end of the construction or toward the end

17   of the construction?

18   A.  After an inspection.

19   Q.  Is that true of all of the properties that you referred to?

20   A.  Yes.

21   Q.  So then none of these projects were ones where you

22   actually, you or your husband actually hired a contractor to

23   build something on property that you already owned?

24   A.  That's correct.

25   Q.  If you could look again at Exhibit 43 in the smaller

C6iQcam3                    Campbell - Cross

1   notebook, Plaintiff's 43.  I think you testified on direct you

2   or Mr. Cohen had indicated in the conference call on April 16th

3   that you would close if the sponsor addressed or remedied, or

4   whatever the word was, the items on that list?

5   A.  Yes, I think it was missing the gas, but yes.

6   Q.  Well, you think that you specifically talked about gas on

7   that occasion?

8   A.  I don't recall.

9   Q.  You talked about heat and hot water, correct?

10  A.  Right.

11  Q.  As far as you can recall, this is a correct list or

12  complete list of the items that were specified to the sponsor

13  in that call?

14  A.  They were the large items, yes.

15  Q.  Were there others that you mentioned as far as you know?

16  A.  No.

17  Q.  Do you have any recollection of what the Sponsor's

18  representative said in response to that list?

19  A.  No, but I remember being given assurances the work would be

20  completed, but not verbatim.

21  Q.  Not verbatim?  You don't remember the exact words?

22  A.  Right, exactly.

23  Q.  Were you told that the sponsor was working on them

24  immediately?

25  A.  Yes.

C6iQcam3                          Campbell - Cross

1    Q.  Do you have any recollection of being told that don't go

2    back to California today or tomorrow, stay around for a few

3    more days and come back and see the apartment because we're

4    working on it?  Do you recall anything like that in words or

5    substance?

6    A.  No.

7    Q.  There was no suggestion that you remember that you should

8    defer your return to California and come back to the apartment?

9    A.  No.

10   Q.  Now, before you went back to California, you found that

11   newspaper article, correct?

12   A.  Yes.

13   Q.  Then you went back to California Friday afternoon.  Is that

14   correct?

15   A.  Yes.

16   Q.  The 17th?

17   A.  Yes.

18   Q.  Over the weekend you began to look at -- strike that --

19   over the weekend you started an internet search for other

20   possible apartments to buy in New York.  Is that correct?

21   A.  Yes.

22   Q.  So would you please look in the, again in the big notebook,

23   at defendant's 32.  The e-mail at the bottom --

24   A.  I am sorry.

25   Q.  Tell me when you're ready.

C6iQcam3                           Campbell - Cross

1   A.   Sorry.   Okay.   I have it.

2   Q.   The e-mail at the bottom appears to be from you to Mr.

3   Cohen and Mr. Gleicher and it says, "Okay, don't flip out, but

4   in the meantime what do you think of the penthouse at Solo

5   Mews?"

6           Did you send that e-mail to Mr. Cohen and Mr. Gleicher

7   on Sunday, April 19th?

8   A.   Yes.

9   Q.   And on top of the page there is an e-mail from Mr. Cohen to

10  you for Monday morning that.   You received that e-mail from him

11  on that morning?

12  A.   I don't recall.

13  Q.   But you sent the one on the bottom?

14  A.   Yes.

15           MR. BRAUN:   I ask Defendant's 32 be received in

16  evidence.

17           MR. ALTER:   No objection.

18           THE COURT:   Defendant's Exhibit 32 is received in

19  evidence.

20           (Defendant's Exhibit 32 received in evidence)

21  BY MR. BRAUN:

22  Q.   When you said in your e-mail to Mr. Cohen and Mr. Gleicher

23  okay, "don't flip out," you understood that that was because

24  you were doing a dramatic change of direction, correct?

25  A.   Yes, we had been so single-minded for so long.

C6iQcam3                          Campbell - Cross

1    Q.  Now I would ask you to look at Defendant's 99 in the same

2    notebook.  Do you recall any of these e-mails?

3    A.  No.

4    Q.  If you look at the first page of the document, do you

5    recall being advised on the morning of April 22 -- well, prior

6    to that -- that Julia and Richard had looked at the Soho Mews

7    apartment on the preceding day?

8    A.  I don't recall the timing, but I was asking them to.

9    Q.  So Julia and Richard did look at Soho Mews around Tuesday

10   of that week.  Is that correct?

11   A.  I am not sure.

12   Q.  Julia is Julia Cahill, correct?

13   A.  Yes.

14   Q.  And Richard is Richard Gray or --

15   A.  Richard Gray.

16         MR. BRAUN:  This e-mail exchange was produced to us by

17   plaintiff, and I ask that it be received in evidence as

18   Defendant's 99, your Honor.

19         MR. ALTER:  No objection.

20         THE COURT:  Defendant's Exhibit 99 is received in

21   evidence.

22         (Defendant's Exhibit 99 received in evidence)

23   BY MR. BRAUN:

24   Q.  But you do recall that Mr. Gray and Ms. Cahill looked at

25   the Soho Mews apartment during that week that began of April

C6iQcam3                        Campbell - Cross

1   20, correct?

2   A.  Yes.

3   Q.  Now please take a look at Defendant's 80 for identification

4   in the same notebook.  Ms. Campbell, do you remember this

5   e-mail exchange?

6   A.  No.

7   Q.  Do you remember that Richard and Julia visited 57 Irving on

8   your behalf --

9   A.  Yes.

10  Q.  -- during that week?  They did during that week, correct?

11  A.  I don't recall the exact timing.

12  Q.  But they did do it?

13  A.  Yes.

14  Q.  Do you recall asking for materials regarding the particular

15  apartment at 57 Irving?

16  A.  Yes.

17  Q.  Written materials?

18          MR. BRAUN:  I would ask, since it has been produced to

19  us by plaintiff, I ask that Defendant's 80 be received in

20  evidence.

21          MR. ALTER:  No objection.

22          THE COURT:  Defendant's Exhibit 80 is received in

23  evidence.

24          (Defendant's Exhibit 80 received in evidence)

25  BY MR. BRAUN:

C6iQcam3                          Campbell - Cross

1   Q.  By the way, you asked Mr. Gray and Ms. Cahill to visit the

2   unit at 57 Irving Place on your behalf, correct?

3   A.  Yes.

4   Q.  And you asked them to visit the unit at Soho Mews on your

5   behalf, correct?

6   A.  Yes.

7   Q.  Now if you will please take a look at Defendant's 100.  The

8   top is an e-mail from Ms. Cahill to you, in which she says we

9   had a very nice visit at 57 Irving today, and it is dated

10  Friday, April 24.

11          Do you recall being advised by Ms. Cahill -- strike

12  that.  First of all, do you remember this e-mail at all?

13  A.  No.

14  Q.  Do you recall being advised by Ms. Cahill she had a nice

15  visit to 57 Irving?

16  A.  In substance, yes.

17          MR. BRAUN:  I ask that Defendant's 100 be received in

18  evidence.

19          MR. ALTER:  No objection.

20          THE COURT:  Defendant's Exhibit 100 is received.

21          (Defendant's Exhibit 100 received in evidence)

22  BY MR. BRAUN:

23  Q.  Now please look at Defendant's 98.  I'd like to -- first of

24  all --

25  A.  Defendant's 98?

C6iQcam3                           Campbell - Cross

1    Q.   Yes.

2    A.   Sorry.

3    Q.   It is in the big notebook?

4    A.   Okay.

5    Q.   Defendant's 98, tell me when you have it.

6    A.   I have it.

7    Q.   Do you remember any of these e-mails?

8            MR. ALTER:   It should be noted she is not copied on

9    these e-mails.

10   A.   No.

11   BY MR. BRAUN:

12   Q.   Well, if you look at the second page, there is an e-mail

13   from Ms. Campbell to Mr. Cohen, Mr. Gleicher, Ms. Cahill, dated

14   Monday, April 27, at 4:06 pm.  Do you remember that e-mail?

15   A.   No.

16   Q.   Of course you don't dispute that you sent it?  It is from

17   your files?

18   A.   Correct.

19           MR. BRAUN:   I ask that Defendant's 98 be received in

20   evidence.

21           MR. ALTER:   No objection.

22           THE COURT:   Defendant's Exhibit 98 is received.

23           (Defendant's Exhibit 98 received in evidence)

24   BY MR. BRAUN:

25   Q.   Now, Ms. Campbell, if you look at that e-mail on the second

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

C6iQcam3                              Campbell - Cross

1    page from you to Mr. Cohen, Mr. Gleicher and Ms. Cahill for

2    Monday afternoon, it says in part -- well, it says in part that

3    you're waiting for the offering plan, and so you do recall that

4    you did get an offering plan for 57 Irving?

5    A.  Yes.

6    Q.  Then you go onto say, "After we review the plan and all is

7    as good as it seems right now, I would like to go ahead with 57

8    Irving."

9              Do you have a recollection of expressing that view to

10   any of these people?

11   A.  I am sure I was willing to take the next step to find out

12   when the construction was being finished, that kind of thing,

13   not to sign a contract.

14   Q.  In other words, as far as you're concerned, the next step

15   is to find out when the construction at 57 Irving would be

16   completed?

17   A.  And other germane information.

18   Q.  Such as?

19   A.  Such as how much input I would have during the

20   construction, what about the -- how many units had been sold

21   and who the people were because it was a small project.

22   Q.  So assuming you were satisfied with what you saw in the

23   offering plan as of April 27, you were prepared to go ahead

24   with 57 Irving, whatever "go ahead" means, correct?

25   A.  Yes.

C6iQcam3                        Campbell - Cross

1   Q.  Now please take a look at Plaintiff's 45.  That would be in

2   the smaller notebook.

3   A.  I have it.

4   Q.  You do remember that e-mail, don't you?

5   A.  Yes.

6           MR. BRAUN:  I ask Plaintiff's 45 be received in

7   evidence.

8           MR. ALTER:  No objection.

9           THE COURT:  Plaintiffs' Exhibit 45 is received in

10  evidence.

11          (Plaintiff's Exhibit 45 received in evidence)

12  BY MR. BRAUN:

13  Q.  Now, the bulk of this e-mail is in the form of an e-mail

14  from you to Mr. Cohen, correct?

15  A.  Yes.

16  Q.  And you sent it to him in the expectation that he would

17  forward it to the sponsor, correct?

18  A.  Yes.

19  Q.  This e-mail is really sort of a prelude or almost a set-up

20  to the four-way conference call that you participated in the

21  following day, April 21, correct?

22  A.  Yes.

23  Q.  This e-mail expresses your concerns as of the morning of

24  April 20?

25  A.  Yes.

C6iQcam3                         Campbell - Cross

1   Q.  The e-mail, in your e-mail you say, among other things,

2   that "the condition of the apartment in and of itself is not my

3   greatest concern," right?

4           That is what you wrote there?

5   A.  Yes.

6   Q.  You also wrote that, said that you knew that, "with time

7   and necessary care," it could be made into what you wanted,

8   correct?

9   A.  Yes.

10  Q.  In fact, you had the financial wherewithal to complete all

11  the work yourself if the sponsor failed to fulfill its own

12  obligations, correct?

13  A.  Yes.

14  Q.  You spent roughly a million dollars to fix up the apartment

15  on Central Park West, correct?

16  A.  Yes.

17  Q.  So what was really bothering you as of that day was not so

18  much really the condition of the apartment, right?

19          It was the fear that the sponsor was somehow

20  financially unstable?

21  A.  Yes.

22  Q.  Is that fair to say?

23  A.  Yes, because I didn't think they would finish the apartment

24  or they were capable of finishing the apartment, but if they

25  worked, it was easy to do.

1    Q.   Do you know how many workmen were on the site at the Mark

2    Hotel on the day you were there?

3    A.   No.

4    Q.   Did you try to find out?

5    A.   No.

6    Q.   Did you ask anyone?

7    A.   No.

8    Q.   In your view, is there a minimum number of workmen who

9    would be engaged in work at the site on that day that would

10   indicate a financial soundness on the part of the sponsor?

11   A.   No.

12   Q.   How many people did you see in the lobby?  How many workmen

13   do you think you saw in the lobby?

14   A.   I don't remember.

15   Q.   Was it more than five?

16   A.   Going in and out and working, probably.

17   Q.   More than 10?

18   A.   I don't remember.

19   Q.   If there were less, if the total aggregate number of

20   construction workers in the building on that day were less than

21   10, you would not find that very comforting, right, in terms of

22   the ability of the sponsor to complete work in the building?

23   A.   Correct.

24   Q.   If there were a hundred people working in the building on

25   that day, that would be an indication that the sponsor did have

1   financial capabilities, correct?

2   A.  I am not in a position to say that.

3   Q.  But, in any event, you were worried about the financial

4   condition of the sponsor as of that point in time, right?

5   A.  Yes.

6   Q.  You were at a point of decision, right?

7   A.  No.  I was waiting to see whether they would finish my

8   apartment.  I still was willing to close if the apartment were

9   finished.

10  Q.  From your point of view, the basic purpose of the April 21

11  call that took place on the next day was to get some kind of

12  comfort from the sponsor regarding its future performance?

13  A.  Correct.

14  Q.  You asked the Sponsor's representatives for some kind of a

15  commitment as to when the work in the apartment would be

16  completed, correct?

17  A.  Yes.

18  Q.  And you don't remember them making any kind of commitment?

19  A.  Not hard and fast, no.

20  Q.  Did they make any kind of a commitment that they would do

21  the work?

22  A.  They said several weeks, yes.

23  Q.  Did they say anything about having started the work?

24  A.  I don't recall.

25  Q.  Did they say anything about the status of the heat or air

C6iQcam3                          Campbell - Cross

1    conditioning?

2    A.  We didn't discuss specifics.

3    Q.  You didn't discuss any specific items during that call?

4    A.  Not that I recall.

5    Q.  Was there any discussion of the hot water or its status as

6    of that moment in time?

7    A.  Again I don't recall discussing the specifics.

8    Q.  Now, in terms of requesting assurances, do you recall

9    whether it was yourself or Mr. Cohen who made a request, or

10   perhaps it was both of you?

11   A.  I don't recall.

12   Q.  Do you recall the words that were used to request

13   assurances?

14   A.  Not specifically.

15   Q.  Do you recall any specific assurance that was requested

16   other than specification of the time the work in the apartment

17   would be complete.

18   Q.  We wanted financials, statement of financial viability.

19   Q.  Did you explain what you meant by statement of financial

20   viability or did Mr. Cohen explain that?

21   A.  I don't recall, but it was about the health of the overall

22   project, not only just that apartment.

23   Q.  Did you specify what type of a document you were looking

24   for?

25   A.  No.

C6iQcam3                         Campbell - Cross

1    Q.  You don't remember anything that Mr. Marton or Mr. Canter
2    said other than you're not entitled to it?
3    A.  No.  That is all I remember.
4    Q.  The "it" was what, in your understanding?
5    A.  Financial, any kind of information related to the financial
6    viability of this project.
7    Q.  Do you have a recollection of being told in that call
8    something as to when the hotel was expected to open?
9    A.  I don't remember, but I know it kept being delayed.
10   Q.  But in that call --
11   A.  No.
12   Q.  -- were you told anything about when the hotel was expected
13   to open?
14   A.  Not that I recall.
15   Q.  Did you ask or did Mr. Cohen ask for information about as
16   to when the hotel would be opened?
17   A.  Not that I recall.
18   Q.  Did you or Mr. Cohen ask to adjourn your closing until
19   after the hotel was opened?
20   A.  No.
21   Q.  You say with a lot of emphasis you're confident you did not
22   make that kind of request or suggestion?
23   A.  Yes.
24   Q.  Was there any discussion in that call of a subordination
25   and non-disturbance agreement?

C6iQcam3                    Campbell - Cross

1    A.  I am not sure what that means.

2    Q.  Was there any discussion of the idea that even if the

3    developer or sponsor defaulted under their mortgage loans, that

4    the co-op would remain undisturbed in the possession of its

5    space within the building?

6    A.  I don't remember any discussion.

7    Q.  Or any discussion of the fact or the idea a unit owner

8    would remain undisturbed in possession of their apartment if

9    there was a mortgage foreclosure by the Sponsor's bank?

10   A.  No.

11   Q.  Can you again take a look at Defendant's 3, which is the

12   offering plan.  By the way, did your concerns as of April 20,

13   21 about the financial condition of the sponsor result in any

14   way of your knowledge about the number of units were under

15   contract?

16   A.  It was part of it.

17   Q.  Would you please take a look at the page in the offering

18   plan that has the stamp number of sponsors OO134.

19   A.  (Pause)

20   Q.  In the very first paragraph after the first sentence, it

21   says:

22          "Under the terms of such financing, sponsor may not

23   declare the plan effective until purchase agreements are signed

24   by bona fide purchasers for 15 percent of the suites offered

25   under the plan.  Even if the plan is declared effective for the

1    minimum number of sales, it is possible Sponsor can convey

2    suites with fewer than the minimum number of sales if

3    purchasers counted toward effectiveness and not ultimately

4    purchase a suite."

5            Then it goes on.  You were not aware of that language

6    as of April 20-21, 2009, correct?

7    A.  No, no.

8    Q.  It also says:

9            "Purchasers under the plan will not be liable for any

10   payment under the construction loan and each suite will be

11   conveyed free and clear of the liens thereunder."

12           You were not aware of that language in the offering

13   plan, correct?

14   A.  Correct.

15   Q.  Had you been advised of that concept as of that point in

16   time?

17   A.  No.

18   Q.  Now, if you could turn, please, to page OOO95 on the

19   document.

20   A.  (Pause)

21   Q.  Do you see that is a discussion of terms of mortgages, and

22   you were not familiar with the contents of that section as of

23   April 20-21, 2009.  Is that correct?

24   A.  Correct.

25   Q.  In the end of the second paragraph, after explaining

C6iQcam3                      Campbell - Cross

1   non-disturbance and the document called CTROA, it says.

2          "Accordingly, the cooperative leasehold will not be

3   terminated by reason of the default by Mark Hotel LLC of its

4   obligations in respect of any mortgage which will encumber the

5   leaseholder stake."

6          You were not aware of that language as of April 20-21,

7   2009, correct?

8   A.  Correct.

9   Q.  I want to ask you to turn to page OO140 in the document.  I

10  specifically want to direct your attention to the third

11  paragraph on the page which says:

12         "Sponsor has not furnished any bond or other security

13  for the performance of the obligations of the Sponsor under the

14  plan.  Sponsor's ability to perform its obligations under the

15  plan will depend on its financial condition from time to time.

16  No warranty is made that Sponsor will be financially able to

17  perform all or any of such obligations."

18         You were not familiar with that language as of April

19  20 and 21, 2009, correct?

20  A.  Correct.

21  Q.  Could you please take a look in the smaller notebook at

22  Plaintiff's 30.

23  A.  I have it.

24  Q.  Did you see that document on or about April 21, 2009?

25  A.  I don't recall.

1          MR. BRAUN:  I would ask -- we have stipulated to

2     this -- I would ask that this particular letter be received in

3     evidence, Plaintiff's 30.

4          MR. ALTER:  No objection.

5          THE COURT:  Plaintiff's Exhibit 30 is received in

6     evidence.

7          (Plaintiff's Exhibit 30 received in evidence)

8     BY MR. BRAUN:

9     Q.  Do you recall being advised, at or about the time of that

10    April 21 phone call, that Mr. Cohen was to mandate the return

11    of your down payment from the Sponsor?

12    A.  I don't recall.

13    Q.  Do you recall being advised at or about that time Mr. Cohen

14    advised the Sponsor's attorneys in writing that unless the down

15    payment was returned by the end of the week, he would initiate

16    a proceeding before the Attorney General?

17    A.  No.

18    Q.  Do you have any recollection of Mr. Cohen premising such

19    demands on the Sponsor's refusal to extend your closing date

20    until after the hotel had been built?

21    A.  I am sorry.  Would you repeat that.

22    Q.  Did you know as of about April 21, 2009, that Mr. Cohen had

23    demanded the return of your down payment on the basis of the

24    stated reason that the Sponsor had refused to extend your

25    closing date until after the hotel had opened?

1   A.  No.

2   Q.  Would you now take a look at Plaintiff's 32.  Did you see

3   this letter on or about April 23, 2009?

4   A.  I don't remember.

5   Q.  Do you recall being advised that Sponsor's counsel had

6   written a letter to Mr. Cohen in response to Mr. Cohen's letter

7   to the Sponsor's counsel?

8   A.  I know they had correspondence, but I wasn't aware of

9   anything else.

10  Q.  Do you recall being advised that Sponsor's counsel had

11  stated in writing that appropriate elevator service will be

12  provided to your client upon closing should she choose to

13  occupy the suite?

14  A.  No.

15  Q.  Did you know at or about that time that Sponsor's counsel

16  had advised Mr. Cohen in writing that heat, hot water and air

17  conditioning service are in operation in the building and in

18  particular in your client's suite?

19  A.  No.

20  Q.  Did you know, were you advised at the end of April 2009

21  that Sponsor's counsel had advised Mr. Cohen in writing that

22  the floors in the suite had been finished?

23  A.  No.

24  Q.  Did you learn toward the end of April 2009 that Sponsor's

25  counsel had advised Mr. Cohen in writing that the shower

1  enclosures had been completed?

2  A.  No.

3  Q.  Were you advised that Sponsor's counsel had written to Mr.

4  Cohen that many of the other punch list items identified at the

5  inspection had already been addressed?

6  A.  No.

7  Q.  Were you advised that Sponsor's counsel had written to Mr.

8  Cohen that Sponsor:

9        "Remains committed to trying to address any good-faith

10  issues raised by your client, but wishes to do so within the

11  parameters of the parties' rights and obligations that is set

12  forth in the offering plan and purchase agreement"?

13  A.  No.

14        MR. BRAUN:  I ask, since we stipulated, we all know

15  what this document is.  I ask Plaintiff's 32 be received in

16  evidence.

17        MR. ALTER:  One second, please.  That is the one you

18  asked about earlier, right?  No objection.

19        THE COURT:  Plaintiff's exhibit 32 is received in

20  evidence.

21        (Plaintiff's Exhibit 32 received in evidence)

22  BY MR. BRAUN:

23  Q.  Now I would ask you to look at Defendant's 37, please.

24        Ms. Campbell, as you can see, this appears to be a

25  letter, dated April 24, 2009, from Mr. Cohen to Mr. Canter.  So

1   I would ask you, first of all, have you seen that letter?  I

2   should say -- withdrawn.

3           Did you see that letter on or about April 24, 2009?

4   A.  I don't recall.

5   Q.  You do recall being advised that Mr. Cohen had exercised

6   your adjournment right to put the closing back some period of

7   time?

8   A.  Yes.

9   Q.  Do you recall he pushed it back to May 11, 2009?

10  A.  Yes.

11  Q.  Do you recall learning that while Mr. Cohen had exercised

12  your adjournment right and to be the effect of scheduling the

13  closing for May 11, he then actually in the same letter said

14  that maybe you wouldn't show up for a closing at May 11?

15  A.  I wasn't aware of that.

16  Q.  Do you recall whether Mr. Cohen exercised your adjournment

17  right without consulting you first?

18  A.  I am sure he must have consulted me.

19  Q.  You just don't recall the consultation?

20  A.  I don't recall it, no.

21  Q.  Did you ever discuss with Mr. Cohen whether, in fact, you

22  were available to return to New York for a closing on May 11,

23  and just answer it yes, don't give me the contents other than

24  yes, no, we had a conversation or I don't remember.

25  A.  I don't remember.

C6iQcam3                          Campbell - Cross

1            MR. BRAUN:  I ask Defendant's 37 be received in

2      evidence.

3            MR. ALTER:  No objection.

4            THE COURT:  Defendant's Exhibit 37 is received in

5      evidence.

6            (Defendant's Exhibit 37 received in evidence)

7      BY MR. BRAUN:

8      Q.  I would ask the witness to take a look at Defendant's 78

9      for identification.

10     A.  (Pause)

11     Q.  I would like to ask you, Ms. Campbell, whether you saw

12     either of the e-mails on the first page on or about April 27,

13     2009?

14     A.  I don't remember.

15     Q.  Do you have any recollection of there being communications

16     between Mr. Cohen and Mr. Gleicher about laying low or staying

17     low until May 1?

18     A.  No.

19     Q.  You don't recall?

20     A.  I don't recall.

21           MR. BRAUN:  Your Honor, the parties have stipulated to

22     it, and I would ask that Defendant's 78 be received in

23     evidence.

24           MR. ALTER:  No objection.

25           THE COURT:  Defendant's Exhibit 78 is received.

C6iQcam3                        Campbell - Cross

1              (Defendant's Exhibit 78 received in evidence)

2      BY MR. BRAUN:

3      Q.  Now please look at Defendant's 38.

4      A.  38?

5      Q.  Yes, please.

6              (Off-the-record discussion)

7      Q.  Ms. Campbell, before I ask you about 38, I would like you

8      to go back to 78, please.  Again looking at that first e-mail

9      from Mr. Cohen to Mr. Gleicher, do you have any understanding

10     as to why Mr. Cohen would be telling Mr. Gleicher to lay low or

11     I should say stay low at this point until May 1?

12     A.  No.

13     Q.  You don't recall?  You don't have a recollection what

14     significance May 1 has?

15     A.  I do.

16     Q.  What was that?

17     A.  That if they didn't have a closure by then, the project was

18     not viable at that point.

19     Q.  Wasn't it Mr. Cohen's effort at this point to push the

20     closing back past May 1 to see whether there were any closings?

21             MR. ALTER:  May we have that qualified as to her

22     understanding.

23             MR. BRAUN:  Yes, of course.

24             THE COURT:  Yes.  She can only testify to her

25     understanding.

C6iQcam3                          Campbell – Cross

1    BY MR. BRAUN:

2    Q.  Do you have any understanding of whether Mr. Cohen was

3    seeking to have, encouraging Mr. Gleicher to stay low until May

4    1 because he was hoping that there be no closings by May 1?

5    A.  No.

6    Q.  No, you have no understanding?

7    A.  No, I don't have any understanding.

8    Q.  Please turn to 38 for a moment.  You don't recall whether

9    you actually ever saw that letter, correct?

10   A.  Correct.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C6iQcam5                        Campbell - Cross

1    Q.  You think you were told about it by Mr. Cohen?

2    A.  I know I was.

3    Q.  You know you were told about it, is that correct?

4    A.  Yes.

5    Q.  But you don't know whether you actually saw it?

6    A.  Correct.

7    Q.  And if you ever saw it, you don't know if you actually read

8    it, is that also correct?

9    A.  That's correct.

10           MR. BRAUN:  I would ask that Defendant's 38 be

11   received in evidence.

12           MR. ALTER:  Your Honor, I have no real objection

13   except the fact that a different copy of it has already been

14   admitted under label Plaintiff's 13.  If he wants it a second

15   time, I have no objection.

16           THE COURT:  I object to that.  It's already in.

17           MR. BRAUN:  I'm sorry, I was looking at --

18           THE COURT:  Fine.  Move on.

19           MR. BRAUN:  Thank you.

20   Q.  Did you ever tell Sponsor or a Sponsor representative that

21   Ms. Cahill was no longer representing you?

22   A.  No.

23   Q.  Do you know whether anyone on your behalf told Sponsor or

24   Sponsor representatives that Ms. Cahill was no longer

25   representing you?

1    A.  No.

2    Q.  Could you take a look at Defendant's 67 now, Ms. Campbell?

3    That's an email from Mr. Cohen to Ms. Cahill dated May 13,

4    2009.  I would ask you whether you've seen it before?

5    A.  I don't remember.

6    Q.  Do you recall being advised that someone at Corcoran had

7    made inquiry in May of '09 regarding the status of The Mark

8    transaction?

9    A.  No.

10   Q.  Do you know who Kelly Mack was as of May 2009?

11   A.  I knew that she was the person that was contacted by a

12   president of a real estate firm in California, and she was

13   allegedly the president of Corcoran.

14   Q.  You mean it was Ms. Mack who was contacted or Ms. Liebman

15   who was contacted?

16   A.  Oh, I'm sorry, it was Ms. Liebman, I apologize.

17   Q.  That's all right.  And that's back in '07 or '08 when you

18   were starting your search for a place in New York, correct?

19   A.  Yes.

20   Q.  So as of May '09, you didn't know who Kelly Mack was?

21   A.  No.

22   Q.  Did Ms. Cahill ever tell you that Kelly Mack or someone in

23   Corcoran had asked her about the transaction?

24   A.  No.

25   Q.  But as of this date, May 13, 2009, you had already advised

C6iQcam5                    Campbell - Cross

1   Ms. Cahill that you were not interested The Mark Hotel,

2   correct?

3   A.  Correct.

4   Q.  You had lost your interest, correct?

5   A.  Correct.

6           MR. BRAUN:  Since the document is by Mr. Cohen and was

7   produced to us by plaintiff, I do ask that Defendant's 67 be

8   received in evidence.

9           MR. ALTER:  No objection.

10          THE COURT:  Defendant's 67 is received.

11          (Defendant's Exhibit 67 received in evidence

12  Q.  Now, I'd like you to look at 68, the next item in the book.

13  I want to direct your attention to the very first email, the

14  latest email, which is on the top of the first page, and

15  appears to have been sent by you to Mr. Cohen on May 18, 2009.

16  Did you send him that email?

17  A.  Looks like I did.

18          MR. BRAUN:  I would ask that Defendant's 68 --

19  A.  Yes.

20  Q.  I'm sorry, did you have more to say?

21  A.  No.

22          MR. BRAUN:  I'd ask that Defendant's 68 be received in

23  evidence.

24          MR. ALTER:  No objection.

25          THE COURT:  Defendant's 68 is received.

C6iQcam5                         Campbell - Cross

1        (Defendant's Exhibit 68 received in evidence)

2   Q.  Now, in that email to Mr. Cohen, you had a postscript that

3   says, "Please call me about The Mark.  I just spoke with Julia.

4   Kelly Mack may call me.  I am happy to tell her everything, but

5   Julia, and rightly so, wants your opinion on whether there are

6   things I should specifically say or not say."

7        Do you have a recollection of communicating with Julia

8   Cahill that -- communicating with Julia Cahill and her

9   suggesting that you should speak to Mr. Cohen about an inquiry

10  from Kelly Mack?

11  A.  I don't.

12  Q.  So you have no recollection of being advised by Julia

13  Cahill that Kelly Mack might call, correct?

14  A.  No.

15  Q.  And you have no recollection of them reaching out to

16  Mr. Cohen for his advice as to what to say to Ms. Mack?

17  A.  I don't.

18  Q.  Can you take another look at Defendant's 63.  That's the

19  email on the night of the inspection about the apartment being

20  fabulous.  Now, I want to ask you, Ms. Cahill, at the bottom

21  right-hand corner the document says G00069, and I want to ask

22  you if you have an understanding of what the significance of

23  the letter G is?

24  A.  No.

25  Q.  I will tell you, Ms. Campbell, that the G indicates that if

C6iQcam5                         Campbell - Cross

1    this document was produced to us by Mr. Gleicher in response to

2    a subpoena that we served upon him during discovery in this

3    case.  I will further represent that it was not -- no copy of

4    the document was produced to us by you or your attorneys.  I

5    want to ask you isn't that because you deleted it?

6    A.   I deleted a lot of emails.

7    Q.   And you never received an instruction from counsel,

8    correct, that you should not destroy documents?

9    A.   No.

10   Q.   So it's possible that there are other emails that were

11   received and then deleted regarding the Sponsor's interest in

12   having you come back to the building, correct?

13           THE COURT:  Sustained.  Anything is possible.  How

14   much more --

15           MR. BRAUN:  I am just about done, your Honor.

16           THE COURT:  OK, because to sit and ask this witness

17   about what she understands the legend of a Bates number to mean

18   when she has already testified that she doesn't read

19   agreements, she doesn't read letters, she has lawyers who do

20   all that stuff for her, so I don't know how many more questions

21   you want to put to her on --

22           MR. BRAUN:  No, I figured -- could you give me one

23   second, your Honor?  I may be finished.

24           THE COURT:  Yes.

25           (Pause)

C6iQcam5                          Campbell - Cross

1          MR. BRAUN:  Your Honor, I don't have anything further.

2          THE COURT:  Thank you.

3          Redirect?

4    REDIRECT EXAMINATION

5    BY MR. ALTER:

6    Q.  Ms. Campbell, I would like you to look at Defendant's

7    Exhibit 6, if you would, please.

8    A.  I have it.

9    Q.  Mr. Braun asked you some questions about this email, is

10   that correct?

11   A.  Pardon?

12   Q.  Mr. Braun asked you some questions about this?

13   A.  Yes.

14   Q.  There is a line there you say, "I am not in a rush to move

15   in, etc."  Do you see what I'm referring to?

16   A.  Yes.

17   Q.  And when did you send this email?

18   A.  January 2008.

19   Q.  In January 2008, when were you expecting the closing to

20   take place?

21   A.  May 1st of the same year.

22   Q.  When the closing was delayed past -- into 2009, did your

23   situation about not being in a rush to move in change?

24   A.  Yes.

25   Q.  Let's look at Defendant's Exhibit 62.  Talking about the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    top email about which Mr. Braun asked you some questions.  Are

2    you with me?

3    A.  Yes.

4    Q.  Now, you talk there about arranging to make an additional

5    trip.  In the context of that email, could you please tell us

6    what you meant?

7    A.  I wanted to have the assurance that the apartment was ready

8    for inspection.

9    Q.  Well, you talk specifically about an additional trip.  What

10   did you mean in that email about additional trip, if you

11   remember?

12   A.  I don't recall.

13   Q.  All right.  I will move on.  Defendant's Exhibit 74, the

14   pictures.  Now, who took these pictures?

15   A.  Paul Gleicher.

16   Q.  What was his purpose at the inspection?

17   A.  He was taking pictures just for refreshing his memory for

18   interior design purposes.

19   Q.  Was it his purpose of the inspection to record defects in

20   the apartment?

21   A.  No.

22   Q.  Let me look at the pictures here and ask you on any of the

23   pictures, can you see if there was heat in the apartment?

24   A.  No.

25   Q.  Can you see if there is air conditioning in the apartment?

1   A.  No.

2   Q.  Can you see if there is hot water in the apartment?

3   A.  No.

4   Q.  With the possible exception of one bathroom picture, can

5   you see if there are shower enclosures in the apartment?

6   A.  No.

7   Q.  Do the floors show in the pictures?

8   A.  Pardon?

9   Q.  Do the floors show in the pictures?

10  A.  Yes.

11  Q.  Can you see from the picture, I don't know, can you see

12  whether the picture whether they show the floor was finished or

13  unfinished?

14  A.  No, it's unclear.

15  Q.  Now, Mr. Braun asked you about you could have wired money

16  into -- in order to satisfy the closing?

17  A.  Yes.

18  Q.  Where would you have wired the money?

19  A.  I didn't have any -- I wasn't given any place yet.

20  Q.  You're saying you could have wired the money?

21  A.  Yes.

22  Q.  Do you know what the tradition is in such circumstances?

23  A.  No.

24  Q.  Could you have wired the money into Mr. Cohen's escrow

25  account?

1  A.  Yes.

2  Q.  Could he therefore have written any checks that were

3  necessary?

4  A.  Yes.

5          MR. BRAUN:  Leading, your Honor.

6          THE COURT:  It is leading.  Is it possible?  It's a

7  great little argument for why she didn't bring checks with her,

8  but she has just testified that she didn't know what the custom

9  was anyway.

10          MR. ALTER:  All right.  I will move on, your Honor.

11  Q.  Let's look at Defendant's Exhibit 27.  That's the report

12  from Mr. Ubell.  Are you with me?

13  A.  Yes.

14  Q.  You testified in answer to a question of Mr. Braun that you

15  didn't recall receiving it.  Do you remember that?

16  A.  Yes.

17  Q.  To whom was this addressed?

18  A.  To Mr. Cohen.

19  Q.  Well, it's to you --

20  A.  It's to me care of Mr. Cohen.

21  Q.  So it came directly to Mr. Cohen, is that correct?

22  A.  Yes.

23  Q.  Now, you were questioned by Mr. Braun and, for that matter,

24  by me about discussion you had on April 16.  Do you remember

25  that?

1   A.  Yes.

2   Q.  During that conversation, was there any question -- was

3   there any discussion about how long it would take to finish the

4   things that were talked about?

5   A.  Several weeks, two to three weeks, at least.

6   Q.  Were you asked in that conversation to stick around for two

7   or three weeks to see whether the matters would be finished?

8   A.  No.

9           MR. ALTER:  Give me a minute, please.

10          (Pause)

11  BY MR. ALTER:

12  Q.  Please turn to Defendant's Exhibit 98.  Tell me when you

13  are with me.

14  A.  Mmm-hmm.  OK.

15  Q.  Please turn to the second page.  There is an email from you

16  dated April 27, and it says, "After we review the plan and all

17  is as good as it seems right now, I would like to go ahead with

18  57 Irving."

19          Now, are you saying that you were at that point going

20  to make a commitment to 57 Irving?

21  A.  No.

22  Q.  Did you ever make a commitment to 57 Irving?

23  A.  No.

24  Q.  At the time you sent this email, had you given up yet on

25  The Mark?

C6iQcam5                        Campbell - Redirect

1   A.  No.

2   Q.  Let's look at Defendant's 68.  Top email it says --

3   Mr. Braun asked you questions about this email.  It says -- you

4   say in the PS to Mr. Cohen, "Kelly Mack may call me."  Do you

5   see that?

6   A.  Yes.

7   Q.  Did Kelly Mack ever call you?

8   A.  No.

9   Q.  Did you have any conversation with her?

10  A.  No.

11  Q.  At this time Julia is Julia, that's Julia Cahill, is

12  getting you the apartment at 15 Central Park West?

13  A.  Yes.

14  Q.  Let's look at the bottom of that email.  This chain

15  includes an email addressed to, among other people, Julia

16  Cahill, which has the subject: 15 CPW 11B deal sheet it says,

17  "Dear All:  Attached you will find a deal sheet."  Is that the

18  deal for the apartment at 15 Central Park West?

19  A.  I assume so.

20  Q.  What's the date of that?

21  A.  May 18, '09.

22  Q.  There was discussion before about deleting emails.  Did

23  your computer at the time -- we're talking about April, May,

24  2009 -- did your computer at the time have an automatic delete

25  function?

Case 1:09-cv-09644-WHP  Document 77  Filed 07/18/12  Page 180 of 239          180


C6iQcam5                      Campbell - Redirect

```
 1    A.  No.
 2    Q.  What would happen with emails if you received them?
 3    A.  If I felt they were important to save, I would save them.
 4    If I didn't feel I needed them, I would delete them.
 5    Q.  What if you didn't need them, what would happen?
 6    A.  They would still be in my in box and my email.
 7    Q.  Did you save emails connected with -- connected with the
 8    project at The Mark?
 9    A.  Some.
10    Q.  Did you delete others you felt weren't important or for
11    other reasons?
12    A.  Yes.
13    Q.  What reasons would they have been other than it was
14    unimportant, if any?
15    A.  Just that I didn't think I'd ever need them again, why keep
16    them?
17    Q.  Are you talking about deleting emails, are you talking
18    about contemporaneously in April or May of 2009?
19              MR. BRAUN:  I think we are leading too much, your
20    Honor.
21              THE COURT:  Sustained.
22    Q.  To the extent you deleted any emails relating to The Mark,
23    when did you delete them?
24    A.  Usually as they came.  I would read them and decide whether
25    to save it or not.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  To the best of your knowledge, after this lawsuit began,

2   did you delete any emails regarding The Mark hotel?

3   A.  No.

4           MR. ALTER:  No further questions.

5           THE COURT:  Anything further, Mr. Braun?

6           MR. BRAUN:  No, your Honor.

7           THE COURT:  I have just a couple of questions,

8   Ms. Campbell.

9           When is it that you decided not to go forward with

10  Unit 1402 at The Mark Hotel?

11          THE WITNESS:  When they told me I couldn't come back

12  to reinspect it.

13          THE COURT:  When was that?

14          THE WITNESS:  I think it was April 29, 2009.

15          THE COURT:  I am having difficulty understanding why

16  it is that on April 24 you would be communicating with folks

17  about 57 Irving Place if your heart was set on The Mark Hotel.

18          THE WITNESS:  Because I had waited so long for The

19  Mark, and when I inspected it, it wasn't finished, neither was

20  the building close to being finished.  Everything was late, and

21  I just felt deflated.  I wanted to have a backup plan.  I

22  wanted to see what else was out there.  I wanted an apartment

23  by 2009 in the fall.

24          THE COURT:  Did anyone ever tell you that the Sponsor

25  had represented that it was fixing the issues in the building?

C6iQcam5                         Campbell - Redirect

 1                THE WITNESS:  They said they were going to.

 2                THE COURT:  Well, was it ever communicated to you that

 3     the floors had been finished in the apartment?

 4                THE WITNESS:  No.  No.

 5                THE COURT:  In the time line that was discussed during

 6     opening statements, on April 28 you received or our attorney

 7     receives a letter from Canter, and on the 29th you direct Cohen

 8     to apply to the Attorney General's office?

 9                MR. ALTER:  Your Honor, the letter was sent on the

10     28th, federal Expressed received the 29th.

11                THE COURT:  I just said on the 29th she decided that

12     she was no longer interested in The Mark and directed Cohen to

13     apply to the AG.

14                Why would you have your attorneys continue to stand by

15     their letter delaying the closing to May 11 if you had all

16     these other things in motion?

17                THE WITNESS:  I didn't have anything in motion.  I

18     just wanted to see what was out there.

19                THE COURT:  But --

20                THE WITNESS:  I still wanted to close up until

21     April 29.  I still had hopes that they would say, all right,

22     it's taken us this long -- but from the very beginning of this

23     we could never get any information.  Everything was always

24     being delayed, and then upon inspection, the project wasn't

25     even nearly completed, both the apartment and the building.

1   And so I had grave concerns about it.

2          THE COURT:  Did anyone discuss with you during the

3   inspection whether The Mark Hotel had security personnel or

4   other personnel for the entrances to the building?  Did you

5   raise that at all?

6          THE WITNESS:  No, I had other things to think about.

7          THE COURT:  Well, you walked into the lobby and you

8   said all this other stuff was going on.  If you were going to

9   move into a $18 million apartment, was there any concern on

10  your part as to whether or not there was appropriate security

11  in the building since there was no hotel operating, there was

12  no restaurant operating, and you said there were at least five,

13  maybe ten workmen, passing in and out of the lobby while you

14  were there, was that your testimony?

15         THE WITNESS:  Yes.

16         THE COURT:  So what did you understand the security in

17  the building to be?

18         THE WITNESS:  I actually hadn't given it any thought.

19  I was concerned that I might be the only person living in the

20  building if I closed.

21         THE COURT:  And if you had that concern, what did you

22  understand was going to be in place?

23         THE WITNESS:  I didn't think that far ahead.  I

24  just -- I still really wanted the apartment to be finished, and

25  I would have closed.  And I think that would not have -- I just

1    didn't think that far ahead.

2            THE COURT:  Well, as of the date of inspection, what

3    was your plan before you went up on the 14th floor?  What was

4    your plan as to when you were going to move into the apartment?

5            THE WITNESS:  Well, immediately after closing, I

6    wasn't going to move in immediately, but immediately I was

7    going to start decorating and getting the apartment ready to

8    move in.

9            THE COURT:  How long did you envision that process was

10   going to take?

11           THE WITNESS:  Well, several months because it takes --

12   we had chosen some things but we had to choose more, and if

13   you're customizing things, it takes a couple months, at least

14   three usually, so I knew it would be several months, and I

15   really wanted it finished by the fall of 2009.

16           THE COURT:  All right.  Do counsel wish to make any

17   further inquiries of Ms. Campbell based upon the Court's

18   questions?  Anything further from the plaintiff?

19           MR. ALTER:  Nothing from the plaintiff.

20           THE COURT:  Anything?

21           MR. BRAUN:  No, your Honor.

22           THE COURT:  All right.  Ms. Campbell, you are excused.

23   You may step down.  We will take a very short recess, and

24   plaintiff will call the next witness, all right?

25           MR. ALTER:  Thank you, your Honor.

1              (Witness excused; recess taken)

2              (In open court)

3              THE COURT:  Would plaintiff call next witness?

4              MR. ALTER:  Yes, plaintiff calls Mr. Richard Cohen.

5    RICHARD N. COHEN,

6         called as a witness by the Plaintiff,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. ALTER:

10             THE COURT:  State your full name spell your last name

11   slowly for the court reporter.

12             THE WITNESS:  Richard Cohen.  Richard N. Cohen.

13             THE COURT:  You may inquire.

14             MR. ALTER:  Thank you, your Honor.

15   Q.  Mr. Cohen, what's your profession?

16   A.  I'm an attorney.

17   Q.  In what jurisdictions are you admitted?

18   A.  New York -- sorry, do I talk into this microphone?

19             THE COURT:  Yes.

20   A.  New York and Connecticut.

21   Q.  Are you admitted into the bar of any federal court?

22   A.  Eastern and Southern District.

23   Q.  Of New York?

24   A.  Yes.

25   Q.  In what year were you admitted in New York?

C6iQcam5                          Cohen - Direct

1    A.  1987.

2    Q.  Is there a particular area of the law in which your

3    practice is concentrated?

4    A.  Yes.

5    Q.  What is that?

6    A.  Real estate transactions.

7    Q.  How long have you concentrated in this area of practice?

8    A.  Approximately 24 years.

9    Q.  Did you attend professional meetings while in law school?

10   A.  I did.

11   Q.  Which organization?

12   A.  The International Council of Shopping Centers.

13   Q.  What did you learn there?

14          MR. BRAUN:  Excuse me?  That is very ambiguous.

15          MR. ALTER:  I'll withdraw it.

16   Q.  How many closings have you handled in your career.

17   A.  It was thousands, maybe over 2,000.

18   Q.  Excluding the present matter, how many transactions have

19   ended up in litigation?

20   A.  Two.

21   Q.  Of those two, how many went to trial?

22   A.  One.

23   Q.  Did there come a time when you were introduced to Roberta

24   Campbell as a possible client?

25   A.  Yes.

1   Q.  When was that?

2   A.  It was late 2007.

3   Q.  How did that come about?

4   A.  Ms. Campbell was referred by a real estate broker.

5   Q.  Who was that?

6   A.  It was Julia Cahill.

7   Q.  Did you represent Mrs. Campbell in connection with her

8   contract to purchase at The Mark Hotel?

9   A.  I did.

10  Q.  What was the name of your firm at the time?

11  A.  Friedberg Cohen Coleman & Pinkas LLP.

12  Q.  What is the name of your firm now?

13  A.  Cohen & Coleman LLP.

14  Q.  Now at that time, late 2007 to early 2008, was there

15  someone other than Roberta Campbell who was being named as the

16  purchaser in this transaction?

17  A.  Yes.

18  Q.  And who was that?

19  A.  Mr. William Campbell.

20  Q.  What happened to him and his interest, if you know?

21  A.  His interest was assigned to Ms. Campbell.

22  Q.  Was that on occasion of their divorce or in connection with

23  their divorce?

24  A.  Correct.

25  Q.  Did there come a time when Ms. Campbell signed the

C6iQcam5                        Cohen - Direct

1    contract?

2    A.  Yes.

3    Q.  Please look at Defendant's Exhibit 2.  Defendant's is the

4    bigger of the two books.  Defendant's Exhibit 2 that's in

5    evidence, I believe.  Is this the contract?

6    A.  Yes.

7    Q.  What's its date?

8    A.  January 17, 2008.

9    Q.  Was there an offering plan in connection with the offering

10   which included the unit here in question?

11   A.  Yes.

12   Q.  Did you receive a copy?

13   A.  I did.

14   Q.  Is that Defendant's 3?  That's a separate book there.

15          My question, sir, was did you receive a copy of the

16   offering plan which was Defendant's Exhibit 3?  That's a

17   separate book in front of you.

18   A.  Yes.

19   Q.  I believe that is in evidence.  Please look at page 66

20   there.

21   A.  Of which?  Of the offering?

22   Q.  Tell me when it is estimated the first closing is to take

23   place.

24   A.  It says that the closings were supposed to begin in or

25   about May 2008.

C6iQcam5                    Cohen - Direct

1   Q.  According to the plan at the bottom of that page, what

2   happens if there isn't a closing by one year from that date?

3   A.  Then the -- all of the purchasers would be entitled to the

4   return of their deposit; they would be entitled to rescind

5   their contracts.

6   Q.  Was there a closing by May 1, 2008?

7   A.  No.

8   Q.  Was the plan ever declared effective by that date?

9   A.  No.

10  Q.  What are the consequences of declaring the plan effective?

11  A.  When a developer declares of the plan effective, that is

12  the point of no return where the developer has to go forward

13  and finish creating the condominium or the coop that they are

14  creating.

15  Q.  But it's his option whether to declare it effective

16  assuming he meets the prerequisites?

17  A.  Right, they need 15 percent purchasers.  15 percent of the

18  units have to be in contract to declare the plan effective.

19  Q.  At that point, it's still his option whether to go forward

20  or not?

21  A.  Right.

22          MR. BRAUN:  I'm sorry, effectively, Mr. Cohen is being

23  asked to give expert explanations of the law.  Since this is

24  really background, I am not really objecting to the questions

25  that have been asked so far, but I could foresee a situation

C6iQcam5                        Cohen - Direct

1    where this becomes problematic, so I just want to register that

2    concern.

3              MR. ALTER:  I am moving on.

4    Q.  Were you and Ms. Campbell eventually notified that the plan

5    was declared effective?

6    A.  Yes.

7    Q.  When approximately was that?

8    A.  February 8, 2009.

9    Q.  Please look at first Defendant's Exhibit 12.  That's in the

10   bigger book.

11   A.  Did you say defendant?

12   Q.  Yes, Defendant 12 and then Plaintiff's 1, which is in the

13   smaller book.

14             Were these the notifications that you received?

15   A.  Yes.

16   Q.  What's the exact date on those?

17   A.  February 26.

18   Q.  Of?

19   A.  2009.

20   Q.  Between the signing of the contract in January 2008 and

21   notification that the plan was declared effective in 2009, were

22   steps taken on behalf of Ms. Campbell to expedite process?

23   A.  Process, you mean closings?  Yes.

24   Q.  And were you yourself involved in that?

25   A.  I just heard about phone calls.

1    Q.  We will ask the people who made them.  But you yourself

2    were not?

3    A.  Right.

4    Q.  Please refer to Plaintiff's Exhibit 1 in evidence and tell

5    us the originally scheduled closing date.

6    A.  The original closing date scheduled by the Sponsor was

7    March 31, 2009.

8    Q.  After that notification, what, if anything, did you do

9    personally to try to speed up the closing?

10   A.  Made phone calls and emails.

11   Q.  I'm sorry.  And whom did you have these phone calls and

12   emails with?

13   A.  Sponsor's represent -- sponsor's attorneys and/or

14   paralegals.

15   Q.  And in particular what individual?

16   A.  Michael Wefels.

17   Q.  Who did you understand Mr. Wefels to be?

18   A.  He was a paralegal from Kramer Levin.

19   Q.  Is Exhibit Defendant's 16 one of those exchanges?

20   A.  I'm sorry, which?  Did you say Plaintiff or Defendant?

21   Q.  Defendant 16, the bigger book.

22   A.  Yes.

23           MR. ALTER:  I'll offer that in evidence.

24           MR. BRAUN:  No objection, your Honor.

25           THE COURT:  Defendant's Exhibit 16 is received.

C6iQcam5                          Cohen - Direct

1        (Defendant's Exhibit 16 received in evidence

2   Q.  I would like to read two lines from a lower email from the

3   first page.  It says, "When will they have a TCO?"  And the

4   upper email says, which is the response of Mr. Wefels' says

5   "Prior to the closing."

6        Is Defendant's Exhibit 17 another of those

7   exchanges -- before I do that, what's the date on Defendant 16

8   before I get to 17?

9   A.  It's March 9, 2009.

10  Q.  Let's look at Defendant's Exhibit 17.  What's the date on

11  that?

12  A.  That's March 24.

13  Q.  Let's look at Defendant's 17?

14  A.  Oops, that's the wrong one.  March 17.  It's confusing

15  here.  17.  March 12.

16  Q.  Thank you.

17       Is that another email exchange that you had with

18  Mr. Wefels?

19  A.  Yes.

20       MR. ALTER:  I offer that in evidence.

21       MR. BRAUN:  No objection.

22       THE COURT:  Defendant's Exhibit 17 is received in

23  evidence.

24       (Defendant's Exhibit 17 received in evidence)

25  Q.  Now, on the second page of this email of Plaintiff's 17,

C6iQcam5                     Cohen - Direct

1    you ask three numbered questions of Mr. Wefels, is that

2    correct?

3    A.  Yes.

4    Q.  On page 1, we have 3 numbered paragraphs which are

5    Mr. Wefels -- the ones in lower case are Mr. Wefels' response

6    to you, correct?

7    A.  Yes.

8    Q.  And the capital letters, upper case comments on those --

9    under those things are your response further to Mr. Wefels, is

10   that correct?

11   A.  Yes.

12   Q.  Let look at the question you asked number 1.

13            "In order to properly plan for the closing we need

14   more detailed information regarding the status of the TCO than

15   just saying you would have it before closing."

16            Let me do it this way by asking his Honor to note the

17   paragraphs that I'm interested in, which is the Mr. Cohen's

18   comment on the second page, Mr. Wefels' response on the first

19   page, and Mr. Cohen's further response on the first page to

20   number one.

21            Let's move on to the next one.  Please look at

22   Plaintiff's Exhibit 3.  That's in the other book.  Are you with

23   me?  Tell me when you are, please.

24   A.  Plaintiff's 3, yes.

25   Q.  Is that yet another email exchange you had with Mr.  --

C6iQcam5                          Cohen - Direct

```
 1   this is a one-way email is this an email you sent to

 2   Mr. Wefels?

 3            MR. BRAUN:  Excuse me, your Honor.  This is a

 4   combination exhibit.  I think it needs to be clarified as to

 5   exactly what email or emails the examiner is referring to if he

 6   is going to ask the witness about an email.

 7   Q.  Are all emails in Plaintiff's Exhibit 3 email exchanges

 8   between yourself and Mr. Wefels?

 9   A.  Yes.

10            MR. ALTER:  I would offer Plaintiff's Exhibit 3.

11            MR. BRAUN:  One second, please.

12            MR. ALTER:  Sure.

13            MR. BRAUN:  No objection, your Honor.

14            THE COURT:  Plaintiff's Exhibit 3 is received.

15            (Plaintiff's Exhibit 3 received in evidence)

16            MR. ALTER:  I would just like to point out the second

17   paragraph on the page with Bates number 00650.  I call your

18   Honor's attention to paragraph 2 of that email.

19   Q.  Please refer, sir, to Plaintiff's Exhibit 50.

20            THE COURT:  Just wait.  For the record -- because if I

21   am going to follow the record, you have given me three

22   instructions, to get to an exhibit to find a certain paragraph

23   to figure out what the point is that you want to make by

24   bringing Plaintiff's Exhibit 3 to my attention.  So the

25   paragraph that you are directing me to which you have referred
```

C6iQcam5                           Cohen - Direct

1   to as paragraph number 2 --

2              MR. ALTER:  It has a number on it.

3              THE COURT:  -- says "I previously asked for some

4   direct information from the architects or engineers as the

5   estimated time that the TCO will be obtained.  My client's not

6   ready to fly cross country based only on the statement that you

7   would have it before closing.  Many Sponsors adjourn their

8   closing for additional 30 day periods after the initial closing

9   letters are sent out, and we need to know accurate information

10  and when the unit will be ready for inspection."

11             That's what's germane in this many, many multipage

12  email that constitutes Plaintiff's Exhibit 3 that, as has

13  already been previously noted, moves through a number of

14  non-sequential Bates numbers, right?

15             MR. ALTER:  That is the point that I wish to bring out

16  at this point in time.  Conceivably, I will refer to other

17  parts of this at some other point in the testimony.

18             THE COURT:  OK, but there are so many emails in

19  Plaintiff's Exhibit 3 that have paragraph numbers, I'm not

20  going to do homework on this case.

21             MR. ALTER:  No, we understand.

22             THE COURT:  It's all going to be here or it isn't.

23             Next question.  You were going to Plaintiff's Exhibit

24  50, I think.

25             MR. ALTER:  Yes, I was.

1   Q.  Do you have that in front of you, sir, Mr. Cohen?

2   Plaintiff's Exhibit 50?

3   A.  Yes.

4   Q.  Is that another email you sent?

5   A.  Yes.

6           MR. ALTER:  I would like to offer that one.

7           MR. BRAUN:  No objection, your Honor.

8           THE COURT:  Plaintiff's Exhibit 50 is received.

9           (Plaintiff's Exhibit 50 received in evidence)

10  Q.  Sir, to whom did you address that email?

11  A.  It's to Ramon Chicon.

12  Q.  Who is Ramon Chicon?

13  A.  He was Sponsor's representative that was designated in the

14  closing notice to contact to set up an inspection of the unit.

15  Q.  And that's Plaintiff's Exhibit 1 you were referring to?

16  Keep your hand on this one and look back at Plaintiff's Exhibit

17  1, please.

18  A.  Yes, his name is listed there and his phone number and his

19  email.

20  Q.  And your contact with him, your inquiry of him says -- let

21  me quote:  "Sponsor's closing notice says to contact you

22  regarding inspection of the suite prior to closing.  Please let

23  us know when you will be ready for an inspection."

24          Did you also call him that day, March 24th?

25          MR. BRAUN:  Leading.

1          THE COURT:  Overruled.

2          MR. ALTER:  You may answer.

3   A.  Yes.

4   Q.  Did you reach Mr. Chicon?

5   A.  I did not.

6   Q.  Did you subsequently learn through discovery in this action

7   an internal email exchange with defendant that you recall that

8   Mr. Chicon set off?

9   A.  I did.

10         MR. BRAUN:  I object to relevance grounds to review an

11  email that Mr. Cohen saw for the first time apparently as a

12  result of discovery of this lawsuit.

13         THE COURT:  Overruled.

14         MR. ALTER:  Let me read joint fact 33.  It's on page

15  11 of the joint pretrial order.

16         "On March 24, 2009, there was an exchange of emails

17  between Mr. Chicon and Maria Pedernera, an Alexico employee.  A

18  copy of an email thread containing these emails is Plaintiff's

19  Exhibit 51."

20         I don't remember if I offered Plaintiff's 50, if I

21  didn't, I would like to offer it now.

22         THE COURT:  You did, and it is received.

23         MR. ALTER:  And I would like to offer Plaintiff's

24  Exhibit 51.

25         MR. BRAUN:  No objection to the Exhibit itself, your

C6iQcam5                        Cohen - Direct

```
1    Honor.  It is the potential questions that I may object to.
2              THE COURT:  Plaintiff's Exhibit 51 is received.
3              (Plaintiff's Exhibit 51 received in evidence)
4    Q.  Ms. Pedernera at the bottom sends an email to Ramon Chicon
5    saying, "phone call attorney for apartment 1402 re:
6    walk-through."
7              Mr. Chicon's response is "Hello Maria:  Same drill as
8    before.  Please call them back and let them know we will
9    contact them a couple days before we schedule the walk.  You
10   cannot provide additional information.  Thanks."
11             Now, sir, please refer back to Plaintiff's Exhibit 50.
12   And what is Mr. Chicon's response to your email?
13   A.  He says, "I will let you know."
14   Q.  Please refer to Defendant's Exhibit 18.  That's the other
15   book.
16             MR. ALTER:  I'm sorry, I didn't formally offer joint
17   fact 33.  I read it in, but I didn't offer it.  Any objection?
18             MR. BRAUN:  Joint fact 33, no, sir, no objection.
19             MR. ALTER:  So stipulated.
20   Q.  Please refer to Defendant's Exhibit 18.  Did you receive
21   that?
22   A.  Yes.
23             MR. ALTER:  I offer it in evidence.
24             MR. BRAUN:  No objection.
25             THE COURT:  Defendant's Exhibit 18 is received in
```

C6iQcam5                         Cohen – Direct

1    evidence.

2              (Defendant's Exhibit 18 received in evidence)

3    Q.   What is the date of that notification?

4    A.   March 24, 2009.

5    Q.   I trust you permit to lead saying, does this adjourn the

6    previously scheduled closing date to April 7?

7    A.   Yes.

8    Q.   And you received –- its dated March 24, is that correct?

9    A.   We just said that.

10   Q.   Is that the same date as your conversation in your email

11   with Mr. Chicon?

12   A.   It is.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

C6IJCAM6                      Cohen - direct

1    Q.  Did Mr. Chicon either in the e-mail or in response to a

2    phone call tell you that was being adjourned?

3    A.  No.

4    Q.  Where was Ms. Campbell at this time?

5    A.  She was in California.

6    Q.  Prior to this letter, when was the closing scheduled for?

7    A.  March 31.

8    Q.  This notice was sent to you by certified mail.  Is that

9    correct?

10   A.  Yes.

11   Q.  You received a call by certify mail.  Is that correct?

12   A.  I think so.

13   Q.  Go to the second page.

14   A.  Yes.

15   Q.  So the earliest you could have received this was when?

16   A.  From the post office, a few days, I would assume.

17   Q.  How long was this before the previous call, sir, previously

18   scheduled closing?

19   A.  Less than a week.

20   Q.  Did the closing get further adjourned from this April 7th

21   date?

22   A.  Yes.

23   Q.  How were you informed of this?

24   A.  By letter.

25   Q.  Is that from Kramer Levin?

C6IJCAM6                       Cohen - direct

1   A.  Yes.

2   Q.  Is that Plaintiff's Exhibit 5?

3   A.  Yes.

4          MR. ALTER:  I offer it.

5          MR. BRAUN:  No objection.

6          THE COURT:  Plaintiff's exhibit 5 is received in

7   evidence.

8          (Plaintiff's Exhibit 5 received in evidence)

9   BY MR. ALTER:

10  Q.  What is the date of this letter?

11  A.  April 2nd.

12  Q.  It was sent to you and to Ms. Cohen by --

13         MR. BRAUN:  Excuse me? Ms. Cohen?

14         MR. ALTER:  Did I say Ms. Cohen?  I apologize.  Let me

15  withdraw that and start again.

16  BY MR. ALTER:

17  Q.  Was it sent to you and to Ms. Campbell and also William

18  Campbell by Federal Express.  Is that correct?

19  A.  Yes.

20  Q.  So when is the earliest you could have received this

21  letter?

22  A.  April 3rd.

23  Q.  That was how long before the previously scheduled closing?

24  A.  Again less than a week.  April 7th, April 3, 4 days.

25  Q.  Do you have a calendar for April in front of you?

C6IJCAM6                    Cohen - direct

1   A.  I have no idea -- here it is, yes, I do.

2   Q.  Between April 3rd and April 7th there is a weekend, is

3   there not?

4   A.  Yes.

5   Q.  After this, receiving this letter, Plaintiff's 5, did you

6   have further correspondence with Mr. Wefels?

7   A.  Yes.

8   Q.  Is that Plaintiff's 7?

9   A.  Yes.

10          MR. ALTER:  I offer it.

11          MR. BRAUN:  No objection, your Honor.

12          THE COURT:  Plaintiff's Exhibit 7 is received in

13   evidence.

14          (Plaintiff's Exhibit 7 received in evidence)

15   BY MR. ALTER:

16   Q.  I would like you to read, please, the four paragraphs at

17   the bottom of the first page of that.

18   A.  Where it says Michael?

19   Q.  Yes.

20   A.  This is April 3rd.  "We are in receipt of your third

21   closing notice adjourning the closing for the third time.  I

22   previously asked you on numerous occasions to contact your

23   engineers, architects or expediters to give us a reasonable

24   estimation of the time for the actual closings.

25          "Such requests have been ignored or answered with

C6IJCAM6                        Cohen - direct

1    nonresponsive language.  Additional calls to the contact person

2    listed in your closing notice for scheduling and inspection

3    have been met only with a response that we will let you know.

4    As we have explained, our client lives currently in California

5    and will need to fly to New York for the inspection and

6    closing.  You have put her in an unacceptable, tenuous position

7    of having to wait week by week to make her plans to travel to

8    New York.

9         "The offering plan states that the Sponsor may from

10   time to time adjourn the closing upon reasonable prior notice.

11   We find that your one week back-to-back notices are

12   unreasonable and think that the Attorney General's Office would

13   also find the same."

14   Q.  All right.  Let's finish that.  Please look at Page 1 of

15   that e-mail, the response by Mr. Wefels to your e-mail.  I will

16   read the last sentence of that.

17        "Sponsor is as anxious to close as is your client and

18   is trying to be as accommodating and courteous as possible."

19        Now, during this time period between notification that

20   the offering plan was effective and the inspection, did there

21   come a time that you asked defendant for a reduction in the

22   purchase price?

23   A.  Yes.

24   Q.  Why was that?

25   A.  Considering the state of the economy and there were many

204

1    sponsors, many condominium developments that were having

2    trouble getting sponsors -- sorry -- getting purchasers to come

3    to closings, people were defaulting.

4            It seemed like the prudent and wise and proper thing

5    for a real estate attorney at that point in time, as many of my

6    colleagues were doing, to ask for a price reduction.

7    Q.  Were you looking for a price reduction because you did not

8    want to close?

9    A.  It wasn't me.  Ms. Campbell, but absolutely not.

10   Q.  Because Ms. Campbell did not want to close?

11   A.  Absolutely not.  It really came from me, not from her.  It

12   just seemed like what a wise attorney would be asking for at

13   the time.

14   Q.  Was it your request for reduced purchase price successful?

15   A.  No.

16   Q.  Now Plaintiff's Exhibit 5 schedules the closing for April

17   16th.  As of the date of Plaintiff's Exhibit 5, which you can

18   refer to it and I'll tell you it was April 2nd, was the

19   walk-through scheduled?

20   A.  No.

21   Q.  When did the defendants schedule the walk-through, if you

22   recall?

23   A.  Not till much closer to the closing date.

24   Q.  Do you recall how the walk-through got scheduled?

25   A.  It was a phone call from Mr. Wefels.

                                                                        205
C6IJCAM6                        Cohen - direct

1    Q.  Please look at Plaintiff's Exhibit 141.  Is the bottom

2    e-mail on the first page of that exhibit an e-mail you sent to

3    Ms. Campbell, Ms. Cahill and Mr. Gleicher after receiving that

4    phone call you just testified about?

5    A.  It is.

6           MR. ALTER:  I offer Plaintiff's Exhibit 141 in

7    evidence.

8           MR. BRAUN:  No objection.

9           THE COURT:  Plaintiff's Exhibit 141 is received in

10   evidence.

11          (Plaintiff's Exhibit 141 received in evidence)

12   BY MR. ALTER:

13   Q.  Let me read it and ask you some questions about it.

14          "Attorney's office just called again.  They now say

15   they expect the TCO on Monday.  First time they have given an

16   estimate.  They say the stop work order is just for the

17   sidewalk.  Call Paul and you can confirm.  Please tell us what

18   you can tell us about stop work order and Paul for the

19   confirmation"?

20   A.  In the title report we found there was a stop work order,

21   so I was very concerned that considering the slow process of

22   construction, that maybe the whole project was going to come to

23   a halt.  So I wanted the title company and Paul to check with

24   an expediter to find out what that stop work order referred to.

25   Q.  By "Paul," that is Mr. Gleicher?

C6IJCAM6                          Cohen - direct

1   A.  Yes.

2   Q.  Continuing my reading of it, "They would like to schedule

3   the walk-through on April 15th.  I told them that was too short

4   notice as I have explained umpteen times you need more than a

5   week's notice to get here.  I told them send me the TCO on

6   Monday when you get it.  Then I will send it to my client, and

7   she will look into flight arrangements to get here for an

8   inspection and close perhaps a few days later depending on how

9   the inspection goes.  That is if it is just punch list items or

10  anything major that is not completed."

11          Did Mr. Wefels ever confirm in writing that the

12  inspection was to be on April 15th?

13  A.  I think there was a subsequent e-mail.

14  Q.  Let's look at Plaintiff's Exhibit 8.  Is that what you're

15  referring to?

16  A.  Yes.

17          MR. ALTER:  I offer Plaintiff's Exhibit 8 in evidence.

18          MR. BRAUN:  I am sorry.  I am struggling here because

19  there are multiple e-mails here.  Your Honor, I don't have any

20  objection.

21          THE COURT:  Plaintiff's Exhibit 8 is received.

22          (Plaintiff's Exhibit 8 received in evidence)

23          MR. ALTER:  I would like to read from the second of

24  the two e-mails that are on this exhibit, my second, I mean the

25  bottom which is the earlier one.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C6IJCAM6                      Cohen - direct

1           MR. BRAUN:  I believe it is the third.

2           MR. ALTER:  Okay.  Mr. Cohen the bottom e-mail on the

3    page numbered OOO966, Mr. Cohen asked Mr. Wefels have you

4    confirmed so she can make flight reservations, and this is

5    dated Friday, April 10th.  On the same day Mr. Wefels says we

6    are confirmed for the walk-through.

7    BY MR. ALTER:

8    Q.  Is that the written confirmation you were referring to?

9    A.  Yes.

10   Q.  Did you have occasion after that, before the 15th, to

11   e-mail Mr. Wefels further?

12   A.  I think so.

13   Q.  Well, look at the Defendant's Exhibit 28, please, and tell

14   me if that matches my description.

15   A.  Defendant's?

16   Q.  Defendant's 28.  No, no, it is not Defendant's 28.  I am

17   sorry.  Yes, it is Defendant's 28.  I am talking about the

18   third e-mail on Defendant's Exhibit 28.  I understand Exhibit

19   28 is in evidence.

20   A.  What is the number on it?

21   Q.  It is a very lengthy e-mail chain.

22   A.  What is the number on the bottom of the page?

23   Q.  It is a very lengthy e-mail chain, but I am talking about

24   the middle e-mail on page numbered Bates OO271.  Do you see

25   where I am referring to?

C6IJCAM6                    Cohen - direct

1   A.   OO271, yes, okay.

2   Q.   The middle e-mail sent by you on 11:15 am --

3           MR. BRAUN:   Objection only to form.  I guess, I think

4   counsel is referring to the e-mail that begins in the middle of

5   the page and it appears sent on April 14 at 11:15 am.   The

6   middle e-mail suggests there are at least three e-mails.

7   BY MR. ALTER:

8   Q.   The middle of the page, the e-mail sent at the time that

9   has both Mr. Braun and I described it.  Do you see where I am

10  referring?

11  A.   I see one that says 11:15 am.

12  Q.   That is the one.  Please read Paragraph 1 and then I'll ask

13  you a question about it.

14  A.   "Mr. Wefels again.  As mentioned yesterday, the link you

15  sent according to our architect was only a record of an

16  application to New York City.  We will need more than that,

17  such as the final approval."

18  Q.   Now, can you tell us what that is about?

19  A.   The Sponsor was supposed to get certain permission from the

20  city for extended stays, and we were looking for the actual

21  document that the city had granted that.

22  Q.   Please explain this extended stay concept to us.

23  A.   Well, it was a very strange provision in the offering plan

24  that many of these units could not be occupied for more than 30

25  days without people having to leave the units and then come

C6IJCAM6                    Cohen - direct

1    back again because of the zoning.

2    Q.  What was the issue with that with respect to Ms. Campbell's

3    unit?

4    A.  Well, she had been promised hers would be designated as one

5    of the extended stay units.

6    Q.  And you're asking about the paperwork on that?

7    A.  I am trying to establish it has been properly approved by

8    New York City.

9    Q.  As of the 14th, that is the day before the closing -- day

10   before the inspection and two days before the scheduled

11   closing, had it been approved?

12           MR. BRAUN:  I don't think this witness -- are you

13   asking for hearsay?

14   BY MR. ALTER:

15   Q.  Had you been advised it had been approved?

16   A.  No.

17   Q.  Please read the second paragraph.

18   A.  "I previously told you on numerous occasions we have not

19   agreed to close on April 16th so I don't know why you're

20   putting that date on your closing checklist.

21           "We are entitled to 10 days' adjournment and

22   additionally the proof as required in Paragraph 1 is a closing

23   condition that must be satisfied prior to the closing pursuant

24   to the First Amendment of the contract."

25   Q.  You referred to here, sir, to 10 days' adjournment.  In

1   fact, you had a right to a two-week adjournment.  Isn't that a

2   fact?

3   A.   Correct.

4   Q.   Did you nonetheless go forward with the inspection the

5   following day?

6   A.   We did.

7   Q.   Ms. Campbell had come in from California for that?

8   A.   Yes, on very quick notice.

9   Q.   Did you attend with Ms. Campbell?

10  A.   I did.

11  Q.   Who else attended on behalf of Ms. Campbell?

12  A.   Paul Gleicher, Richard Gray, Lawrence Ubell.

13  Q.   They have already been identified before you took the stand

14  so I'll move on.  Who attended on behalf of the defendant?

15  A.   Ramon Chicon and Stuart Marton.

16  Q.   Where did you all meet up?

17  A.   We met in the lobby.

18  Q.   Please describe the lobby to the court.

19  A.   The lobby was unfinished.  Walking in, the floors were all

20  dusty.  In the photographs we had seen these beautiful glossy

21  black and white floors that were supposed to be there.  Instead

22  it was all faded white with sawdust or particle board dust.

23           To the left was the restaurant or what was purported

24  to be a restaurant.  It was all closed up.  I looked in the

25  glass to see what was going on, and it was unfinished, boxes

C6IJCAM6                      Cohen - direct

1    and equipment.  It was certainly not in any condition to be

2    opened.

3                On the right-hand side there was reception desk, and

4    that was unfinished.  Then there were elevators straight ahead.

5    Q.  Did you get upstairs by an elevator?

6    A.  We did.

7    Q.  Please tell us about the elevator.

8    A.  Well, the elevator looked like a construction freight

9    elevator.  It had padding inside.

10   Q.  How was it summoned, if you recall?

11   A.  It was a person who had to operate it.

12   Q.  How was the elevator summoned, do you recall?

13   A.  It was either by cell phone, walkie-talkie, somebody called

14   this fellow to operate it for us.

15   Q.  Please describe the clothing the person operating it was

16   wearing.

17   A.  He was wearing construction clothes.

18   Q.  When you exited the elevator, did you walk through a

19   hallway to reach the apartment?

20   A.  We did.

21   Q.  Please describe the hallway.

22   A.  I just remember that it seemed unfinished, there was no

23   carpeting, the walls weren't painted or wall papered.  It was

24   just very unfinished.

25   Q.  How long was the inspection?

C6IJCAM6                          Cohen - direct

1   A.  I'd say at least three hours, about two to three hours.  It

2   seemed like forever.

3   Q.  Did you all walk around together?

4   A.  No.

5   Q.  Was the heat and air conditioning working?

6   A.  No.

7   Q.  How do you know that?

8   A.  Because I went over to the thermostat and reached up to see

9   how it worked and asked Mr. Marton how does this work.

10  Q.  What did he respond?

11  A.  He told me it doesn't, it is not connected.

12  Q.  Was the hot water working?

13  A.  It was not.

14  Q.  How do you know that?

15  A.  Because I went to the kitchen sink and I turned on the

16  water and put my hands under the water spout and the water

17  stayed cold.

18  Q.  Did you have any conversation with Mr. Marton about that?

19  A.  I did.

20  Q.  And you said?

21  A.  I said where's the hot water?  How does it work?

22  Q.  And his response?

23  A.  And he said the boilers haven't been connected.  There's

24  nobody living in the building so there is no hot water.

25  Q.  Did you tell Ms. Campbell about the heat, air conditioning

1    and hot water during the inspection?

2    A.  I think I did.

3    Q.  Did you inspect the stove to see if there were gas?

4    A.  No.

5    Q.  Why not?

6    A.  Just by looking at it, you could see it wasn't able to be

7    used.  There were missing burners or knobs.

8           MR. ALTER:  I would like to read in, your Honor, from

9    Page 14 of the joint pretrial order, Joint Fact 52.

10          "On the day of the inspection, representatives of the

11   Mark Hotel informed Ms. Campbell and her representatives that

12   the heat, air conditioning and hot water systems were operable

13   at that time but had not been turned on."

14          So stipulated?

15          MR. BRAUN:  Yes.

16   BY MR. ALTER:

17   Q.  Going into the inspection, what date had the defendant

18   purported to schedule the closing?

19   A.  The very next day, April 16th.

20   Q.  Going into the inspection, did you expect the closing to

21   take place the next day?

22   A.  No.

23   Q.  Why not?

24   A.  I had previously told them in e-mails it was an unrealistic

25   date, that we needed to inspect it and then check that all the

C6IJCAM6                         Cohen - direct

1     proper paperwork had been presented, that the Sponsor had

2     fulfilled all of its conditions.

3     Q.  Had you mentioned to them your contractual right to adjourn

4     the closing?

5     A.  I had.

6     Q.  Even if the inspection -- pardon me.  Withdrawn.

7          Even if the scheduling had been valid and the

8     inspection had been fine, would you have been inclined to

9     exercise the two-week adjournment?

10         MR. BRAUN:  I didn't understand that.  May I read that

11    question.

12         (Pause)

13         MR. BRAUN:  It is leading, your Honor.

14         THE COURT:  It is leading.  It is speculative, but I

15    am going to overrule the objection.  Would you have exercised

16    the two-week adjournment provision even if everything was fine

17    on April 15th?

18         THE WITNESS:  Typically having represented many

19    purchasers, I never wanted a purchaser that I was representing

20    to be the first person to close in a new building.

21         What I had discovered was sometimes we would go to a

22    closing and a closing that should take two hours would wind up

23    taking five hours because the sponsor wouldn't have their

24    papers together, they wouldn't have their mortgage

25    satisfactions together and we would waste a whole lot of time.

C6IJCAM6                      Cohen - direct

1              Also I found the person who first moved into a

2      building was always subject to all kinds of start-up problems.

3      My preference was always to have my client, having had

4      experiences where they were the first to close, to have other

5      people be the guinea pigs and let them test out the Sponsor,

6      let them see see that all the paperwork is done so we can come

7      in for a fast closing and the beginning shake-out is done.

8      BY MR. ALTER:

9      Q.  Now, of course, the ultimate decision whether to close

10     would be Ms. Campbell's.  Is that correct?

11     A.  Of course.

12     Q.  I gather from your previous answer that you would have

13     recommended against it.  Is that correct?

14     A.  I would have.

15     Q.  Had you discussed the timing of the closing with Ms.

16     Campbell before the day of the inspection?

17     A.  I don't think we did.

18     Q.  Incidentally, when did you first have a face-to-face

19     meeting with Ms. Campbell?

20     A.  In the lobby right before the inspection.

21     Q.  You never met with her before?

22     A.  Correct.

23     Q.  When were you planning on discussing with her when you

24     should close?

25     A.  After we finished a good inspection that showed the

1    apartment was habitable.

2    Q.  Did you have such an inspection?

3    A.  We did not.

4    Q.  During the inspection, was anything said about going

5    forward or not going forward the next day, the closing?

6    A.  I don't recall.  I don't think so.

7    Q.  What was your assumption as of the end of the inspection as

8    to whether there would be a closing the next day?

9    A.  It would be impossible.  It was not habitable.  It was

10   dangerous.  No one could live there, so it made no sense to

11   close the next day.

12   Q.  Did the closing, in fact, take place on April 16th?

13   A.  No.

14   Q.  Did you have correspondence with Mr. Gleicher following the

15   inspection?

16   A.  Excuse me?

17   Q.  Rather than ask you that, let me ask you to please look at

18   defendant's exhibit --

19   A.  One second.  (Pause)  Where were you?

20   Q.  We were looking at Defendant's 28, if you will, which is

21   already in evidence.  This is a long e-mail.  We looked at

22   other parts of it.  I would like to call your attention to the

23   latest which is the first e-mail in that chain, the one from

24   Mr. Gleicher to you and Ms. Campbell dated Thursday, the 16th,

25   at 11:18 am.  Do you see that?

C6IJCAM6                        Cohen - direct

1    A.  Yes.

2    Q.  Now I show you the second paragraph, call to your attention

3    the second paragraph where he says, "I have another thought on

4    a potential means to delay the closing."

5           Do you see that?

6    A.  I see it.

7    Q.  Had you requested he think of things to delay the closing?

8    A.  No.

9    Q.  What did you understand him to be talking about?

10   A.  We had asked him to help compile a list that we could

11   present to the Sponsor of all the items that needed to be

12   repaired, or not repaired, but to be completed prior to a

13   closing.

14   Q.  Did you have any correspondence with Mr. Canter on Friday,

15   the 17th?

16          At the risk of anticipating your answer, let me ask

17   you to look at Defendant's Exhibit 30, the second page of that,

18   please, e-mail from Ms. Campbell to you the morning, early

19   morning of Friday, the 17th.  You received this e-mail from

20   Ms. Campbell?

21   A.  Yes.

22   Q.  Is there a link to a Washington Post site.  Is that link

23   the article which is Defendant's Exhibit 29?

24   A.  Yes.

25   Q.  Turning to Defendant's Exhibit 30, did Ms. Campbell request

C6IJCAM6                    Cohen - direct

1   that you forward the e-mail message in the link to Mr. Marton?

2   A.  Yes, she did.

3   Q.  Did you seek to do that via Mr. Canter?

4   A.  Yes.

5   Q.  That is the bottom e-mail on the first page of Defendant's

6   30?

7   A.  Yes.

8   Q.  Now, Defendant's Exhibit 30 talks about setting up a

9   conference call before Ms. Campbell leaves for California that

10  day.  Do you see that?

11  A.  I do.

12  Q.  Did that conference call happen that Friday?

13  A.  No.  There wasn't enough time to arrange it.

14  Q.  Did it eventually happen?

15  A.  Yes.

16  Q.  When was that?

17  A.  The following Tuesday morning.

18  Q.  That is the 21st?  You have a calendar in front of you.

19  A.  I think so, yes.

20  Q.  Before that, on the 20th, did you have some e-mail

21  exchanges with Mr. Canter?

22  A.  Yes.

23  Q.  Let's look at Defendant's 31.  Is this a letter that you

24  sent to Mr. Canter by Federal Express, an e-mail on the 21st of

25  April -- I am sorry.  I apologize.  Let me withdraw that and --

C6IJCAM6                    Cohen - direct

1    I am sorry.

2              Defendant's Exhibit 31, is that an e-mail exchange you

3    had with Mr. Canter on the 20th?

4    A.  Yes.

5              MR. ALTER:  I offer Defendant's Exhibit 31 in

6    evidence.

7              MR. BRAUN:  No objection.

8              THE COURT:  Defendant's Exhibit 31 is received in

9    evidence.

10             (Defendant's Exhibit 31 received in evidence)

11   BY MR. ALTER:

12   Q.  Let's look first at the earliest of these e-mails which is

13   on the second page of this exhibit bearing Bates number 00258.

14             The second sentence of it, "Raising your voice,

15   threats, telling me how to practice law, hostility and insults

16   directed at me will not get our client any closer to this

17   purchase."

18             Did you have a telephone conversation with Mr. Canter

19   just before this e-mail?

20   A.  I did.

21   Q.  Is that your characterization here in this e-mail of what

22   happened at that --

23   A.  Yes.  I wouldn't have written it if it wasn't.

24   Q.  Finishing my question would be at that conversation.

25   Please give me a chance to finish my questions.

C6IJCAM6                        Cohen - direct

1              I would like to turn to his response later that

2      morning which is the bottom e-mail on the first page bearing

3      Bates number OO257.  I call your attention to the last sentence

4      of it which says, "Sponsor will not hesitate -- however,

5      Sponsor will not hesitate to enforce its rights, all of which

6      are reserved and none waived, including with respect to your

7      client's failure to post close title on the scheduled closing

8      date."

9              Now, sir, what did you understand Mr. Canter to be

10     saying to you in that e-mail?

11     A.  He was threatening we would be in default because we hadn't

12     closed on April 16th, thereby entitling the Sponsor to keep the

13     down payment.

14     Q.  You respond in the upper half of Defendant's 31.  Is that

15     correct?

16     A.  I did.

17     Q.  And this is all the day before that four-way conversation,

18     correct?

19     A.  Right.

20     Q.  And that four-way conversation I believe you said took

21     place Tuesday, the 21st.  Is that correct?

22     A.  Right.

23     Q.  Did you subsequently learn that defendant would have been

24     unable to close on the 16th?

25              MR. BRAUN:  Objection; leading.

C6IJCAM6                      Cohen - direct

1              THE COURT:  Yes, sustained.

2    BY MR. ALTER:

3    Q.  Did you subsequently learn whether defendant would have

4    been able to close on the 16th?

5    A.  Yes.

6    Q.  What did you learn?

7    A.  That they couldn't have closed on the 16th.

8    Q.  Why do you say that?

9    A.  Well, from a legal document perspective, they had not

10   transferred the property, the Sponsor had not transferred it to

11   the apartment corporation.  There were mortgage, mortgages that

12   had to be subordinated which had not been done and there were

13   operating agreements that needed to be signed and delivered

14   between the hotel and the co-op which hadn't been done.

15   Q.  Did you know about this at the time?

16   A.  No.

17   Q.  Had you gone to closing on the 16th, would you have with

18   you learned about that?

19             MR. BRAUN:  Objection; speculation.

20             THE COURT:  Sustained.

21             MR. ALTER:  Let me read Joint Fact 63 which is on Page

22   15 of the joint pretrial order.  On April 17th, 2009 Sponsor's

23   attorneys filed with the New York County Clerk five documents,

24   all executed with knowledge on April 15th 2009 and dated as of

25   April 17th, 2009.  Copies of these documents are exhibits

C6IJCAM6                    Cohen - direct

1    defendant's 124 to 128."

2              So stipulated?

3              MR. BRAUN:  Yes, your Honor.  I also ask, if I may,

4    that the documents Defendant's 124 to 128 that are referred to

5    in this paragraph be received in evidence.

6              MR. ALTER:  That was my next statement.

7              THE COURT:  Defendant's Exhibits 124 to 128 are

8    received in evidence.

9              (Defendant's Exhibits 124 to 128 received in evidence)

10   BY MR. ALTER:

11   Q.  Do you have defendant's book there?  Please look at

12   Defendant's Exhibit 124 and 128.  Are these containing the

13   documents about which you just testified?

14   A.  Yes.

15   Q.  Before we get to the conversation Tuesday morning, the

16   21st, let's go back to Defendant's 31.

17             If you recall, this was the e-mail exchanges of

18   Monday, April 20th.  The top e-mail sent by you to Mr. Canter

19   at 10:11 am, do you see that one?

20   A.  Yes.

21   Q.  Can you please read that to us.

22   A.  "Jonathan, after discussing with your client, if your

23   client is actually taking the ludicrous, bad faith and

24   litigious position that our client failed to close on what you

25   referred to as the scheduled closing date which was obviously

C6IJCAM6                    Cohen - direct

1    prematurely scheduled by the Sponsor and is therefore in

2    default while there was no heat, no hot water, no elevator

3    service which would have been hazardous in the event of an

4    emergency and extremely inconvenient, floors unfinished, et

5    cetera, please let me know today.

6            "Sponsor was not and is not ready to close and to

7    assert otherwise is to disingenuous.  If that is Stuart's

8    position, we will file a complaint with the Attorney General's

9    Office tomorrow.  Hopefully that is not the direction that this

10   is going."

11   Q.  Did you and Mr. Canter eventually manage to set up that

12   four-way conversation with Mr. Marton and Ms. Campbell?

13   A.  Yes.

14   Q.  That conversation we have heard testimony, is on Tuesday

15   morning, the 21st?

16   A.  Correct.

17   Q.  Where was Ms. Campbell at the time?

18   A.  She was in California.

19   Q.  How long did the conversation last?

20   A.  I'd say 15 to 20 minutes, but I can't be sure.

21   Q.  Please tell us as best you recollect the substance of that

22   conversation.

23   A.  Well, we expressed -- I had spoken and also Ms. Campbell

24   spoke of our extreme and Ms. Campbell's extreme disappointment

25   with the condition of the apartment and the building when we

C6IJCAM6                    Cohen - direct

1    saw it, that basically they could not possibly expect that she

2    could pay an additional $14 million in cash to close the

3    purchase based on what we had seen there.

4            Because Lehman Brothers had collapsed, the financial

5    markets had been in turmoil, many buildings were having

6    troubles, we asked the Sponsor to give us assurances that they

7    had the financial wherewithal to actually complete the

8    building.  Having seen what we saw, we were troubled and wanted

9    them to at least give us some assurance that they had the cash

10   available and they had the funds needed to finish the hotel and

11   the luxury suites.

12   Q.  Did you get a response from the defendant's representatives

13   on that phone call?

14   A.  Well, Mr. Canter snapped and immediately suggested you're

15   not entitled to them, you're not getting any assurances.

16   Q.  Was there request to delay the closing until after the

17   hotel would be opened?

18   A.  We did think that considering the circumstances, the most

19   prudent thing would be to have the closing delayed until it

20   became operational, the hotel, so we could see that they

21   actually had the means to finish the building.

22   Q.  Was there a response to that request?

23   A.  It was denied.

24   Q.  Was there any discussion about whether you should have

25   closed on the 16th?

1    A.  He threatened that we would be in default, that, yes, we

2    should have closed.

3    Q.  Prior to the inspection on April 15th, had you had contact

4    with counsel for any of the people that had agreements to

5    purchase other units of the Mark?

6    A.  No.

7    Q.  Subsequent to the inspection, did you have any contacts

8    with any such counsel?

9    A.  I did.

10   Q.  Why was that?

11   A.  Well, because of the amount of money that was involved

12   here, we were very concerned and we wanted to find out if any

13   of the other purchasers were also being, as we saw, bullied by

14   the Sponsor to close in an unsafe and hazardous building.

15          We wanted to know if it was only us or there were

16   others that experiencing the same undue pressure to close in a

17   hazardous and unfinished building.

18   Q.  What was the result of these contacts, if any?

19   A.  There was no result.

20   Q.  Why was that?

21   A.  We found that our situation was different than the other

22   peoples' situation.

23   Q.  In what way was it different?

24          MR. BRAUN:  This is going to be hearsay if he will be

25   distinguishing his situation or his client's situation from the

C6IJCAM6                    Cohen - direct

1    situation of other prospective purchasers.  Based on whatever

2    communications he had with their attorneys, that is clearly

3    suffused with hearsay.

4            THE COURT:  I don't know if he said that is the basis

5    for it.  What is the basis for your understanding that Ms.

6    Campbell's situation was different from others who had entered

7    into contracts with the hotel?

8            THE WITNESS:  Well, skipping ahead here, but I think

9    we were the only ones that got a letter from Kramer Levin that

10   said that we would not be entitled to come back for another

11   inspection.

12           MR. BRAUN:  Again I don't know how the witness would

13   know what happened with respect to other purchasers.

14           THE COURT:  How do you know that you were the only

15   party who didn't get an invitation for another inspection?

16           THE WITNESS:  That is what we were told by other

17   counsel.

18           THE COURT:  I am going to sustain the objection.

19           MR. ALTER:  I'll move on, your Honor.

20   BY MR. ALTER:

21   Q.  After that four-way conversation on the morning of the 21,

22   when was your next telephone or in-person conversation with

23   Mr. Canter?

24   A.  There wasn't any.

25   Q.  Are you saying that from then all the way up to the

C6IJCAM6                    Cohen - direct

1    commencement of this litigation, you had no further telephone

2    or in-person conversations with Mr. Canter at all?

3    A.   That's right.

4    Q.   Did you have any correspondence with Mr. Canter that day

5    after the four-way conversation?

6    A.   We did, yes.

7    Q.   Is that Plaintiff's 30?

8    A.   Yes.

9             MR. ALTER:   That is in evidence already, your Honor.

10   BY MR. ALTER:

11   Q.   Let's look at the last paragraph of that, stating that,

12   "Based on our telephone conversation this morning, we expect

13   that you will send a notice to us shortly claiming our client

14   is in default for failing to close on the scheduled date."

15            Did Mr. Canter, in the conversation that morning, the

16   four-way conversation, state that Ms. Campbell was in default

17   for failure to close on the 16th?

18   A.   Yes.

19   Q.   Had he said so in the e-mail the previous day, Defendant's

20   Exhibit 31?

21   A.   He said they would not hesitate to enforce their rights.

22   Q.   Including with respect to your client's failure to close

23   title on the scheduled closing date?

24   A.   Right.

25   Q.   Based on that conversation and that e-mail the day before,

C6IJCAM6                     Cohen - direct

1   did you, indeed, expect him to send a notice of default, as you

2   say here?

3   A.  I did.

4   Q.  I see you demand returning of the down payment.

5        On what basis were you demanding return on the down

6   payment?

7   A.  Really if you look at the letter as a whole, it was

8   conditional that if you are going to default Ms. Campbell and

9   take the ludicrous position that she was in default, then we

10  want our money back and we need to, may need to file with the

11  Attorney General's Office.

12       There was a feeling that in a contract like this,

13  there is an implied obligation of good faith and fair dealing,

14  and if they were going to be so far in breach of that, that we

15  would have no -- our only alternative would be to demand our

16  down payment back.

17  Q.  How does that differ, if at all, from what you said in your

18  e-mail previous day, Defendant's Exhibit 31 -- yes, Defendant's

19  Exhibit 31?

20  A.  It doesn't.  It is the same.

21  Q.  Was it your intention in this letter of April 21st,

22  defendant's letter of April 21 to repudiate the contract?

23  A.  No, not at all.

24  Q.  Did Mr. Canter, indeed, declare a default on the 16th?

25  A.  He did not.

C6IJCAM6                    Cohen - direct

1   Q.  Please look at Plaintiff's Exhibit 312.  Is that Mr.

2   Canter's response to your letter of April 21?

3   A.  Yes.

4   Q.  What is the date of that letter?

5   A.  April 23rd.

6   Q.  What is the first sentence of that letter?

7   A.  "This responds to your April 21, 2009 letter."

8   Q.  Let's look at the second page of that, the bottom paragraph

9   which begins in sum.  The third line, let me read the sentence:

10          "As indicated above, notwithstanding the posturing,

11  preposterous demand reflected in your April 21 letter which we

12  will disregard, Sponsor believes your client still wishes to

13  proceed with the closing.  As a final good-faith effort to

14  allow that to happen before Sponsor is forced to place your

15  client in default, terminate the purchase agreement and retain

16  the deposit as liquidated damages, Sponsor's is willing to and

17  hereby does adjourn the scheduled closing date until 9:00 am on

18  April 27th at our offices."

19          Did you also get a formal adjournment notice from Mr.

20  Wefels to that effect?

21  A.  Did.

22  Q.  Please look at Plaintiff's Exhibit 10 and tell me if that

23  is what you're talking about?

24  A.  Yes.

25          MR. ALTER:  I see, your Honor, Plaintiff's 32 at least

C6IJCAM6                        Cohen - direct

1    with my marking it is not in evidence.

2                (Off-the-record discussion)

3                MR. ALTER:  32 is in, I understand, so let me just

4    offer Plaintiff's 10.  That is also in, you're right, you are

5    correct, that is also in.

6    BY MR. ALTER:

7    Q.  Did you respond to Mr. Canter's letter of the 23rd?

8    A.  Yes.

9    Q.  That is Plaintiff's Exhibit 12?

10   A.  Right.

11               MR. ALTER:  I offer Plaintiff's 12 in evidence.

12               MR. BRAUN:  I think it is in by a different number.  I

13   don't object to the document.

14               MR. ALTER:  Give me a number and I'll be happy to take

15   it.

16               MR. BRAUN:  I don't object.

17               THE COURT:  Why don't you confer for a moment as to

18   whether it is in or not.

19               MR. ALTER:  All right, we will do so.

20               (Off-the-record discussion)

21               MR. ALTER:  Yes, your Honor, it is already in as

22   Defendant's Exhibit 37.

23               MR. BRAUN:  Thank you.

24   BY MR. ALTER:

25   Q.  Let me call your attention, sir, the court's attention to

1   the first paragraph on the second page.

2            "I will discuss with Mrs. Campbell her availability to

3   return to New York to reinspect the unit prior to the

4   rescheduled closing date of May 11, 2009.  After reinspection,

5   determination whether the building and unit are habitable, we

6   will advise whether we find the rescheduled closing date to be

7   valid.  It seems quite strange and wrong we even have to

8   discuss the issue of habitability when considering purchasing

9   an apartment for almost $19 million."

10           Did Mr. Canter respond to your letter of the 24th?

11  A.  He did.

12  Q.  Is that the Plaintiff's 13?

13  A.  Yes.

14           MR. ALTER:  That is already in evidence, your Honor.

15  BY MR. ALTER:

16  Q.  What is the date of that letter?

17  A.  April 28th, 2009.

18  Q.  Please read the first sentence of it.

19  A.  "This responds to your April 24th, 2009 letter."

20  Q.  Let me read, sir, from the paragraph numbered 3, the first

21  two sentences thereof.

22           "We dispute and, therefore, again reject your

23  continued attempt most recently in your April 24th letter to

24  arrogate to purchaser rights  that purchaser decidedly does not

25  have.  Thus, having had an opportunity to inspect the suite

1    prior to the duly scheduled closing date and having executed an

2    inspection statement, purchaser has no further right to inspect

3    the suite prior to closing."

4              Now, this letter, sir, is by Federal Express on April

5    28th.  When did you receive this?

6    A.  I assume April 29th.

7    Q.  Did you also get a formal notice from Mr. Wefels adjourning

8    the closing to to May 11th?

9    A.  I think so, yes.

10   Q.  That is Defendant's 39.  Am I correct?

11   A.  Yes.

12             MR. ALTER:  I offer Defendant's 39.

13             MR. BRAUN:  No objection.

14             THE COURT:  Defendant's Exhibit 39 is received in

15   evidence.

16             (Defendant's Exhibit 39 received in evidence)

17   BY MR. ALTER:

18   Q.  What did you do after receiving Mr. Canter's letter and

19   reading it?

20   A.  I immediately either called or e-mailed Ms. Campbell.

21   Q.  Did you have a conversation with her when you e-mailed her

22   or not?  Did you have a conversation?

23   A.  Yes.

24   Q.  Without going into details of your conversation, did you

25   and she reach certain conclusions?

1    A.  We did.

2    Q.  First tell me what was your, Richard Cohen's conclusion?

3    A.  I had never seen anything so ludicrous before and could not

4    recommend to my client that she should close on an apartment at

5    this price or even if it was a hundred thousand dollars without

6    having a chance to come back and have an inspection to see if

7    all these serious issues about habitability, hot water, heat,

8    incomplete elevators not functioning, I just couldn't recommend

9    to her that she should proceed without having another

10   inspection.

11   Q.  What was Ms. Campbell's conclusion after your conversation

12   with her?

13   A.  She agreed that it would be foolish to close with the

14   Sponsor breaching the contract like that.

15   Q.  Was there any discussion about applying to the Attorney

16   General for refund of her down payment?

17   A.  We did.

18   Q.  Did you, in fact, make that application?

19   A.  We did.

20   Q.  Now, you received this letter on April 29th and you had

21   this phone call with Ms. Campbell on April 29th.  On what date

22   did you begin to prepare the application to the Attorney

23   General?

24   A.  The same day.

25   Q.  Did you or anyone in your firm take any steps whatsoever to

C6IJCAM6                    Cohen - direct

1   draft that application prior to learning on the 29th that there
2   would be no further inspection allowed?
3   A.  No.
4   Q.  Prior to your conversation with Ms. Campbell on the 29th,
5   had she authorized you to submit such an application?
6   A.  No.
7   Q.  Did you, therefore, actually submit such an application to
8   the Attorney General?
9   A.  Afterwards, yes.
10  Q.  Is that Defendant's 44?
11  A.  Yes.
12              THE COURT:  Mr. Alter, is this an appropriate juncture
13  to recess for the evening?
14              MR. ALTER:  Yes, I think it is, your Honor.
15              THE COURT:  All right.  Mr. Cohen, you're excused
16  until tomorrow morning.  We are going to resume at 10:00
17  o'clock.
18              THE WITNESS:  Thank you.
19              THE COURT:  You may step down.  Be careful of the
20  wires.  What witnesses do we have tomorrow?
21              MR. ALTER:  Your Honor, we have agreed to take out of
22  turn tomorrow morning at 9:30 Mr. Gleicher.  We are going to
23  interrupt Mr. Cohen's testimony and then at -- 9:45, I am
24  sorry, Mr. Gleicher and then --
25              MR. BRAUN:  At 11:00, Mr. Chicon.

C6IJCAM6                          Cohen - direct

1          MR. ALTER:  Mr. Gleicher should be finished, I would

2     hope, now speaking for Mr. Brown as well as myself, I think he

3     will be finished by 11:00.  Mr. Chicon we are taking out of

4     turn beginning at 11:00 o'clock.  After Mr. Chicon, I would

5     presume we will continue with Mr. Cohen and I do have Mr.

6     Ubell, the inspector, lined up for tomorrow, but depending -- I

7     had him lined up for today, too -- depending on how it goes

8     tomorrow, we'll see if it is necessary.

9          (Off-the-record discussion)

10         THE COURT:  All right.  You don't have to be here at

11    9:45 tomorrow or 10:00 o'clock.  They will give you their best

12    estimate of when you should be be hear.

13         Anything else at this time?

14         MR. ALTER:  No, your Honor.

15         THE COURT:  All right.  Look, I think that one of the

16    things that needs to be addressed is why the Sponsor would not

17    give a second inspection of the premises.

18         MR. ALTER:  I would respectfully suggest that is the

19    defendant's showing.

20         THE COURT:  I am addressing my remarks to all sides in

21    the courtroom, that's all.

22         MR. ALTER:  Thank you.

23         MR. BRAUN:  Your Honor, we are going to offer evidence

24    that she was, in fact, given that opportunity.

25         THE COURT:  All right.  That is why --

C6IJCAM6                          Cohen - direct

1            MR. BRAUN:  We are disputing that.

2            THE COURT:  -- that is why we are having a trial,

3    okay?

4            MR. ALTER:  Okay.

5            THE COURT:  Thank you.  Mr. Cohen, you can step down.

6            (Court adjourned until 9:45 am on Tuesday, June 19,

7    2012)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2     Examination of:                        Page

 3     ROBERTA CAMPBELL

 4     Direct By Mr. Alter  . . . . . . 17

 5     Cross By Mr. Braun . . . . . . . 76

 6     Redirect By Mr. Alter  . . . . .174

 7     RICHARD N. COHEN

 8     Direct By Mr. Alter  . . . . . .185

 9                       PLAINTIFF EXHIBITS

10     Exhibit No.                          Received

11     1   . . . . . . . . . . . . . . . . . . .30

12     43   . . . . . . . . . . . . . . . . . .49

13     10 and 14  . . . . . . . . . . . . . . .59

14     34   . . . . . . . . . . . . . . . . . .61

15     13   . . . . . . . . . . . . . . . . . .63

16     36   . . . . . . . . . . . . . . . . . .73

17     18   . . . . . . . . . . . . . . . . . .90

18     141  . . . . . . . . . . . . . . . . . .98

19     43   . . . . . . . . . . . . . . . . . 139

20     45   . . . . . . . . . . . . . . . . . 153

21     30   . . . . . . . . . . . . . . . . . 162

22     32   . . . . . . . . . . . . . . . . . 164

23     3   . . . . . . . . . . . . . . . . . . 194

24     50   . . . . . . . . . . . . . . . . . 196

25     51   . . . . . . . . . . . . . . . . . 198
```

```
1    5  . . . . . . . . . . . . . . . . . . . 201

2    7  . . . . . . . . . . . . . . . . . . . 202

3    141  . . . . . . . . . . . . . . . . . . 205

4    8  . . . . . . . . . . . . . . . . . . . 206

5                    DEFENDANT EXHIBITS

6    Exhibit No.                              Received

7    2  . . . . . . . . . . . . . . . . . . . .25

8    9  . . . . . . . . . . . . . . . . . . . .25

9    3  . . . . . . . . . . . . . . . . . . . .26

10   7, 10 and 139  . . . . . . . . . . . . . .27

11   12  . . . . . . . . . . . . . . . . . . . .30

12   24  . . . . . . . . . . . . . . . . . . . .39

13   63  . . . . . . . . . . . . . . . . . . . .46

14   30  . . . . . . . . . . . . . . . . . . . .51

15   29  . . . . . . . . . . . . . . . . . . . .52

16   46  . . . . . . . . . . . . . . . . . . . .60

17   71  . . . . . . . . . . . . . . . . . . . .66

18   101  . . . . . . . . . . . . . . . . . . .67

19   115  . . . . . . . . . . . . . . . . . . .69

20   44  . . . . . . . . . . . . . . . . . . . .72

21   6  . . . . . . . . . . . . . . . . . . . .83

22   62  . . . . . . . . . . . . . . . . . . . .91

23   62  . . . . . . . . . . . . . . . . . . . .97

24   74  . . . . . . . . . . . . . . . . . . . 105

25   72  . . . . . . . . . . . . . . . . . . . 123
```

1   28    . . . . . . . . . . . . . . . . . 125

2   75    . . . . . . . . . . . . . . . . . 139

3   76    . . . . . . . . . . . . . . . . . 140

4   27    . . . . . . . . . . . . . . . . . 141

5   32    . . . . . . . . . . . . . . . . . 147

6   99    . . . . . . . . . . . . . . . . . 148

7   80    . . . . . . . . . . . . . . . . . 149

8   100   . . . . . . . . . . . . . . . . . 150

9   98    . . . . . . . . . . . . . . . . . 151

10  37    . . . . . . . . . . . . . . . . . 166

11  78    . . . . . . . . . . . . . . . . . 167

12  67    . . . . . . . . . . . . . . . . . 171

13  68    . . . . . . . . . . . . . . . . . 172

14  16    . . . . . . . . . . . . . . . . . 192

15  17    . . . . . . . . . . . . . . . . . 192

16  18    . . . . . . . . . . . . . . . . . 199

17  31    . . . . . . . . . . . . . . . . . 219

18  124 to 128    . . . . . . . . . . . . . 222

19  39    . . . . . . . . . . . . . . . . . 232

20

21

22

23

24

25