```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/20/12
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ROBERTA CAMPBELL,                          :

                  Plaintiff,        :

      -against-                          :

MARK HOTEL SPONSOR, LLC,                   :

                 Defendant.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

09 Civ. 9644 (WHP)

OPINION

WILLIAM H. PAULEY III, District Judge:

          This diversity case presents an "only in New York" story.[1]  In January 2008,

Plaintiff Roberta Campbell ("Campbell") signed a contract with Defendant Mark Hotel Sponsor

LLC ("Sponsor") to purchase a luxury cooperative apartment at the Mark Hotel in Manhattan

(the "Suite") for $18.75 million.  In the fifteen month interval between the contract signing and

the scheduled closing, Lehman Brothers collapsed and the United States tumbled into a

recession.  In April 2009, issues arose with heat, hot water, closet rods, and attorneys' egos, and

the parties' deal never closed.  The disposition of Campbell's $4.68 million down payment

remains in dispute.

          Campbell now lives at 15 Central Park West, one of the most desirable addresses

in Manhattan.  Meanwhile, the luxury co-ops at the Mark Hotel remain unsold.  Over the last

three years, Sponsor has managed to sell only two of the forty-two suites originally offered for

---

[1] Diversity jurisdiction brings the "mainstream of tort and contract litigation" to district courts,
along with the slices-of-life that such cases provide. See James William Moore & Donald T.
Weckstein, Diversity Jurisdiction:  Past, Present, and Future, 43 Tex. L. Rev. 1, 23 (1964).

sale, despite significant price reductions.  Ultimately, Campbell may have made a wise lifestyle

decision to abandon her purchase at the Mark Hotel.  Had she closed in the spring of 2009, even

today Campbell would be one of the only owner/residents atop the Mark Hotel.  Nevertheless,

based on the evidence presented at trial and the one-sided language of the parties' agreement,

Sponsor is entitled to the down payment.  Following a four-day bench trial, this Court makes the

following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

FINDINGS OF FACT

I.   <u>The Parties</u>

At the commencement of this action, Campbell was a citizen of California. (Trial

Transcript ("Tr.") 18.)  Sponsor is a New York limited liability company and the sponsor of a

plan to offer forty-two cooperative suites at the Mark Hotel for sale to the public (the "Offering

Plan"). (<u>See</u> DX 3 (the "Offering Plan").)  Mark Hotel Member LLC ("MHM"), another New

York limited liability company, is the sole member of Sponsor.  No member of MHM is a citizen

of California, a corporation incorporated or having its principal place of business in California,

or a permanent resident alien domiciled in California. (Tr. 19.)

II.  <u>The Mark Hotel, the Purchase Agreement, and the Offering Plan</u>

The Mark Hotel was closed in January 2007 for a complete "gut" renovation,

during which the entire interior except for structural columns and floor slabs was demolished.

(Tr. 21-22, 596-600.)  The purpose of the renovation was to convert the building into a luxury

property with transient hotel units on the lower floors and cooperatively-owned suites on the

upper floors. (Tr. 21-22.)

-2-

In January 2008, Campbell and her then-spouse signed a contract, dated January 17, 2008, to purchase Suite 1402 (also known as 13B) at the Mark Hotel for $18.75 million (the "Purchase Agreement").[2] (See DX 2 (the "Purchase Agreement").)  The Purchase Agreement incorporated the Offering Plan by reference. (Purchase Agreement § 10.2.)  Campbell made two down payments totaling $4,687,500, which Sponsor's attorneys, Kramer Levin Naftalis & Frankel LLP ("Kramer Levin" or the "Escrow Agent"), currently hold in escrow. (Tr. 24; see Offering Plan 000080.)

A.      Hotel Amenities

The Offering Plan described the amenities that Sponsor planned to provide in the building:  a doorman, a concierge, elevator service, a package room, maintenance personnel, a fitness center, room service, dry cleaning, and similar services commonly found in hotels. (Offering Plan 000034-36.)  But the Offering Plan disclaimed Sponsor's liability "for the availability, interruption, discontinuance or quality of any such services." (Offering Plan 000036.)

B.      Closings

Sponsor had the authority to schedule a closing date for the Suite and to adjourn that date from time to time. (Purchase Agreement § 5.1, at 4.)  Campbell negotiated for and obtained the right to one two-week adjournment of the closing. (See Purchase Agreement at "Rider.")

Under the Purchase Agreement, Campbell was obligated to close

---

[2] All of Campbell's former spouse's rights under the Purchase Agreement have been conveyed to her. (Tr. 23, 814.)

> once a temporary or permanent Certificate of Occupancy is issued
> for the Suite (notwithstanding any construction items noted on
> Purchaser's Inspection Statement . . . remaining for Sponsor to
> complete and/or correct in accordance with its obligations under
> the Plan, and notwithstanding the incomplete construction and/or
> decoration of any other portions of the Building not preventing
> Purchaser's occupancy of the Suite).

(Purchase Agreement § 16.3, at 9.) The Purchase Agreement further provided that the "issuance

of a temporary or permanent Certificate of Occupancy for the Suite shall be deemed presumptive

evidence that the Coop Property and Suite have been fully completed in accordance with the

Plan." (Purchase Agreement § 16.1, at 9.) Thus, once the New York City Department of

Buildings ("DOB") issued a temporary certificate of occupancy ("TCO") for the Suite, Campbell

was obligated to close unless there were conditions of incomplete construction or decoration

outside the Suite preventing her occupancy.

In the Offering Plan, Sponsor estimated that construction work would be

sufficiently complete to permit closings beginning in May 2008, but disclosed that this date

could be delayed. (Offering Plan 000083; see also Purchase Agreement § 16.4.) If Sponsor did

not close on at least one unit by May 1, 2009, Sponsor was required to offer rescission to all

purchasers who signed purchase agreements for a suite. (Tr. 51, 85, 167, 188-89.)

C.     Ongoing Construction

The Offering Plan contemplated that construction would be ongoing for at least

one year after closings began. (See Offering Plan 000037-38.) The Offering Plan explained that

during this time,

> Elevators and personnel may be taken out of service and diverted to
> facilitate construction . . .  Sponsor may not fully complete the decoration
> or finishing of the corridors and other portions of the Coop Property and
> the Hotel Owner may not fully complete the decoration or finishing of the

-4-

lobby, . . . corridors [and] elevator finishes . . . until [a] particular floor is fully occupied or, if additional construction within an area within the Building is anticipated, for some period thereafter.

(Offering Plan 000037-38.)  In addition, the Offering Plan explained that certain amenities may not be available until the building was "completed and fully operational."  (Offering Plan 000037-38.)

D.    Inspection

Campbell had the right to inspect the Suite prior to closing, at which time she could make notes about deficiencies on an Inspection Statement, or "punch list."  The Offering Plan provided that Sponsor would address the items on the Inspection Statement after the closing. (Offering Plan 000137.)

At least one week prior to the closing date, Sponsor was required to notify Campbell that the Suite was "ready for inspection." (Purchase Agreement § 17, at 9.)  The phrase "ready for inspection" was not a term of art or a technical term, and simply meant that Sponsor was ready to allow a purchaser to come and look at a suite in order to identify deficiencies for the Inspection Statement. (Tr. 780-82.)  Once Campbell inspected the Suite after a TCO issued, her right to an inspection was satisfied.

E.    Purchaser's Default

The Purchase Agreement contained a "time of the essence" provision regarding Campbell's performance.  Under that provision, if Campbell failed to close title on the closing date, she had thirty days to cure her default.  If she failed to cure, Sponsor could cancel the Purchase Agreement and retain her down payment and any accrued interest as liquidated

damages. (Purchase Agreement § 11(b), at 7.)  The Purchase Agreement also provided that

Campbell

> shall be obligated to reimburse Sponsor for any legal fees and
> disbursements incurred by Sponsor in defending Sponsor's rights under
> this Agreement or, in the event Purchaser defaults under this Agreement
> beyond any applicable grace period, in canceling this Agreement or
> otherwise enforcing Purchaser's obligations hereunder.  The provisions of
> this Article shall survive closing of title or the termination of this
> Agreement.

(Purchase Agreement § 34, at 15.)  Campbell would not be obligated to pay Sponsor's legal fees

if she were the prevailing party. (Purchase Agreement "Rider.")

F.    Financial and Other Risks

The Offering Plan disclosed that Sponsor made "no commitment to sell more"

than seven of the forty-two suites, which was the minimum required to declare the Offering Plan

"effective." (Offering Plan 000014.)  The Offering Plan also provided that "[e]ven if the Plan is

declared effective with a minimum number of sales, it is possible that Sponsor can convey Suites

with fewer than the minimum number of sales if purchasers counted towards effectiveness do not

ultimately purchase a Suite." (Offering Plan 000134.)

The Offering Plan disclosed that Mark Hotel LLC, the project's developer and an

affiliate of Sponsor, was obtaining loans for the project secured by its interest in the property.

(Offering Plan 000095.)  It also suggested the possibility that Mark Hotel LLC might default on

those loans. (See Offering Plan 000095.)  However, the Offering Plan explained that a default by

Mark Hotel LLC would not affect the rights of the cooperative owners because of agreements

between Mark Hotel LLC and its lenders to subordinate the lenders' mortgage liens to the rights

of the cooperative corporation and its shareholders. (See Offering Plan 000095.)  The Offering

Plan also set forth Sponsor's financial obligations but warned that Sponsor made "[n]o warranty . . . that [it] will be financially able to perform all or any" of its financial obligations. (Offering Plan 000140.)

    III. <u>Events Prior to Campbell's Inspection</u>

        By letter dated February 26, 2009, Sponsor notified Campbell that it had declared the Offering Plan "effective." (DX 12.) On the same day, Sponsor scheduled Campbell's closing for March 31, 2009. (PX 1.) Sponsor adjourned the closing twice, eventually scheduling it for April 16, 2009. (<u>See</u> DX 18; PX 5.)

        Before the scheduled April 16 closing date, Sponsor obtained various prerequisites to closing. For example, on April 13, 2009, the DOB issued a TCO for the first-floor hotel lobby and the fifth, ninth, thirteenth, and fourteenth floors of the building—including the Suite. (<u>See</u> DX 106.) On April 15, 2009, the New York Attorney General accepted for filing an amendment to the Offering Plan disclosing that Sponsor had declared it effective. (DX 120, 139.) Other prerequisites to closing—such as documents relating to the creation of the cooperative corporation, the conveyance of an interest in the Mark Hotel to the cooperative corporation, and the subordination agreements with Mark Hotel LLC's lenders—could have been satisfied at or immediately prior to the closing of the first suite and did not render Sponsor unable to close on April 16. (Tr. 711-12.)

        Shortly before April 15, 2009, Campbell flew from California to New York for the inspection of the Suite.

IV. The Inspection

On Wednesday, April 15, 2009, Campbell and four of her representatives attended the inspection.  Campbell's team included Richard Cohen ("Cohen"), her attorney in connection with the transaction; Paul Gleicher ("Gleicher"), her architect; Lawrence J. Ubell ("Ubell"), her home inspector; and Richard N. Gray, her friend and a practicing lawyer in New York City. (Tr. 35-46.)  Two Sponsor representatives attended the inspection—Stuart Marton ("Marton"), a business executive, and Ramon Chicon ("Chicon"), an architect. (Tr. 312.)

During the inspection, the participants discussed items in the Suite that required further work.  Chicon compiled a handwritten list of these items, and at the conclusion of the inspection, both he and Campbell initialed the list and signed a cover sheet, creating the Inspection Statement, or "punch list," provided for in the Purchase Agreement. (Tr. 314-15; see DX 24.)

Campbell contends that there were conditions preventing her occupancy of the Suite on the date of the inspection because, inter alia, (1) the Suite's floors were unfinished, (2) the showers lacked glass shower enclosures, (3) there were loose fittings and valves in the bathrooms, (4) cooktop grates and a microwave were missing, (5) there were dangerously large gaps between the pavers on the terrace, (6) the Suite needed to be repainted, (7) closet rods needed to be installed, (8) the lobby was a construction site, (9) the Suite lacked reliable elevator service, (9) the Suite lacked heat, hot water, air conditioning, and cooking gas, and (10) the building lacked luxury services.  As revealed at trial, none of these conditions, however, prevented Campbell's occupancy of the Suite.

A.     The Condition of the Suite

The Suite was substantially complete on the date of the inspection.  Photographs of the Suite's "Great Room" show it to have been in good condition. (See DX 74.)  And while the floors were unstained, Sponsor reasonably believed that Campbell wanted to defer staining them until after she installed custom floor wiring. (Tr. 308-10.)  Moreover, staining the floors could have been completed in a few days and therefore properly was included on a punch list of items that could be addressed after closing. (Tr. 826.)

The absence of glass shower enclosures in two of the bathrooms similarly was a proper punch list item.  During the inspection, Chicon informed Campbell and her representatives that installation of the shower enclosures was imminent. (Tr. 322.)  Moreover, Chicon pointed out that the showers were so large that even without an enclosure, no water could splash out. (Tr. 322-23.)  The loose fittings and valves in the bathrooms described in Ubell's report, (see DX 27), could have been repaired in a day, (Tr. 584-86), and did not render the Suite unsuitable for occupancy.

Cooktop grates and a microwave, which were missing during the inspection, were held under lock and key elsewhere in the building to prevent pilferage during construction. (Tr. 324, 642, 310.)  They would have been brought to the Suite after the closing. (Tr. 801.)

The relatively small gaps between the pavers on the terrace did not appear to create a significant tripping hazard and, in any event, did not render the Suite unsuitable for occupancy. (See DX 74.)

The installation of closet rods and the repainting of the Suite were proper punch list items that Sponsor was entitled to address after the closing.

-9-

B.    The Condition of Common Areas, Building Systems, and Services

    1.    Common Areas

        a.    The Lobby

The lobby was approximately seventy-five to eighty percent complete on the date of the inspection. (Tr. 387.)  The drywall, floor, and reception desk were not complete. (Tr. 210-11, 372.)  The lobby was generally clean, (Tr. 313), although there may have been some dust on the floor. (Tr. 210-11.)  However, nothing in the lobby prevented people from entering the building, crossing the lobby, and entering an elevator to go up to the Suite. (Tr. 121, 387, 273-74, 313-14.)  The condition of the lobby was consistent with the warnings in the Offering Plan regarding construction at the time of the first closing.

        b.    The Corridor

The corridor between the elevator and the entrance to the Suite was unfinished, with no carpeting or wall paper. (Tr. 37, 211.)  But these incomplete conditions were cosmetic.

    2.    Building Systems

        a.    Elevators

As of the inspection date, the DOB had inspected and approved for operation two elevators in the building—one passenger elevator and one freight elevator. (See PX 84; PX 86.)  The freight elevator used during the inspection needed to be summoned by telephone or walkie-talkie. (Tr. 37, 100-01.)   In all other respects, the elevator operated normally. (Tr. 100-01, 274.)  And Sponsor disclosed the possibility that elevators would be taken out of regular service to accommodate construction elsewhere in the building.

b.    Heat, Air Conditioning, Hot Water, and Cooking Gas

As of April 13, 2009, the systems for supplying heat, air conditioning, hot water, and cooking gas to the Suite had been properly constructed and completed. (Tr. 278-79.) Indeed, Campbell's team seemed to understand that the proper completion of those systems was a prerequisite for the issuance of a TCO. (See Tr. 278-79, 277, 500-01.) However, as of the inspection date, Con Edison had not yet activated the gas, (see Tr. 279), and thus, during the inspection, the thermostats in the Suite were non-responsive, and there was no hot water. (Tr. 212.) Sponsor's representatives informed Campbell's team that the systems were not activated because no one was living in the building. (Tr. 327-28.) Con Edison activated the gas on April 21, 2009. (Tr. 279.)

The fact that Con Edison had not activated the gas prior to the inspection was not, under the circumstances, a condition of incomplete construction preventing Campbell's occupancy of the Suite.  Campbell did not plan to move into the Suite until the fall of 2009. (Tr. 34-35.) Further, Sponsor's principal, Izak Senbahar ("Senbahar"), and Sponsor's building consultant, Robert Donohue, testified credibly that, had Sponsor expected Campbell to move in earlier, Sponsor would have been able to activate the systems prior to Campbell's arrival, either by accelerating Con Edison's activation of gas service or by other means. (Tr. 617-18, 456-58.) For example, heat and air conditioning were provided by absorption units that could run on either gas or fuel oil, and on the date of the inspection, there was fuel oil in the building's oil tank. (Tr. 278-79, 614-18.) Thus, heat and air conditioning could have been activated during Campbell's inspection.

-11-

3.    Services

Basic services were available in the building on April 15, 2009.  Security personnel monitored the building's entrances twenty-four hours per day, seven days per week. (Tr. 797.)  There were fire alarms and smoke detectors, refuse disposal, mail delivery, and a package room. (Tr. 797.)  And according to the Offering Plan, the absence of other luxury services was not a condition of incomplete construction or decoration preventing Campbell's occupancy of the Suite.

V.   Communications Immediately After the Inspection

Hours after the inspection, Gleicher sent Campbell an e-mail stating, "I just wanted to tell you that I think the apartment is absolutely fabulous.  The light, openness, views, ceilings, finishes, etc., etc., etc.  I hope you feel the same way." (DX 63.)  Campbell responded several hours later, agreeing, "I definitely feel the same way." (DX 63.)  Campbell testified that she merely was agreeing that the apartment had the potential to be "absolutely fabulous" if it had been completed. (Tr. 47.)  And Gleicher testified that his e-mail was not referring to the "construction conditions" in the Suite. (Tr. 256-57.)  Nonetheless, Campbell's response—on the eve of her scheduled closing—agreeing that the Suite was "absolutely fabulous" undercuts the alleged seriousness of many of her criticisms of the Suite and the building.

Campbell did not close on April 16. (Tr. 216.)  Instead, there was a conference call that day involving Campbell, Cohen, Marton, and Jonathan Canter ("Canter"), Sponsor's attorney in connection with the transaction.  During the call, Campbell indicated that she would close as soon as Sponsor addressed issues with the elevators, heat, hot water, and certain items on the Inspection Statement. (See PX 43.)  Sponsor's representatives told Campbell that Sponsor

-12-

would take care of these issues right away, and asked her to stay in New York for a few more days, return to see the Suite again, and then close during the following week (i.e. the week of April 20, 2009). (Tr. 759-60, 495-97.) Campbell declined the invitation, however, because her attorney told her it would have taken weeks to complete all the items on the Inspection Statement. (Tr. 495-97, 518-20.)

By this point, Campbell and Sponsor were on divergent paths. Before the afternoon conference call on April 16, Campbell's architect Gleicher e-mailed Cohen, offering "thought[s] on a potential means to delay the closing." (DX 28.) By contrast, following the April 16 conference call, Sponsor went to work on the Suite. That afternoon, Marton e-mailed Senbahar a list of the construction items Campbell identified during the call and indicated that Niso Bahar ("Bahar"), an employee involved in monitoring the final stages of construction, was "jumping on it immediately." (PX 43.) Bahar then sent a series of e-mails to various members of the construction team marked "URGENT" and sought to arrange for a weekend work permit. (PX 74.) Nonetheless, Campbell returned to California on Friday, April 17. (Tr. 146.) On Sunday, April 19, Campbell began searching the internet for other Manhattan apartments. (See DX 32.) And on April 20, Gleicher e-mailed his building consultant that Campbell was "increasingly concerned that the Mark is going to go bust and does not want to be forced into a closing . . . . Can you provide any ammunition for her?" (DX 75.) Three days later, Gleicher captured the tension between Campbell's team and Sponsor:

> The Co-op (not a condo) is trying to force her to close by May 1, 2009, because after that date the Sponsors will be obligated to give all deposits back to the 7 apartments that are under contract unless one of them closes by May 1. [Campbell] wants the apartment, she is just worried that she could buy into something that will never in turn become a financially viable project, and she will be living by herself in a vacant building with

-13-

> no amenities. So [Campbell] will not close until about three months from
> now. We are certain the Sponsor will claim that [Campbell] is in default
> for not closing as they will claim that they have done all that is required.
> We are looking for ammunition to show them that they are not ready to
> close.

(DX 76.) These e-mail exchanges suggest that Campbell's team had mobilized to find reasons to

delay the closing.

On Tuesday morning, April 21, 2009, Campbell, Cohen, Canter, and Marton

participated in another conference call. Campbell proposed the call after locating an October

2006 article from The Washington Post about the potential adverse impact on purchasers if a

condominium developer goes bankrupt. (See DX 29, 30.) In an e-mail to Cohen, which was

forwarded to Marton prior to the call, Campbell explained that "the condition of the apartment,

in and of itself," was "not [her] greatest concern." (PX 45.) Instead, she felt that "the condition

of the apartment coupled with the unseemly pressure to close immediately on an uninhabitable

residence, in an incomplete building/hotel" was indicative of problems with Sponsor's financial

condition. (PX 45.) Accordingly, Campbell proposed a conference call to "determine what

assurances can be provided" because "[u]nless and until I receive satisfactory written evidence

that the hotel and co-op projects are fiscally sound, I would find it difficult to proceed with the

sale." (PX 45.)

During the April 21 call, Sponsor's representatives did not agree to provide

Campbell any written information about Sponsor's financial condition. However, they assured

her that work had been done in her Suite and that her Suite would be completed. (Tr. 57-58,

729.) They also assured her that the hotel would be completed and was expected to open in

approximately three months. (Tr. 57-58, 728.) Further, Canter discussed the subordination

-14-

agreements, which allowed suite purchasers to continue in possession even if Mark Hotel LLC

defaulted on its loans. (Tr. 728.)  Campbell asked to delay the closing until the hotel opened, but

Sponsor refused. (Tr. 729, 790.)  In an April 20 e-mail to Cohen and during the April 21

conference call, Canter made reference to reserving Sponsor's rights regarding Campbell's

"failure" to close on April 16. (DX 31; see Tr. 224-25.)

VI. Post-Inspection Lawyers' Correspondence

On April 21, 2009, Cohen sent a letter to Canter which provided in relevant part:

As the Sponsor has rejected the Purchaser's offer to adjourn the closing
until after the Hotel is in operation and all building issues are corrected,
we hereby demand the return of our client's downpayment.  Failure to
return the downpayment by Friday of this week, will result in a claim to
the Attorney General's office for a determination on the disposition of
downpayments and/or other legal action.

(PX 30.)  The letter also set forth Cohen's expectation that Sponsor would declare Campbell in

default for failing to close on April 16.  But the demand for Campbell's down payment was not

conditioned on Sponsor issuing a default notice.  Rather, the letter is most reasonably read as

demanding Campbell's down payment because Sponsor refused to adjourn the closing until after

the hotel opened.  Campbell, however, had no right under the Purchase Agreement or the

Offering Plan to demand such a delay.  Under these circumstances, Cohen's April 21 letter

expresses a clear and unequivocal refusal to perform the contract except upon satisfaction of an

extracontractual condition.

Canter responded by letter dated April 23, 2009. (PX 32.)  In that letter, Canter

assured Cohen that (1) elevator service was available and would "be provided to your client upon

closing should she choose to then occupy the Suite;" (2) heat, hot water, and air conditioning

were in operation in the building and the Suite; (3) the floors were finished and the shower

-15-

enclosures completed; and (4) most other Inspection Statement items were completed. (PX 32.)

Canter also stated that Sponsor would "disregard" the "posturing and preposterous demand

reflected in [Cohen's] April 21 letter." (PX 32.)  Canter then adjourned the closing until April 27

as "a final good faith effort" to allow a closing. (PX 32.)  Canter concluded his letter by stating

that "Sponsor at all times reserves all of its rights, remedies and privileges, and waives nothing."

(PX 32.)  Campbell was never made aware of the contents of this letter. (Tr. 163-64, 181-82.)

Cohen responded by letter dated April 24, 2009. (DX 37.)  In that letter, Cohen

exercised Campbell's right to adjourn the closing by fourteen days, to May 11, 2009, "assuming

that the Sponsor's Rescheduled Closing Notice is actually effective." (DX 37.)  Cohen also

wrote,

> I will discuss with Mrs. Campbell her availability to return to New York to
> reinspect the Unit prior to the rescheduled closing date of May 11, 2009.
> After a reinspection and determination whether the Building and Unit are
> habitable, we will advise you whether we find the rescheduled closing date
> to be valid.

(DX 37.)  Cohen's letter reflected an equivocal commitment to close on May 11 if, after a

"reinspection" of the Suite, Campbell found it satisfactory.

Canter responded to Cohen's letter by letter dated April 28, 2009. (PX 13.)

Canter wrote that because Campbell "had an opportunity to inspect the Suite prior to the duly

scheduled closing date and . . . executed an inspection statement, [she] has no further right to

inspect the Suite prior to Closing." (PX 13.)  Canter also stated that Campbell had "no right . . .

to impose on Sponsor any unilateral 'determination whether the Building and Unit are

habitable.'" (PX 13.)  Because Cohen's April 24 letter reasonably may be read as a demand for

more than simply the opportunity to confirm that the heat, hot water, and air conditioning had

been activated and major Inspection Statement items completed, Canter did not act in bad faith in rejecting Cohen's demand for a "reinspection," which was a right Campbell did not expressly have under the Purchase Agreement. But Canter's refusal to allow Campbell back into the Suite before a closing certainly reflected poor judgment, and would understandably raise an alarm in any purchaser's mind.

Cohen discussed Canter's April 28 letter with Campbell on April 29. (See Tr. 62, 64-65.) Campbell testified that she decided not to purchase the Suite at the Mark Hotel after learning of Canter's April 28 letter, and not before. (Tr. 181.) But two days earlier, Campbell sent an e-mail to Cohen about another Manhattan apartment, stating, "After we review the Plan, and all is as good as it seems right now, I would like to go ahead with 57 Irving." (DX 98 at P00534.) Neither Campbell nor Cohen responded to Canter's April 28 letter.

For transactional lawyers in the business of closing deals, Canter and Cohen acted myopically. At trial, Cohen contended that Canter's conduct would have rendered further efforts to revisit the Suite "fruitless," (Tr. 400), while Canter retorted that Cohen's conduct would have rendered efforts to set a mutually agreeable closing date a "futile act." (Tr. 769.) In comparison to a three year gauntlet of litigation—including a motion to dismiss, 150,000 pages of document discovery, sixteen depositions, expert discovery, dueling motions for summary judgment, and a full trial—a simple phone call to the other party's attorney would seem anything but futile, even if the attorney initiating the call thought it would be fruitless.

VII.     Further Developments

On May 8, 2009, Cohen submitted to the New York Attorney General on Campbell's behalf an application for a determination on the disposition of the down payment. (See DX 44.)

Campbell did not close on May 11, 2009.  Accordingly, Sponsor sent her a letter stating that she was in default and notifying her of her right to cure within thirty days. (DX 46.) When Campbell did not close within thirty days, Sponsor declared the Purchase Agreement terminated. (PX 34.)

Between April 28 and May 20, 2009, Campbell was not asked to return to the Mark Hotel to see the Suite. (Tr. 75, 396-97.)

On May 20, 2009, Campbell signed a contract to purchase an apartment at 15 Central Park West for $17.5 million. (DX 115.)  She closed on that apartment in July 2009. (Tr. 70-71.)

Sponsor closed on two suites in late April 2009. (Tr. 687.)  The Offering Plan became stale as of December 31, 2009. (Tr. 687-88.)  In February 2012, Sponsor filed an amendment to the Offering Plan and has since endeavored to sell nine of the remaining suites, including Suite 1402, at reduced prices. (Tr. 688.)  To date, Sponsor has been unsuccessful in selling any of the remaining suites. (Tr. 688.)

## CONCLUSIONS OF LAW

### I. Jurisdiction

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

### II. Campbell's Obligation to Close

Campbell's obligation to close arose by April 16, 2009. The Purchase Agreement is clear that the DOB's issuance of a TCO triggered Campbell's obligation to close unless there were conditions of incomplete construction or decoration outside the Suite preventing Campbell's occupancy of the Suite. The DOB issued a TCO on April 13, 2009, and there were no conditions preventing Campbell's occupancy of the Suite at the time of her inspection. The proper construction of systems for heat, air conditioning, and hot water was a prerequisite to the DOB issuing a TCO, and those systems in fact were properly constructed and completed on the date of Campbell's inspection. Further, Sponsor could have obtained gas service prior to April 21 had Campbell wished to move into the Suite. And while the elevators were not operating in ordinary service mode at the time of the inspection, they had been approved for use by the DOB; they otherwise functioned normally; and the possibility that they would be taken out of ordinary service mode during construction was disclosed in the Offering Plan.

Campbell argues that this Court's decision denying Sponsor's motion to dismiss compels judgment in her favor because the evidence at trial showed that her allegations of a lack of heat, hot water, air conditioning, and cooking gas were true. See Campbell v. Mark Hotel Sponsor LLC, No. 09 Civ. 9644 (WHP), 2010 WL 3466020, at \*5 (S.D.N.Y. Sept. 3, 2010) ("[T]he plain language of the contract indicates that the Co-Op Sponsor did not intend to sell, and Campbell did not intend to close on, a Suite which was uninhabitable. Given the

-19-

deficiencies Campbell alleges, her Suite was unfit for occupancy at the time the Co-Op Sponsor wanted to close, irrespective of the Department of Buildings' 'analysis.'"). But the inferences plausibly drawn from the bare allegations in the complaint cannot override the conclusion derived from a full trial record—that the absence of heat, hot water, and air conditioning on April 15 did not prevent Campbell's occupancy of the Suite because the relevant systems were completely and properly constructed, heat and air conditioning in fact were available, and gas service credibly could have been activated within Con Edison's next eight hour shift. Accordingly, none of the conditions outside the Suite excused Campbell's obligation to close on the issuance of a TCO. The Purchase Agreement is also clear that incomplete work on Inspection Statement items does not excuse or delay Campbell's obligation to close. Campbell's complaints about the Suite fall squarely in that category.

Campbell argues that she was not obligated to close because Sponsor materially breached the Purchase Agreement by refusing to allow a second inspection. Campbell contends that the April 15 inspection was inadequate because the Suite was not "ready for inspection" that day. But the phrase "ready for inspection" is not a term of art or a technical term, and it most reasonably refers to a time when Sponsor is willing to show a suite after the DOB issues a TCO. Campbell argues that a suite is only "ready for inspection" if there are no conditions preventing occupancy. But even under that interpretation, the Suite was ready for inspection on April 15. Accordingly, Sponsor satisfied its obligation to allow Campbell to inspect the Suite prior to closing.

Campbell also argues that the doctrine of caveat emptor entitled her to a second inspection because otherwise she risked accepting the Suite subject to the incomplete conditions

-20-

observed at the inspection. Under New York law, the "buyer has the duty to satisfy [her]self as to the quality of the bargain pursuant to the doctrine [of] caveat emptor, which in New York State still applies to real estate transactions." Loudon v. Courduff, 529 N.Y.S.2d 874, 875 (2d Dep't 1988). But contracting parties are free to agree otherwise. See Dunlop Dev. Corp. v. Spitzer, 810 N.Y.S.2d 28, 29 (1st Dep't 2006). And that is precisely what happened here. Under the Purchase Agreement and Offering Plan, Sponsor agreed to address Inspection Statement items after the closing, and its obligation to fix those items therefore would have survived the closing. Accordingly, Campbell would not have been left without closet rods, glass shower enclosures, and secure bathroom fittings by closing before such problems were remedied.

Further, New York law requires the Mark Hotel building to provide heat, hot water, and elevator service, see N.Y. Mult. Dwell. Law §§ 4(4), 51, 75, 79, and the Offering Plan provided that the "Hotel Owner . . . will be responsible for ensuring that the mechanical equipment is operated in accordance with Law." (Offering Plan 000136.) Given that the relevant systems were properly constructed and completed on the date of the inspection, Campbell was not at risk of accepting a suite that lacked these basic services.

Campbell next argues that Sponsor's refusal to allow a second inspection is not consistent with the conduct of a party acting in good faith. But, on April 16, Sponsor asked Campbell to return to the Suite the following week. Campbell declined this invitation because, in her attorney's opinion, it would have taken weeks to complete all the Inspection Statement items. However, the only conditions arguably preventing her obligation to close were addressed by April 21, when Con Edison activated gas service. Further, Cohen's April 24 letter demanding a "reinspection and determination whether the Building and Unit are habitable," (DX 37),

-21-

reasonably may be read as demanding more than just the opportunity to see that the utilities had been activated.  Accordingly, Canter's April 28 letter declining to allow Campbell a second inspection was not in bad faith.  But it was ill-advised and short-sighted.  A little common sense on Sponsor's part might have gone a long way to avert this dispute.

Finally, Campbell argues—for the first time in her response to Sponsor's proposed findings of fact and conclusions of law—that the inspection was invalid because Sponsor failed to give proper notice.  Campbell asserts that Sponsor notified her in writing that the Suite was ready for inspection six days before the closing, rather than one week before the closing, as the Purchase Agreement requires. (See Purchase Agreement § 17, at P00023.)  But even assuming this constituted a breach, it was minor and did not render Campbell's inspection inadequate.  Moreover, if Campbell truly had been concerned about the notice, she could have demanded strict compliance with the requirement while the contract was still in effect. (See Purchase Agreement § 29, at P00027 (section titled "Strict Compliance").)  Campbell's attempt to raise this issue for the first time after trial is unavailing.

Because all prerequisites to closing were satisfied by April 16, Campbell breached the Purchase Agreement by failing to close.  Accordingly, Sponsor is entitled to retain her down payment and any accrued interest as liquidated damages.

III. Repudiation

Even if Campbell's obligation to close were not triggered on April 16, Campbell repudiated the Purchase Agreement on April 21 by demanding the return of her down payment. "A claim of anticipatory repudiation must be supported by evidence of an unqualified and clear refusal to perform with respect to the entire contract." Joseph P. Carrara & Sons, Inc. v. A.R.

Mack Constr. Co., 931 N.Y.S.2d 813, 813 (3d Dep't 2011) (citations omitted). "It is well established that such a refusal may take the form of an unequivocal statement of intent to perform only upon the satisfaction of extracontractual conditions." Joseph P. Carrara & Sons, Inc., 931 N.Y.S.2d at 813 (citations omitted); see also REA Express, Inc. v. Interway Corp., 538 F.2d 953, 955 (2d Cir. 1976) ("Under New York law, insistence upon terms which are not contained in a contract constitutes an anticipatory repudiation thereof." (citations omitted)).

Here, Campbell demanded the return of her down payment because Sponsor would not agree to an extracontractual concession—i.e., delaying the closing until after the hotel opened. Campbell's demand was not conditioned on Sponsor's declaring her in default and expressed a clear refusal to perform the contract. See Benalaya v. Campbell, 612 N.Y.S.2d 234, 235-36 (2d Dep't 1994) (purchasers repudiated contract where they demanded the return of their down payment and refused to set a closing date). Accordingly, Campbell repudiated the agreement on April 21, and Sponsor was excused from further performance. See Phillips P.R. Core, Inc. v. Tradax Petroleum Ltd., 782 F.2d 314, 321-22 (2d Cir. 1985).

Campbell argues that Sponsor is barred from treating the April 21 letter as a repudiation because Canter's April 23 letter offered to "disregard" the "posturing and preposterous demand reflected in" Campbell's letter. (PX 32.) She relies on cases such as Bigda v. Fischbach Corp., 898 F. Supp. 1004 (S.D.N.Y. 1995), where the court explained that "[w]hen a party materially breaches a contract, the non-breaching party must choose between two remedies—he can elect to terminate the contract and recover liquidated damages or he can continue the contract and recover damages solely for the breach." 898 F. Supp. at 1013, aff'd, 101 F.2d 108 (2d Cir. 1996). Under New York law, however, sales of cooperative apartments

-23-

are governed by UCC Article 2. <u>Friedman v. Sommer</u>, 471 N.E.2d 139, 140 (N.Y. 1984).  And

New York's UCC "rejects any doctrine of election of remedy as a fundamental policy and thus

the remedies are essentially cumulative in nature and include all of the available remedies for

breach.  Whether the pursuit of one remedy bars another depends entirely on the facts of the

individual case." N.Y. U.C.C. § 2-703 cmt. 1; <u>see also</u> N.Y. U.C.C. § 2-610(b) (upon

repudiation, the aggrieved party may "resort to any remedy for breach . . . even though he has

notified the repudiating party that he would await the latter's performance and has urged

retraction").

        Here, Canter's April 23 letter is an effort to urge Campbell to retract her

repudiation and close on the Suite.  The letter described the progress made on the Suite, offered

to "disregard" Campbell's "preposterous demand," and adjourned the closing date as "a final

good faith effort" to ensure a closing.  It also reserved all of Sponsor's rights, stating, "Sponsor

at all times reserves all of its rights, remedies and privileges, and waives nothing." (PX 32.)

Accordingly, the letter did not prejudice Sponsor's ability to treat Campbell's April 21 letter as a

repudiation. <u>See</u> N.Y. U.C.C. §§ 2-703, 2-610(b); <u>see also</u> N.Y. U.C.C. § 1-207 ("A party who

with explicit reservation of rights performs or promises performance or assents to performance in

a manner demanded or offered by the other party does not thereby prejudice the rights reserved.

Such words as 'without prejudice', 'under protest' or the like are sufficient.").  And this is not a

case where the facts warrant a conclusion that Sponsor's "pursuit of one remedy bars another."

N.Y. U.C.C. § 2-703 cmt. 1; <u>cf.</u> <u>Cities Serv. Helex, Inc. v. United States</u>, 534 F.2d 1306, 1317

(Ct. Cl. 1976) ("That the U.C.C. generally makes remedies cumulative and advocates flexibility

in order to make the injured party whole does not mean that it sanctions the injured party's

-24-

pursuit of one course (continuation of the contract) for years, and then a complete turnabout (cancellation) when the initial course proves only partially beneficial."). Under these circumstances, Sponsor did not relinquish the right to treat Campbell's April 21 letter as a repudiation.

Further, Cohen's April 24 letter did not retract Campbell's repudiation. "Retraction may be by any method which clearly indicates to the aggrieved party that the repudiating party intends to perform." N.Y. U.C.C. § 2-611(2); see also Argonaut P'ship v. Grupo Sidek, S.A. de C.V., No. 96 Civ. 1967 (MBM), 1996 WL 617335, at *6 (S.D.N.Y. Oct. 25, 1996). Cohen's April 24 letter was equivocal about Campbell's intent and thus did not clearly indicate that she intended to perform.

IV. Adequate Assurances

Campbell argues that Sponsor repudiated the Purchase Agreement by refusing to provide adequate assurances of Sponsor's financial condition. Under New York law, "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party [to a contract,] the other may in writing demand adequate assurance of due performance." N.Y. U.C.C. § 2-609(1). A party's demand for assurances is reasonable where "there [is] an objective factual basis for the insecurity, rather than a purely subjective fear that the party will not perform." Enron Power Mktg., Inc. v. Nev. Power Co., Nos. 01-16034 (AJG), 03 Civ. 9318 (BSJ), 03 Civ. 9332 (BSJ), 2004 WL 2290486, at *3 (S.D.N.Y. Oct. 12, 2004). Where a demand for assurances is justified, failure to provide adequate assurances is a repudiation of the contract. N.Y. U.C.C. § 2-609(4).

Here, the Offering Plan required Sponsor "to complete the construction of the Co-op Property." (Offering Plan 000134.) Campbell contends that she had reasonable grounds for insecurity about Sponsor's financial ability to meet this obligation because of the delay in declaring the Offering Plan effective, the small number of suites under contract, the condition of the building and the Suite on the date of the inspection, the state of the economy in April 2009, and Sponsor's obligation to close on a Suite prior to May 1, 2009 or offer rescission to all purchasers. But the Suite and the building were substantially complete during her inspection, and almost all of the other circumstances Campbell indentified were entirely consistent with the Purchase Agreement and the Offering Plan. Ultimately, Campbell fails to explain how the existence of contractually contemplated circumstances justifies her demand for financial assurances from Sponsor. Cf. Petroieo Brasileiro S.A., Petrobras v. 1BE Group, Inc., No. 93 Civ. 3305 (TPG), 1995 WL 326502, at *6 (S.D.N.Y. May 31, 1995) ("[U]nder § 2-609 a request must seek assurance of the performance agreed upon in the contract, not performance under new terms." (quoting Joqueviel & Cathala v. Eastern Training Co., No. 87 Civ. 0748, 1989 WL 119440, at *4 (E.D.N.Y. Sept. 28, 1989))). Accordingly, Campbell did not have reasonable grounds for insecurity with respect to Sponsor's performance under the Purchase Agreement.

In any event, Sponsor provided adequate assurances during the April 21 conference call. "There is no absolute definition of adequate assurances; rather, the adequacy depends on the circumstances." Enron Power Mktg., 2004 WL 2290486, at *5. Here, except for a deepening recession, the "circumstances" when Campbell demanded assurances were precisely the circumstances bargained for in the Purchase Agreement. Accordingly, Sponsor's assurances that work had been and would continue to be done on the Suite, along with its assurances that the

hotel would open and that suite owners' rights would be protected by the subordination agreements were adequate. Therefore, Campbell's claim is without merit.

V. Legal Fees

Campbell argues that despite the clear language of the Purchase Agreement, the Offering Plan excuses her from paying Sponsor's legal fees. (See Offering Plan 000083 ("Purchasers shall not be obligated to pay any legal or other expense of Sponsor in connection with the establishment, maintenance or defense of obligations arising from the handling or disposition of trust funds.").) That provision of the Offering Plan is inapplicable here. The provision on which Campbell relies is contained in a section of the Offering Plan outlining the administrative responsibilities of Sponsor and its Escrow Agent in handling purchasers' down payments. This lawsuit has nothing to do with those responsibilities. Indeed, Campbell does not contend that Sponsor or its Escrow Agent violated any of those responsibilities, and Campbell's deposit properly has remained in escrow pending the outcome of this litigation, as required by that section of the Offering Plan. (See Offering Plan 000082 ("Escrow Agent shall continue to hold the deposit and any interest earned thereon until: . . . a judgment or order of a court of competent jurisdiction is served on the Escrow Agent . . .").)

Campbell also contends that Sponsor is not entitled to legal fees because Sponsor cancelled the agreement after Campbell defaulted. But the onerous provision of the Purchase Agreement is clear: Campbell's obligation to pay Sponsor's legal fees "shall survive closing of title or the termination of this Agreement." (Purchase Agreement § 34, at P00029.) Accordingly, Campbell is liable for Sponsor's reasonable legal fees.

While the parties' lopsided contract dictates that Sponsor is entitled to the down payment as liquidated damages, both parties share some blame for the unraveling of this transaction.  Accordingly, this Court will closely scrutinize any fee application by Sponsor.  The parties are encouraged to exercise some common sense and resolve the question of legal fees forthwith.

CONCLUSION

For the foregoing reasons, Sponsor is entitled to Campbell's $4,687,500 down payment together with any accrued interest and reasonable legal fees.  In the absence of an agreement with Campbell, Sponsor is directed to submit any application for reasonable legal fees in accordance with Federal Rule of Civil Procedure 54(d) by August 27, 2012.  Campbell shall submit any response by August 31, 2012.

Dated:  August 20, 2012
        New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Amos Alter, Esq.
11 Riverside Drive
2NW
New York, NY 10023
*Counsel for Plaintiff*

Jeffrey Louis Braun
Kramer, Levin, Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, NY 10036
*Counsel for Defendant*

-28-